UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MACK ESCHER; GUN OWNERS' ACTION LEAGUE; COMMONWEALTH SECOND AMENDMENT; FIREARMS POLICY COALITION, INC.; SECOND AMENDMENT FOUNDATION; NATIONAL RIFLE ASSOCIATION OF AMERICA; and GUN OWNERS OF AMERICA, INC.<br><br>Plaintiffs,<br><br>v.<br><br>COLONEL GEOFFREY NOBLE, in his official capacity as Superintendent of the Massachusetts State Police and of the Commonwealth of Massachusetts; JAMIE GAGNON, in his official capacity as the Commissioner of the Department of Criminal Justice Information Services; and HEATH J. ELDREDGE, in his official capacity as the Chief of Police of Brewster, Massachusetts,<br><br>Defendants. | CIVIL ACTION<br>No. 1:25-cv-10389-GAO |

**<u>MEMORANDUM IN SUPPORT OF</u>**
**<u>STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

I. BACKGROUND ........ 2

A. Massachusetts's Age Restrictions on Firearms........ 2

B. The Parties. ........ 3

II. STANDARD OF REVIEW ........ 3

III. ARGUMENT ........ 4

A. The Second Amendment Permits Firearms Regulation that is Consistent with the Principles Underpinning our Nation's Traditions. ........ 4

B. Our Nation's Historical Tradition Has Always Included Restrictions on Access to Firearms by Individuals Under 21. ........ 5

1. During the Founding Era, Individuals Under the Age of 21 were Functionally Barred from Purchasing Firearms. ........ 7

a. The Infancy Doctrine Limited the Ability of Persons Under the Age of 21 to Purchase Goods, Including Firearms. ........ 7

b. Founding-Era Militia Laws Further Evince the Restrictions on Minors' Ability to Procure Firearms. ........ 10

c. University Restrictions Further Accord with the Founding-Era Tradition of Limiting Minors' Firearm Access. ........ 12

2. During the Reconstruction Era, States Enacted Relevantly Similar Age Restrictions on Firearm Access in Response to a Surge of Youth Violence. ........ 13

a. Changes in Society and Technology from the Founding Era to Reconstruction Resulted in a New Societal Problem. ........ 13

b. In Response, Many States Placed Age Restrictions on Firearm Purchases, Transfers, Carry, and Possession. ........ 15

C. These Historical Traditions from the Founding through Reconstruction Are Relevantly Similar to the Challenged Massachusetts Age Restrictions. ........ 17

IV. CONCLUSION ........ 20

Massachusetts, like 20 other states and the federal government, places careful restrictions on firearm access by individuals under the age of 21. Those restrictions are not complete bans. For example, as early as age 15, a Massachusetts minor can, with parental consent, obtain a license to purchase and carry a non-semiautomatic rifle or shotgun. And even younger minors can, with appropriate supervision, engage in hunting, shooting sports, and other firearms recreation. However, a Massachusetts resident may not lawfully purchase or possess handguns or semiautomatic rifles until age 21. As with laws concerning alcohol consumption and myriad other dangerous activities, that restriction follows from the common-sense understanding—and scientifically proven fact—that minors under 21 lack the mature judgment of older adults. Plaintiffs' challenge to these restrictions under the Second Amendment should be rejected because Massachusetts's restrictions accord with a longstanding American tradition of laws that constrained minors' ability to purchase and possess firearms until they reached the age of 21.

Indeed, at the Founding, persons under 21 were considered "infants" in the eyes of the law, which meant they could not create legally binding contracts for the purchase of goods. That inability extended to the purchase of firearms. As a result, Founding-era militia laws presumed that 18-year-old members would depend on their parents or the town to supply weapons required for service. And no court rulings or other pervasive objections from the Founding era suggested that the Second Amendment entitled such minors to legally unfettered firearm access. Thus, from the nation's beginning, there was an established understanding that legal regulations may burden firearm access by minors under the age of 21, without infringing Second Amendment rights.

In the nineteenth century, that tradition became only more entrenched and pronounced. As the result of social and technological changes, minors enjoyed new practical routes around the legal constraints that previously prevented them from obtaining firearms of their own accord.

States, recognizing a new legal problem, widely enacted laws specifically prohibiting the purchase, transfer, carry, and possession of certain firearms by persons under the age of 21.

Because Massachusetts's firearm age restrictions accord with historical tradition, and thus do not violate the Second Amendment, summary judgment should enter in Defendants' favor.

## I. BACKGROUND

### A. Massachusetts's Age Restrictions on Firearms.

Under Massachusetts law, individuals may possess, purchase, and carry firearms with either a firearm identification ("FID") card or a license to carry ("LTC"). An LTC holder may purchase, rent, lease, borrow, possess and carry any legal firearm.[1] Mass. Gen. Laws c. 140, § 131. An FID card entitles the holder to purchase, transfer, possess and carry (as otherwise permitted by law) non-large capacity, non-semiautomatic rifles and shotguns. *Id.* § 129B(c). Individuals must be aged 21 or older to apply for an LTC. *Id.* § 131(d). Individuals aged 18 or older, as well as those aged 15 to 17 who have parental consent, are eligible for an FID card. *Id.* § 129B(a). Individuals apply for FID cards or LTCs from their local licensing authority. *Id.* §§ 129B(a), 131(d).

In addition, individuals under the age of 21 can undertake certain firearms-related activities in Massachusetts with appropriate supervision. *See* Mass. Gen. Laws c. 140, § 129C. Among these, an individual who holds a Massachusetts firearms license or an on-duty military member "may furnish a minor or person under 21 years of age with a firearm and ammunition for hunting, instruction, recreation and participation in shooting sports." *Id.* § 129C(g); *see also id.* § 129B(c) (noting individual who holds an FID card may use "other firearm[s]" besides non-large capacity, non-semiautomatic rifles and shotguns "under the direct supervision of a holder of a license to carry firearms at an incorporated shooting club or a licensed shooting range"). Possession,

[1] A "firearm" is defined in Massachusetts law to include handguns, rifles, and shotguns, and certain other weapons, unless otherwise specifically noted. Mass. Gen. Laws c. 140, § 121.

purchase, or carry of a firearm without proper licensure and where no exception applies is punishable by imprisonment. Mass. Gen. Laws c. 269, § 10(a).

### B. The Parties.

Plaintiff Mack Escher is 20 years old, holds a valid FID card, and alleges he would seek to possess a handgun and a semiautomatic rifle prior to turning 21 absent the challenged laws. Ex. A (Int. Nos. 1 & 2); SOF ¶ 1.[2] Mr. Escher is a member of each of the six organizational plaintiffs, although his membership in Gun Owners of America was not recorded until July 16, 2025, after this suit was filed. Ex. A (Int. No. 1); Ex. B (Admission No. 1); SOF ¶ 2.

The defendants are named in their official capacities only. Chief of Police Eldrege is the local licensing authority in Brewster, where Mr. Escher resides. SOF ¶ 3. The two state defendants, Superintendent Noble and Commissioner Gagnon, each play a role in firearms licensing. Commissioner Gagnon oversees the Department of Criminal Justice Information Services in its role of informing licensing authorities of conditions that disqualify an applicant for a firearms license, as provided in Mass. Gen. Laws c. 140, § 121F. Superintendent Noble oversees the Massachusetts State Police and, in that capacity, advises licensing authorities of "any disqualifying criminal record" or any "reason to believe that [an] applicant is disqualified from possessing the permit, card or license requested." *Id.* § 121F(c)–(d).

## II. STANDARD OF REVIEW

Summary judgment is proper when there is no genuine dispute of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Where parties cross-move, the court "review[s] each party's motion independently, viewing the facts and drawing inferences

---

[2] Exhibits to the Affidavit of Grace Gohlke, filed with this memorandum, are referenced herein as "Ex. X." The Addendum to this memorandum, cited herein as "ADD[page number]," includes various historical sources and historical laws cited within this memorandum or in expert reports attached as exhibits.

as required by the applicable standard[.]" *Gibson Found., Inc. v. Norris*, 88 F.4th 1, 6 (1st Cir. 2023). Here, the undisputed record shows Defendants are entitled to judgment as a matter of law.

## III. ARGUMENT

### A. The Second Amendment Permits Firearms Regulation that is Consistent with the Principles Underpinning our Nation's Traditions.

The Second Amendment provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Amendment secures a preexisting right that is "exercised individually and belongs to all Americans," *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008), and is incorporated as to the States, *McDonald v. City of Chicago*, 561 U.S 742, 791 (2010).

"Like most rights, the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626. "From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 21 (2022) (quoting *Heller*, 554 U.S. at 626). Since the Founding, American law has regulated arms-bearing conduct in many ways: from prohibitions on "gun use by drunken New Year's Eve revelers" to bans on "dangerous and unusual weapons" to restrictions on concealed carry. *United States v. Rahimi*, 602 U.S. 680, 691 (2024) (quoting *Heller*, 554 U.S. at 626–27).

Following the Supreme Court's decisions in *Bruen* and *Rahimi*, Second Amendment challenges involve two inquiries. *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 43 (1st Cir. 2024), *cert. denied*, 145 S. Ct. 2771 (2005). First, courts ask whether the Second Amendment's "plain text covers an individual's conduct." *Bruen*, 597 U.S. at 17. Second, if it does, courts ask if the government has met its burden to show the restriction nevertheless "is consistent with the principles that underpin our regulatory tradition" of firearms regulation. *Rahimi*, 602 U.S. at 692.

To do so, courts reason by analogy to "ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit[.]" *Id.* (citing *Bruen*, 597 U.S. at 29). This inquiry turns on "[w]hy and how" the regulation burdens the right to keep and bear arms. *Id.* A shared "why"—i.e. whether it addresses the same problem as historical restrictions—is a "strong indicator" that a modern regulation "fall[s] within a permissible category of regulations." *Id.* The "how" inquiry "compar[es] the 'burden on the right of armed self-defense' imposed by the new regulation to the burden imposed by historical regulations." *Ocean State*, 95 F.4th at 44–45.

This analysis does not demand a "historical twin" or a "dead ringer" to modern regulations. *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 30). Indeed, *Rahimi* cautioned that "some courts have misunderstood the methodology" laid out in *Bruen* by insisting on "a law trapped in amber." *Id.* at 691. Properly understood, the Second Amendment "permits more than just those regulations identical to ones" in our nation's early history. *Id.* at 692. As a result, a regulation need "not precisely match its historical precursors." *Id.* Instead, a modern law will "pass constitutional muster" if it is "analogous enough" to those precursors to "comport with the principles underlying the Second Amendment." *Id.* (quoting *Bruen*, 597 U.S. at 30). To require that a modern law perfectly match a historic law erroneously "assumes that founding-era legislatures maximally exercised their power to regulate." *Id.* at 739–40 (Barrett, J., concurring). The Constitution does not impose such a "'use it or lose it' view of legislative authority." *Id.*

### B. Our Nation's Historical Tradition Has Always Included Restrictions on Access to Firearms by Individuals Under 21.

Massachusetts's common-sense age-restrictions related to firearms are "consistent with the principles that underpin our regulatory tradition" of firearms regulation. *Rahimi*, 602 U.S. at 692.[3]

[3] For purposes of this motion, the State Defendants assume without conceding that the Second Amendment's plain text covers the conduct regulated by the challenged law, and thus, the Court need not address the first step of the *Bruen* analysis to enter judgment for Defendants.

At the Founding, persons under the age of 21 were prohibited from purchasing firearms due to legal limitations governing the conduct of minors, such as common law rules curtailing minors' ability to enter contracts, that made it functionally impossible for minors to buy guns. Those broader constraints made it unnecessary for Founding-era state governments to enact specific legislation concerning minors' access to firearms. Moreover, although courts recognized certain exceptions to those legal constraints to help minors get through day-to-day life (e.g., allowing minors to enter contracts for necessities like food), courts did not extend those exceptions to firearms. Accordingly, at the Founding, it was widely understood that the Second Amendment did not shield persons under the age of 21 from age-based firearm restrictions. That understanding is bolstered by Founding-era militia laws and university rules, which reflect presumptions that minors under age 21 lack any legal right to purchase firearms for themselves.

By Reconstruction, that Founding-era understanding manifested in the form of express restrictions on minors' access to firearms—restrictions that became necessary as social changes enabled new avenues for minors to buy guns that had not existed at the Founding. Indeed, the Reconstruction era reflects numerous direct prohibitions on purchase, transfer, and possession of firearms by persons under the age of 21. Those firearm prohibitions, like broader Founding-era legal constraints on minors, were impelled by the understanding that persons under the age of 21 lacked the experience and judgment to use firearms safely without adequate supervision.

Thus, from the Founding through Reconstruction, history reflects a robust tradition of legally restricting firearm access by minors under the age of 21, predicated on the notion that those minors are not yet mature enough for unfettered firearm access. Massachusetts's laws, which allow persons under the age of 21 to access some firearms with appropriate safeguards, while protecting society from the dangers that unregulated firearm use by minors entail, accord with that tradition.

1. *During the Founding Era, Individuals Under the Age of 21 were Functionally Barred from Purchasing Firearms.*

The Founding-era understanding of the Second Amendment supports Massachusetts's age restrictions: (a) the infancy doctrine, which broadly limited the ability of persons under 21 to purchase goods, demonstrates a tradition of burdening the ability of 18- to 20-year-olds to purchase and thereby possess firearms and rendered unnecessary positive firearm-specific prohibitions targeting minors; (b) Founding-era militia laws, which presumed that militia members under the age of 21 would rely on their parents to obtain firearms, provide further evidence of that tradition; and (c) the existence of that Founding-era tradition is confirmed by university regulations from the 1700s and early 1800s, which routinely prohibited minors from possessing and carrying firearms.

**a. The Infancy Doctrine Limited the Ability of Persons Under the Age of 21 to Purchase Goods, Including Firearms.**

Founding-era state law books may not reflect specific legislation targeting firearm access by minors. But that is not because minors enjoyed a legal right to purchase firearms. On the contrary, persons under the age of 21 were so constrained by broader legal doctrines that it was functionally impossible for them to purchase firearms, which made it unnecessary for states to specifically prohibit minors from purchasing or using firearms.

More specifically, as multiple courts have recognized in rejecting Second Amendment claims like those asserted here, "[a]t the Founding, a person was an 'infant[]' or a 'minor[]' in the eyes of the law until age 21." *Nat'l Rifle Ass'n v. Bondi*, 133 F.4th 1108, 1117 (11th Cir. 2025) (en banc), *cert. petition pending* (24-1185) (quoting 1 ZEPHANIAH SWIFT, A SYSTEM OF THE LAWS OF THE STATE OF CONNECTICUT 213 (1795) [hereinafter "1 SWIFT"]); *see also McCoy v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 140 F.4th 568, 575–76 (4th Cir. 2025), *cert petition pending* (25-24) (same); *Rocky Mt. Gun Owners v. Polis*, 121 F.4th 96, 124–25 (10th Cir. 2024) (same); *Chavez v. Bonta*, 773 F. Supp. 3d 1028, 1040 (S.D. Cal. 2025) (same); Ex. C (Expert

Report of Saul Cornell) ¶¶ 18–29 ["Cornell"]; Ex. D (Expert Report of Holly Brewer) ¶¶ 16–30 ["Brewer"]. That Founding-era legal custom found its roots in the English common law, which "set the age of majority at 21 years of age because of the relative lack of maturity and judgment of younger individuals." *Bondi*, 133 F.4th at 1117; *McCoy*, 140 F.4th at 575 ("Like many common law principles, the infancy doctrine made its way across the Atlantic, and early American courts routinely applied it."). According to the "English view[,] . . . a child does not 'arriv[e] at years of discretion' until that age." *Bondi*, 133 F.4th at 1117 (quoting 1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND *453 (George Sharswood ed., 1893)). And "[t]he Founders' generation shared [that] view that minors lacked the reason and judgment necessary to be trusted with legal rights." *Id.* (summarizing views of Gouverneur Morris, Thomas Jefferson, and John Adams).

The infant legal status of persons under the age of 21 carried with it a wide array of legal disabilities, which placed minors under strict control of their parents. For example, "[m]inors could not sue to vindicate their rights without joining their guardians or some other 'next friend.'" *Bondi*, 133 F.4th at 1117 (quoting 1 BLACKSTONE, COMMENTARIES *464). Children were also prohibited from "enlist[ing] in the military without parental consent." *Id.* (citing Act of March 16, 1802, 2 Stat. 132, 135). Parents even "controlled children's access to information, including books," and had the right to "receive[] the profits of their children's labor." *Id.* (cleaned up). And, particularly important for this case, "minors generally lacked the capacity to contract . . . and to purchase goods on account." *Id.* at 1118 (citing 1 BLACKSTONE, COMMENTARIES *465; William Macpherson, TREATISE ON THE LAW RELATING TO INFANTS 303 (1843)); *see also McCoy*, 140 F.4th at 575–76 (same); *Pool v. Pratt*, 1 D. Chip. 252, 253 (Vt. July 1814) ("It is an ancient doctrine, as old as the common law, that an infant shall not, in general be bound by his contract[.]"); Cornell ¶¶ 30–36

(“One of the most significant legal disabilities imposed on minors was a limit on their ability to make binding legal contracts.”). Thus, “[a]s a ‘general rule,’ contracts for the purchase of ‘personal property’ involving minors were ‘voidable.’” *Bondi*, 133 F.4th at 1118 (quoting 1 SWIFT at 215). The rationale for this limitation was to “secure[] [minors] from hurting themselves by their own improvident acts.” *Id.* (quoting 1 BLACKSTONE, COMMENTARIES *464).

This inability to contract “impeded minors from acquiring firearms during the Founding era.” *Bondi*, 133 F.4th at 1118. At the Founding, America was a “cash-poor economy in which most economic transactions involved credit of some form.” Cornell ¶ 35; *see also* Brewer ¶ 49 (“[Y]oung men [at the Founding] did not have the ready cash to purchase expensive items like firearms.”); *Bondi*, 133 F.4th at 1118 (“The purchase of goods, including firearms, required the ability to contract because people often bought goods on credit.”); *McCoy*, 140 F.4th at 576 (“[C]oin was scarce during the founding era . . . .”). And “even if an infant had enough coin to buy a gun, merchants would have been unwilling to sell because they bore the risk that the minor would rescind the transaction and be entitled to a full refund under the infancy contract doctrine.” *McCoy*, 140 F.4th at 576; *see also, e.g.*, *Riley v. Mallory*, 33 Conn. 201, 206–09 (Conn. 1866) (ordering merchant to refund minor’s funds for purchase of firearm after minor sought to void his contract).

Tellingly, although this contractual principle admitted exceptions to help minors obtain certain practical necessities, those exceptions did not yield to any supposed right of 18- to 20-year-olds to possess or purchase firearms—because none existed. That is, notwithstanding the general rule, “a minor could ‘bind himself by his contract for necessaries’”—e.g., “‘for diet[,] apparel, education, and lodging.’” *Bondi*, 133 F.4th at 1118 (quoting 1 SWIFT at 216); *see also* Cornell ¶ 30 (“[T]he common law recognized an exception to the general prohibition on minors contracting for a narrow range of necessities[,] . . . [including] ‘meat, drink, apparel, [and] physic [medicine].’”

(quoting 1 BLACKSTONE, COMMENTARIES *454)); Brewer ¶¶ 24–30 (similar). Firearms, however, were not necessities encompassed by that exception. *Bondi*, 133 F.4th at 1118 ("Importantly, 'liquor, pistols, powder, saddles, bridles, [and] whips' were *not* necessaries.") (emphasis in original) (quoting *Saunders Glover & Co. v. Ott's Adm'r*, 12 S.C.L. 572, 572 (S.C. Const. App. 1822)); *McCoy*, 140 F.4th at 576 ("There is no evidence that the [necessities] exception was ever extended to firearms."); Brewer ¶ 29 (similar); Cornell ¶ 34 (similar); *McKanna v. Merry*, 61 Ill. 177, 179 (1871) ("The courts have generally excluded from the term 'necessaries,' horses, saddles, bridles, *pistols*, liquors, fiddles, chronometers, etc." (emphasis added)).

Accordingly, the "legal treatment of minors at the Founding" demonstrates that "minors generally could not purchase firearms because they lacked the judgment and discretion to enter contracts and to receive the wages of their labor." *Bondi*, 113 F4th at 1118. These legal constraints at the Founding rendered unnecessary legislative action to proactively restrict the ability of minors to purchase, carry, or possess firearms without supervision, while also demonstrating that the Second Amendment has always coexisted with restrictions on firearm access by minors.

**b. Founding-Era Militia Laws Further Evince the Restrictions on Minors' Ability to Procure Firearms.**

Notwithstanding the legal constraints on minors' access to firearms at the Founding, Plaintiffs erroneously point to Founding-era militia laws to demonstrate the existence of the rights they seek. *See* Compl. ¶ 29. According to those arguments, Founding-era militia laws required men over the age of 18 to enroll in militias, and that compulsory militia service supposedly demonstrates that "eighteen-to-twenty-year-olds enjoyed the same Second Amendment rights as their twenty-one-year-old peers at the founding." *Reese v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 127 F.4th 583, 596 (5th Cir. 2025); *see also McCoy*, 140 F.4th at 577–78 (rejecting similar argument). However, Founding-era militia laws, in fact, demonstrate the opposite: such

laws presumed minors under age 21 would not be able to legally procure firearms without assistance, further demonstrating the Founding-era understanding that minors could be lawfully restricted from purchasing firearms and typically were so restricted. *See, e.g.*, *Bondi*, 133 F.4th at 1119 ("Because of the legal incapacity of individuals under the age of 21, states enacted laws at the Founding to address minors' inability to purchase firearms required for their militia service").

Some states, for instance, altogether exempted minors under the age of 21 from the requirement to bring their own firearms to militia service. *See, e.g.*, ADD14–15, 1792 Pa. Laws 395 ("[Y]oung men under the age of twenty-one . . . shall be exempted from furnishing the necessary arms . . . ."); ADD16–17, 2 LAWS OF THE STATE OF DELAWARE 1135–36 (New Castle, Samuel Adams & John Adams 1797) (Statutes of 1793) (same); *see also* Brewer ¶¶ 31–47.

Many other Founding-era militia laws, insofar as they required minors to enroll and appear for service with a weapon, "depended on parents and guardians to outfit [minor members] with the necessary arms." Cornell ¶ 42. In New Hampshire, for example, the militia laws required that minors "under the care of parents, masters or guardians, shall be furnished by them with [the mandatory] arms and accoutrements." ADD12–13, 1792 N.H. LAWS 447; *see also* Cornell ¶¶ 45–47. Six other states' militia laws, including Massachusetts, maintained similar requirements. *See, e.g.*, ADD18–19, 1793 Mass. Acts 297 ("[A]ll parents, masters and guardians shall furnish those of the laid Militia who shall be under their care and command, with the [required] arms . . . ."); *Bondi*, 133 F.4th at 1119–20 (cataloguing Founding-era militia law requirements, as applied to minors); Brewer ¶¶ 32–35. Both Massachusetts and New Hampshire further provided that where a parent was unable to furnish arms for militia members under 21, such arms would be furnished by the town, but they would remain town property. Brewer ¶ 33, 39.

Twelve other states "implicitly required parents to supply minors with firearms because

those states held parents liable for minors' fines related to militia service, including the failure to obtain a firearm." *Bondi*, 133 F.4th at 1119. In Connecticut, for example, a 1792 law imposed fines on militia members for failing to appear for service armed, but, for members under the age of 21, the law made it the responsibility of their "parents, master[,] or guardians" to pay any fines for failing to appear armed. ADD10–11, 1792 Conn. Spec. Acts 428; *see also* Cornell ¶ 43. Altogether, "[b]y 1826, at least 21 of the 24 states admitted to the Union—representing roughly 89 percent of the population . . . —had enacted laws that placed the onus on parents to provide minors with firearms for militia service." *Bondi*, 133 F.4th at 1120.

These laws constitute widespread acknowledgment that, although minors may have been duty-bound at the Founding to serve in an armed militia, they were not constitutionally shielded from age-based legal restrictions that impeded their ability to obtain arms. Instead, there was a default expectation that minors would not be legally capable of procuring firearms for militia service without the help of their parents.

**c. University Restrictions Further Accord with the Founding-Era Tradition of Limiting Minors' Firearm Access.**

Like militia laws, university regulations from the Founding Era further confirm that minors' access to firearms could be lawfully restricted. At the Founding, universities occupied a special legal status in relation to their students, acting *in loco parentis*, meaning the universities stood "in the place of parents to the students entrusted to their care." *Bondi*, 133 F.4th at 1120 (quoting *The Lingering Legacy of In Loco Parentis: An Historical Survey and Proposal for Reform*, 44 Vand. L. Rev. 1135, 1135–36 (1991)).

In exercise of their parental authority, "universities commonly restricted firearm access both on *and off campus*." *Id.* (emphasis added). For example, in 1795, Yale prohibited "keep[ing] any kind of fire-arms, or gun-powder." *Id.* (quoting THE LAWS OF YALE-COLLEGE, IN NEW HAVEN,

IN CONNECTICUT, ENACTED BY THE PRESIDENT AND FELLOWS, THE SIXTH DAY OF OCTOBER, A.D. 1795, at 26 (New Haven, Thomas Green & Son 1800)); *see also* Brewer ¶ 51 (discussing other similar university rules). Similarly, the University of Georgia prohibited students from possessing "any gun" or "other offensive weapon in College" or "out of the college in any case whatsoever." *Bondi*, 133 F.4th at 1120 (quoting *The Minutes of the Senatus Academicus 1799–1842*, Univ. of Ga. Librs. 86 (Nov. 4, 1976)). And the students subject to these rules would have included men over the age of 18, but under the age of 21. Brewer ¶ 51.

Like the militia laws, university regulations further demonstrate the pervasive Founding-era understanding that minors under 21 were not entitled to freely obtain or possess firearms.

### 2. *During the Reconstruction Era, States Enacted Relevantly Similar Age Restrictions on Firearm Access in Response to a Surge of Youth Violence.*

Throughout the course of the nineteenth century, different economic, legal, and social forces came together to create a novel problem that had not existed at the Founding—dangerous use of firearms by minors. In response, governments passed a wave of legislation that placed explicit age limitations on access to firearms, targeting variously purchase, sale, gift, carry and/or possession. "When the common-law regime" that prevailed during the Founding Era "became less effective at restricting minors' access to firearms, statutes increasingly did the work." *Bondi,* 133 F.4th at 1122. That legislation was widespread and withstood constitutional challenge.

#### a. **Changes in Society and Technology from the Founding Era to Reconstruction Resulted in a New Societal Problem.**

First, during the early to mid-nineteenth century, gun technology changed rapidly and dramatically. Ex. E (Expert Report of Brennan Rivas) ¶¶ 19–28 ["Rivas"]; *see also Bondi*, 133 F.4th at 1135 (Rosenbaum, J., concurring) ("[I]n [the nineteenth] century, . . . an unprecedented kind of lethal, gun-related violence that Under-21s largely inflicted . . . became possible because of revolutionary advances in firearms technology.") In the prior century, "the nature of muzzle-

loading black powder weapons made them poor choices for impulsive acts of violence." Cornell ¶ 13. However, the nineteenth century saw "increased violence generally, enhanced firearm lethality, and increased gun ownership rates." Rivas ¶ 19. Among the technological developments of this period, innovations like the percussion cap allowed for reliable repeat fire for the first time for both revolvers and rifles, while "minie balls" "increased bullet velocity and accuracy." Rivas ¶¶ 22–24. Following the Civil War, firearm technology continued to advance with the invention of self-contained cartridges, smokeless powder, and more complex interchangeable parts. Rivas ¶ 27. Changes in domestic arms production and marketing also contributed to the greater availability of firearms by the second half of the nineteenth century. Rivas ¶¶ 26, 32. After the Civil War, the higher-lethality weapons described above were "more accessible to consumers than they had been before." Rivas ¶ 26.

Second, changes in population patterns gave newfound autonomy to minors under the age of 21. Rivas ¶ 29; *see also Bondi*, 133 F.4th at 1135 (Rosenbaum, J., concurring) ("And the urbanization and industrialization of the United States in the Antebellum, Civil War, and Reconstruction periods enabled Under-21s to buy these newly disruptive firearms for the first time."). As Judge Rosenbaum explained in his concurrence in *Bondi*, "only about five percent of the United States's population lived in cities in 1790," but "by 1870, more than a quarter of the American population lived in cities." 133 F.4th at 1138. Urbanization created a "market-based economy" in which, unlike before, "Americans had access to cash income, which they could use to buy goods." *Id.* (Rosenbaum, J., concurring); Rivas ¶ 32.

As young people moved to rapidly expanding urban centers and also "became more likely to keep their own wages," there was a newfound ability "for minors to acquire firearms and other deadly weapons without their parents' knowledge." Rivas ¶ 32. In tandem, "[o]ver the course of

the early nineteenth century," courts "gradually abandoned th[e] set of legal rules" that "prevented minors from making contracts" or "work[ing] for wages." *Bondi*, 133 F.4th at 1139 (Rosenbaum, J., concurring) (quoting James D. Schmidt, *"Restless Movements Characteristic of Childhood": The Legal Construction of Child Labor in Nineteenth-Century Massachusetts*, 23 L. & Hist. Rev. 315, 317–18 (2005)). In sum, "[i]ndustrialization, mass production of guns, and the erosion of the common-law regime that effectively banned Under-21s from buying firearms meant that Under-21s could now purchase cheap, widely available guns." *Id.* (Rosenbaum, J., concurring).

These dual developments—the enhanced lethality of firearms and the newfound autonomous purchasing power of minors—led to "a growing problem of juvenile delinquency." Rivas ¶ 33. "Overall, juvenile crime exploded, and the number of juvenile reformatories increased from one in 1825 to forty-five by 1885." *Bondi*, 133 F.4th at 1139 (Rosenbaum, J., concurring). As the famous reformer Jane Addams stated at the turn of the century, "Never before have such numbers of young boys earned money independently of the family life, and felt themselves free to spend it as they choose in the midst of vice deliberately disguised as pleasure," including among them "the foolish and adventurous persistence of carrying loaded firearms." Rivas ¶ 33. Juvenile crime, particularly related to "pocket pistols," was covered in the press and prompted "[d]emands for additional legislative action" by "jurists, journalists, and physicians." Cornell ¶¶ 74–76.

In short, over the course of the nineteenth century, a public-safety concern developed that was outside the circumstances "the Founders specifically anticipated." *See Bruen*, 597 U.S. at 28.

**b. In Response, Many States Placed Age Restrictions on Firearm Purchases, Transfers, Carry, and Possession.**

In response to this new and growing trend of juvenile violence, states began to place explicit age-based restriction on firearms sales, carry, and possession. Rivas ¶¶ 35–42. These age restrictions affected the majority of the population at the time. Relying on census data, the Eleventh

Circuit *en banc* in *Bondi* explained that, "[b]y the end of the nineteenth century, at least 19 states and the District of Columbia—representing roughly 55 percent of the population of states admitted to the Union . . . restricted the purchase or use of certain firearms by minors." 133 F.4th at 1122.[4]

The first of these laws appeared in Alabama and Tennessee in 1856. *See* ADD187, 1856 Ala. Laws 17; ADD188, 1856 Tenn. Pub. Acts 92; Rivas ¶ 35; Cornell ¶¶ 63–64. Both state laws prohibited any person to sell, loan, or give certain weapons to minors. Rivas ¶ 35. Other jurisdictions "specifically regulated the possession or carrying of weapons by minors themselves." Rivas ¶ 36. For example, Kansas enacted a law that penalized "any minor who shall have in his possession" certain weapons, including "pistol[s]." ADD216, 1883 Kan. Sess. Laws 159; Rivas ¶ 36. Nevada prohibited individuals under the age of 21 from "wear[ing] or carry[ing] . . . [a] pistol" and certain other weapons. ADD220, 1885 Nev. Stat. 51; Rivas ¶ 36. Other jurisdictions also prohibited carry or else imposed fines or other penalties on dealers. Rivas ¶¶ 36–37. Some of these restrictions carried the threat of jail time. Rivas ¶ 37. These age-based restrictions generally established 21 as the threshold for the legal sale or purchase of a deadly weapon. Rivas ¶ 37. One of the common features of these age-based restrictions was to provide exceptions for certain types of weapons or manners of use, including exceptions to allow for hunting and to allow for use of firearms "subject to supervision or control by more senior figures." Rivas ¶¶ 38–39.

Notably, while age restrictions of various types were ubiquitous, they were infrequently challenged and survived challenges that were made. Rivas ¶ 40; *see State v. Callicutt*, 69 Tenn. 714, 716–17 (1878) (rejecting constitutional challenge to state law barring sale, loan, or gift of pistols and other weapons to minors). Respected jurists of the time considered age-based firearms

[4] In addition to the 20 jurisdictions identified in *Bondi*, the Commonwealth's expert, Brennan Rivas, identified additional age-based restrictions from the late nineteenth century in the Arizona Territory, Florida, Ohio, Oklahoma, Pennsylvania, and Virginia. Rivas ¶ 35 n.43, ¶ 36.

restrictions to be "a just restraint of an injurious use of property, which the legislature have authority" to impose. Rivas ¶ 40 (citing Thomas Cooley and Lewis Hochheimer). "And courts routinely upheld and enforced criminal prohibitions" on the sale of firearms to minors. *Bondi*, 133 F.4th at 1142 (Rosenbaum, J., concurring) (citing, e.g., *State v. Allen*, 94 Ind. 441, 443 (1884); *Tankersly v. Commonwealth*, 9 S.W. 702, 702–03 (Ky. 1888); *State v. Quail*, 92 A. 859 (Del. 1914); *Biffer v. City of Chicago*, 116 N.E. 182 (Ill. 1917)). Indeed, "[t]hese nineteenth-century laws were celebrated by the public and went largely unchallenged." *McCoy*, 140 F.4th at 579.

### C. These Historical Traditions from the Founding through Reconstruction Are Relevantly Similar to the Challenged Massachusetts Age Restrictions.

The historical tradition from the Founding to today has been one of regulation and restriction of the access of minors, defined as those under 21, to certain categories of firearms. As described above, the Founding-era common law structure effectively prevented minors from acquiring their own firearms and was grounded in concerns about the immaturity of those under 21. *See supra* at pp. 7-9. Indeed, these Founding-era analogues could be considered *more* restrictive because they applied to all types of weapons, unlike the modern challenged regulations.

Importantly, this common law regime explains the lack of explicit statutory regulation of firearms access by minors at the Founding, despite the widespread concerns during that era about the immaturity of "infants"—there was no use for such laws when the common law already effectively prevented minors' unsupervised access to firearms. Founding-era governments could not be expected to legislate to prevent a problem that did not exist, and such a "'use it or lose it' view of legislative authority" is "flawed" and is not the law. *See Rahimi*, 602 U.S. at 740 (Barrett J., concurring); *see also* Cornell ¶ 17 ("No jurisdiction exercised their police power authority to the fullest extent when legislating. Instead states and localities respond[ed] to specific problems as they emerged and dr[e]w on their reservoir of police power in formulating an appropriate

legislative response."). It is also noteworthy that the general common-law constraints on minors' ability to engage in commerce lacked exceptions that specifically accommodated minors' access to firearms. *See supra* at pp. 9-10. If Founding-era society had understood the Second Amendment to forbid legal burdens on minors' access to firearms, the infancy doctrine, for example, might have excepted firearms, as with other necessities.

As technological, social, and economic forces broke down the effectiveness of the Founding-era common law regime, nineteenth-century statutes filled the gap. Nineteenth century regulations bear particular importance because the Second Amendment was made applicable to the States not in 1791, but in 1868, with the ratification of the Fourteenth Amendment, and the Supreme Court has left open the question of which time period is most directly relevant. *See Rahimi*, 602 U.S. at 692 n.1 (acknowledging "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope" but declining to resolve that dispute (quoting *Bruen*, 597 U.S. at 37)). Here, the nineteenth century analogues are also particularly relevant because they addressed "unprecedented societal concerns" *and* "dramatic technological changes" as compared to the Founding era. *See Bruen*, 597 U.S. at 27. And the nineteenth-century age restrictions are particularly salient because they withstood constitutional challenge in *State v. Callicutt*, 69 Tenn. 714 (1878)—the only challenge of which the State Defendants are aware in the century after Reconstruction. *See McCoy*, 140 F.4th at 579 (identifying the Tennessee Supreme Court in *Callicutt* as "the only court to consider the constitutionality of these laws"); *cf. Bruen*, 597 U.S. at 27 (noting that an analogous historical restriction being "rejected on constitutional grounds" is "probative evidence of unconstitutionality" of a modern regulation).

Massachusetts's modern laws are analogous to the Founding-era and Reconstruction-era

limitations in both their "how" and "why." Starting with the "how," Massachusetts's laws constrain the scope of minors' firearm access in a manner that is analogous to Founding-era practice. Founding-era militia laws recognized that individuals under 21 were unlikely to possess their own weapons, but provided in parallel that they could be trained to use firearms under supervision and where weapons were furnished by responsible adults, whether parents or militia supervisors. *See supra* at pp. 10–12. Similarly, the modern regulations allow qualified adults to furnish otherwise lawful weapons to individuals under 21 years old for purposes of "hunting, instruction, recreation and participation in shooting sports." Mass. Gen. Laws c. 140, § 129C(g); *see also id.* § 129B(c).

Likewise, the modern restrictions mirror many of the features of the post-Reconstruction laws. Both sets of laws target minors' access to particular classes of weapons, while leaving other classes of weapons available. *See supra* at pp. 15–17. Like several of the historic laws that carved out purposes like hunting, the modern regulations protect the ability of minors to use firearms for "hunting, instruction, recreation and participation in shooting sports" under adult supervision. Mass. Gen. Laws c. 140, § 129C(g). And the sanctions for violations are also analogous, as many of the post-Reconstruction laws imposed criminal penalties on violators. Rivas ¶ 37; *Bondi,* 133 F.4th at 1122 ("These mid-to-late-nineteenth-century laws also carried the threat of criminal penalties."). While not all of the historic laws expressly addressed possession, but rather accomplished their aims through carry, purchase or sale restrictions, the analogical inquiry is not a search for "historical twin[s]." *Rahimi*, 602 U.S. at 701.

Turning to the "why," the nineteenth-century age restrictions responded to an increase in juvenile crime during the mid- to late-1800s. *See supra* at p. 15. This continued a trend within our legal system since the Founding of "impos[ing] age limits on all manner of activities that required

judgment and reason." *See Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 834 (2011) (Thomas, J., dissenting); *see also McCoy*, 140 F.4th at 579 ("And these [nineteenth-century] laws were enacted for a familiar reason: a concern that youths lacked the maturity and judgment to responsibly buy their own pistols."). That trend continues today, supported by science. Empirical studies show that risky behavior, including criminal activity, "becomes increasingly common during adolescence, peaks in late adolescence, and then declines." Ex. F (Expert Report of Elizabeth Cauffman) ¶ 16. "[I]mpulsive, reckless, self-destructive, and antisocial tendencies" peak precisely at about 18 years old. *Id.* ¶ 17. "Risky decision-making" likewise peaks in "the late teens and early 20s." *Id.* ¶ 36; *accord Commonwealth v. Mattis*, 493 Mass. 216, 224–29 (2024) (summarizing "[a]dvancements in scientific research" showing 18-to-20-year-olds have "same core neurological characteristics as juveniles" in areas of impulse control, risk-taking, peer influence, and capacity for change).

The modern regulations address this concern regarding immaturity—whose lineage extends to the early days of the Republic—by allowing minors to gain skills in the use of firearms under supervision, but preventing their unfettered access to certain types of firearms. "But when an individual reaches the age of reason and the need to protect him and the public from his immaturity and impulsivity dissipates," those impediments are removed. *Bondi*, 133 F.4th at 1123.

Historic analogues thus "confirm what common sense suggests:" that Massachusetts may restrict the sale, possession, and carry of certain firearms to individuals under 21. *See Rahimi*, 602 U.S. at 698; *see also United States v. Rene E.*, 583 F.3d 8, 14–16 (1st Cir. 2009) (rejecting Second Amendment challenge to federal law prohibiting handgun possession by juveniles, based on 19th and 18th century traditions of restricting access to firearms by minors).

## IV. CONCLUSION

Summary judgment should enter in favor of Defendants as to all claims.

Respectfully submitted,

/s/ *Aaron Macris*
Grace Gohlke, BBO #704218
Aaron Macris, BBO #696323
Assistant Attorney General
Office of the Attorney General
Government Bureau
Constitutional and Administrative Law Div.
One Ashburton Place
Boston, MA 02108
(617) 963-2527
grace.gohlke@mass.gov
(617) 963-2987
aaron.macris@mass.gov

November 20, 2025

## CERTIFICATE OF SERVICE

I, Aaron Macris, hereby certify that, on November 20, 2025, a true and accurate copy of this Memorandum was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) to:

Jason A. Guida
Law Office of Jason A. Guida
17 Lark Avenue
Saugus, MA 01906
jason@lawguida.com

David H. Thompson
Peter A. Patterson
William V. Bergstrom
Cooper & Kirk, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
wbergstrom@cooperkirk.com

***Counsel for the Plaintiffs***

Douglas I. Louison
Joseph Mongiardo
Louison, Costello, Condon & Pfaff, LLP
Ten Post Office Square, Suite 1330
Boston, MA 02109
dlouison@lccplaw.com
jmongiardo@lccplaw.com

***Counsel for Co-Defendant Chief Eldredge***

*/s/ Aaron Macris*
Aaron Macris, BBO #696323
Assistant Attorney General