**ADDENDUM VOLUME II**

# TABLE OF CONTENTS

## VOL I

DELAWARE, AN ACT establishing a MILITIA in this STATE. LAW AND STATUTES (1776)..…ADD5

1792 Conn. Spec. Acts 423, 428.………………………………………………………..ADD10

1792 N.H. Laws 447.…………………………………………………………………………ADD12

1792 Pa. Laws 394–95.…………………………………………………………………………ADD14

2 LAWS OF THE STATE OF DELAWARE 1135–36 (New Castle, Samuel Adams & John Adams 1797) (Statutes of 1793) …………………………………………….…ADD16

1793 Mass. Acts 289, 297 ………………………………………………………………ADD18

William Waller Hening, *New Virginia Justice* (1795) ………………….…………….... ADD20

1 ZEPHANIAH SWIFT, A SYSTEM OF THE LAWS OF THE STATE OF CONNECTICUT 213–18 (1795)………………………………………………………………………………ADD27

THE LAWS OF YALE-COLLEGE, IN NEW HAVEN, IN CONNECTICUT, ENACTED BY THE PRESIDENT AND FELLOWS, THE SIXTH DAY OF OCTOBER, A.D. 1795, at 26 (New Haven, Thomas Green & Son 1800)……………………………………………………………………..…ADD35

ACTS AND LAWS OF THE STATE OF CONNECTICUT, IN AMERICA 307–08 (1796) ………... ADD36

2 LAWS OF THE STATE OF DELAWARE, FROM THE FOURTEENTH DAY OF OCTOBER, ONE THOUSAND SEVEN HUNDRED, TO THE EIGHTEENTH DAY OF AUGUST, ONE THOUSAND SEVEN HUNDRED AND NINETY-SEVEN 1135 (1797) ……………………………………………….. ADD39

THE LAWS OF THE STATE OF NEW-HAMPSHIRE, THE CONSTITUTION OF THE STATE OF NEW-HAMPSHIRE, AND THE CONSTITUTION OF THE UNITED STATES, WITH ITS PROPOSED AMENDMENTS 422 (1797) …................................................................................ ADD41

PUBLIC LAWS OF THE STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS 69 (1798) ……………………………………………………………….. ADD43

Act of Oct. 10, 1799, § 4, 1799 Conn. Acts 511, 511–12 (Reg. Sess.) …......................... ADD46

*The Minutes of the Senatus Academicus 1799–1842*, Univ. of Ga. Librs. 86 (Nov. 4, 1976)………………………….....................................................................................ADD48

2 THE PERPETUAL LAWS OF THE COMMONWEALTH OF MASSACHUSETTS, FROM THE ESTABLISHMENT OF ITS CONSTITUTION, IN THE YEAR 1780, TO THE END OF THE YEAR 1800, at 172–94 (1801) ……………………………………………………... ADD130

Act of March 16, 1802, 2 Stat. 132, 132–35……………………….............................ADD155

A NEW CONDUCTOR GENERALIS 237–39 (1803) ……………………………………... ADD159

Act of Aug. 13, 1807, ch. XLIX, §§ 1–2, 4, in 4 LAWS OF THE STATE, OF DELAWARE 123, 123–24, 125–26 (M. Bradford & R. Porter eds., 1816) .....................ADD163

Act of Mar. 6, 1810, ch. CVII, § 28, 1810 Mass. Acts 151, 176. …………………………… ADD167

## VOL II

2 Nathan Dane, A GENERAL ABRIDGEMENT AND DIGEST OF AMERICAN LAW 363–64 (1824). …………………………………………………….. ADD174

James Kent, 2 COMMENTARIES ON AMERICAN LAW 233-40 (1832) …………..... ADD177

Act of Mar. 12, 1844, § 2, 1843 Ohio Laws 53, 53…………………………….…………. ADD186

1856 Ala. Laws 17….....................................................................................................ADD187

1856 Tenn. Pub. Acts 92………………………………………………….…………… ADD188

Act of May 4, 1864, no. 211, § 1, 1864 Pa. Laws 221, 221–22……....................................ADD189

Ind. 1875 ch. 40 p. 59…………………………………………………………………… ADD191

Geo. 1876 ch. 128 p. 112…………………………………………….…………………… ADD193

Miss. 1878 ch. 46 p. 175……………………………………………………..…………… ADD195

Ohio 1880 S.B. 80 p. 79………………………………………………………….…....…ADD197

Dela. 1881 ch. 548 p. 716…………………………………………………….…………… ADD199

Flor. 1881 ch. 3285 p. 87….................................................................................................. ADD201

Ill. 1881 "Criminal Code" §2 p. 73….....................................................................… ADD202

Nev. 1881 ch. 114 "An Act to Prohibit the Carrying of Concealed Weapons by Minors" ……………………………………………………………………………………ADD205

Penn. 1881 ch. 124 p. 111……………………………………………………………….. ADD207

Mary. 1882 ch. 424 p. 656………………………………………………..…... ADD209

W. V. 1882 ch. 135 § 7 p. 421……………………………………………….... ADD210

Ariz. 1883 ch. 36 § 3 p. 66…………………………..…………………….…... ADD214

1883 Kan. Sess. Laws 159….........................................................................…… ADD216

MO 1883 p. 76…………………………………………………………………... ADD217

Wisc. 1883 ch. 329 p. 290…………………………………………………….… ADD218

Iowa 1884 ch. 78 p. 86…..........................................................................……… ADD219

1885 Nev. Stat. 51……………………………………………………………..… ADD220

Lou. 1890 ch. 46 p. 39………………………………………………………….... ADD221

Okla. 1890 ch. 25 art. 47 §3 p. 496…………………………………………….... ADD222

Va. 1890 ch. 152 p. 118……………………………………..…………………… ADD224

1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND *434–66 (George Sharswood ed., 1893)…………………………………..…………….....…... ADD226

N. C. 1893 ch. 514 p. 468……………………………………………….……….... ADD246

Tex. 1897 ch. 154 p. 221 ...……………………………………………...………ADD248

C.F.W. Dassler, ed., *General Statutes of Kansas 1901* (Topeka: Crane & Co., 1901), ch. 31, art. 11, 499, §2394-2395………………………………………………….…. ADD250

Lyman J. Nash, ed., *Wisconsin Statutes, 1911* (Madison: Democrat Printing, 1911), ch. 181, p. 1931, §4397…................................................................……………. ADD251

# A

# GENERAL ABRIDGMENT

## AND

# DIGEST OF AMERICAN LAW,

### WITH OCCASIONAL

# Notes and Comments.

## BY NATHAN DANE, LL. D.
### COUNSELLOR AT LAW.

## IN EIGHT VOLUMES.

# VOL. II.

C

**BOSTON:**
PUBLISHED BY CUMMINGS, HILLIARD, & Co.
1824.

ADD174    Digitized by Google

## PARENT AND CHILD.

### CHAPTER LI.

ASSUMPSIT.    PARENT AND CHILD

**Art. 1.** *General principles*    § 1. The articles for which
a minor is bound, and usually his parent where the credit is
proper, are alone *necessaries;* as food drink, clothing, wash-
ing, physic, education or instruction, fire-wood, and lodging.
If the law stopped here there would be less uncertainty, as
these may be such as make persons generally comfortable;
but the law seems to go further, and adds they must be ac-
cording to the *estate and degree* or rank of the parent: now,
usually, it is impracticable for a court to know precisely
what a parent's estate and degree is.   Some lawyers go fur-
ther, and say they must be not only necessaries according
to estate and degree but necessaries for the child under his
then circumstances;   and the child will be bound, and of
course the parent, only to the amount of the value of the
necessaries taken up on credit to the minor, and not to the
amount of the contract he makes; for the law to hold the
minor's contract for necessaries as to the *price or amount* not
binding, but only for the *reasonable* value, seems proper on
general principles; for though the law may reasonably
authorize the minor to take up necessaries and bind him-
self, and parent often, to pay their *real* value, yet there is no
occasion for the law to empower the minor to contract for
any *high* or *particular* price, as to this he wants discretion.
So, as to what are necessaries for him or not, he wants dis-
cretion.   Hence the person giving him credit supplies the
articles at his peril.

As where Ed. Chester, a minor, took up of the plaintiff's
testator, a costly cloak of lace velvet, &c. price £21 6s.,
also a doublet and a pair of hose of velvet, price £27, and
promised to pay, &c.   Judgment for the defendant: 1.
because not averred *for himself:* but 2. if so averred for
his own wearing, yet it was not averred "that they were
necessary and convenient for him to wear, according to his
estate and degree."

Debts on contracts for apparel, fustian, velvet, and satin
suits, laced with gold lace, amounting to £14, paid £4 in
part; plea, infancy.   Replication, the defendant was a gent-

Cro. Jam.
560, Ive c
Chester

Cro. El. 583.
Marshall r
Rochester

Digitized by Google

tleman of the Earl of Essex's chamber, " and so it was his necessary apparel;" defendant demurred. Court held, 1. they were to judge *what was necessary apparel*; 2. Held, these suits were not necessary for an infant, though a gen-. tleman: 3. Held, if the £4 had not been received, the plaintiff should have judgment " for those contracts which were allowed of, &c."—now what were these? not the reasonable worth of these articles, for the court deemed them not necessaries; some have understood by "those contracts which were allowed of, &c." the price of apparel the same number of suits, such as were necessaries; but how would it have been possible in an action for three suits of *fustian, velvet*, and *satin laced, not necessaries*, for the court to have given judgment for the reasonable value of three suits of something else, as common cloth, &c. such as was necessary? as such something else was totally foreign to the action. But it is conceived the defendant sold these three rich suits at his peril, and failing to recover for them, it was not in the power of the court to substitute the reasonable price of three proper suits of serge or common cloth, a substitute so totally uncertain, and one that never existed.

And on these authorities it has been said, if a sailor boy buy a coat of superfine broad cloth, and covered with gold lace, and contract to pay the real worth of it; yet he would be held to pay no more than its reasonable value *to him*, which would be no more than cloth of a much inferior degree; but on what principle can a court assume the price of a coat of inferior cloth, where no such coat was sold or existed? And when the plaintiff has acted improperly in selling the superfine broad cloth to a sailor-boy, why should he be allowed to turn round and recover for a suit of suitable cloth? And is the boy, or his parent, to pay costs in such cases? He must unless the value of a proper coat was tendered, and on what principle is a tender to be made in such a case of total uncertainty? It is conceived the plaintiff must recover of the minor child, or of its parent, in such case, on the ground the articles supplied were *necessaries*, or not recover at all; and on the defendant's plea of infancy, the replication has invariably been, that *the very articles sued for were necessaries;* on which issue has been joined.

§ 2. Whatever *price* for *necessaries* a minor may agree for, he or his parent is liable only for their *real value*, otherwise it would be allowing, unnecessarily, a legal capacity in the minor to bargain for the *price*. Hence it is essential the *real value* of the necessaries, and so the *real consideration* be in-

1 D.& E. 41
Trueman v.
Hurst.—Cro El 920. Ayliffe v. Archdale.—Moor. 679.—1 Roll, 729.—Co. L. 172

Digitized by Google

# COMMENTARIES

ON

# AMERICAN LAW.

## BY JAMES KENT.

### VOLUME II.

#### SECOND EDITION.

New-York:

## O. HALSTED.

1832.

ADD177          Digitized by Google

# LECTURE XXXI.

### OF INFANTS.

THE necessity of guardians results from the inability of infants to take care of themselves; and this inability continues, in contemplation of law, until the infant has attained the age of twenty-one years. The age of twenty-one is the period of majority for both sexes, according to the English common law, and that age is completed on the day preceding the anniversary of the person's birth.[a] The age of twenty-one is probably the period of absolute majority throughout the United States, though female infants, in some of them, have enlarged capacity to act at the age of eighteen. Louisiana and France follow in this respect the common law period of limitation, though entire majority by the civil law, as to males, was not until the age of twenty-five, and Spain and Holland follow the rule of the civil law.[b] Nor can infants do any act to the injury of their property, which they may not avoid, or rescind, when they arrive at full age. The responsibility of infants for crimes by them committed, depends less on their

---

[a] *Anon.* 1 *Salk.* 44.   Sir Robert Howard's case, 2 *Salk.* 625.

[b] *Inst.* 1. 23. 1 *Partidas* on Obligations, 5. 11. 5.   *Institutes of the Laws of Holland, by Vander Linden*, book 1, ch. 5, sec. 7.   1 *Toullier*, p. 153.   *Civil Code of Louisiana*, art. 41. 93.   The law of the domicil of birth governs the state and condition of the minor, into whatever country he removes, and his minority ceases at the period fixed by those laws for his majority.   Barrera v. Alpuente, 18 *Martin's Louis. Rep.* 69

ADD178Google

age, than on the extent of their discretion and capacity to discern right and wrong.

Most of the acts of infants are voidable only, and not absolutely void ; and it is deemed sufficient, if the infant be allowed, when he attains maturity, the privilege to affirm or avoid, in his discretion, his acts done, and contracts made in infancy. But when we attempt to ascertain from the books, the precise line of distinction between void and voidable acts, and between the cases which require some act to affirm a contract, in order to make it good, and some act to disaffirm it, in order to get rid of its operation, we meet with much contradiction and confusion. A late writer, who has compiled a professed treatise on the law of infancy, concludes, from a review of the cases, that the only safe criterion by which we can ascertain whether the act of an infant be void or voidable, is, " that acts which are capable of being legally ratified are voidable only ; and acts which are incapable of being legally ratified are absolutely void.[a] But the criterion here given does not appear to free the question from its embarrassment, or afford a clear and definite test. All the books are said to agree in one result, that whenever the act done *may be* for the benefit of the infant, it shall not be considered void, but he shall have his election, when he comes of age, to affirm or avoid it ; and this, says Ch. J. Parker,[b] is the only clear and definite proposition which can be extracted from the authorities. But we are involved in difficulty, as that learned judge admits, when we come to the application of this principle. In *Zouch* v. *Parsons*,[c] it was held by the K. B., after a full discussion and great consideration of the case, that an infant's conveyance by lease and release, was voidable only ; and yet Mr. Preston[d] condemns that decision in

---

*a Bingham on Infancy*, 33.

*b* Whitney v. Dutch, 14 *Mass. Rep.* 457.

*c* 3 *Burr.* 1794.

*d Treatise on Conveyancing*, vol. ii. 249. *Treatise on Abstracts of Title*, vol. i. 324.

Google

the most peremptory terms, as confounding all distinctions and authorities on the point ; and he says, that Lord Eldon repeatedly questioned its accuracy.   On the other hand, Mr. Bingham[a] undertakes to show, from reason and authority, that the decision in Burrow is well founded ; and he insists[b] that all the deeds, and acts, and contracts of an infant, except an account stated, a warrant of attorney, a will of lands, a release as executor, and a conveyance to his guardian, are, in judgment of law, voidable only, and not absolutely void. But the modern as well as ancient cases, are much broader in their exception.   Thus it is held, that a negotiable note, given by an infant, even for necessaries, is void ;[c]  and his acceptance of a bill of exchange is void ;[d] and his contract as security for another, is absolutely void ;[e]  and a bond, with a penalty, though given for necessaries, is void.[f]   It must be admitted, however, that the tendency of the modern deci-sions is in favour of the reasonableness and policy of a very liberal extension of the rule, that the acts and contracts of infants should be deemed voidable only, and subject to their election when they became of age, either to affirm or disallow them.[g]   If their contracts were absolutely void, it would fol-

---

a  *Law of Infancy*, ch. 2.

b  See his work, p. 34, and also his preface.

c  Swasey v. Administrator of Vanderheyden, 10 *Johns, Rep.* 33. Trueman v. Hurst, 1 *Term*, 40.    M·Crillis v. How, 3 *N. H. Rep.* 348.    *Contra*, Dubose v. Wheddon, 4 *M·Cord*, 221.

d  Williamson v. Watts, 1 *Campb. N. P.* 552.

e  Curtin v. Patton, 11 *Serg. & Rawle*, 305.

f  *Co. Litt.* 172, a. recognised as being still the law by *Bayley, J.*, in 3 *Maul. & Selw.* 482.

g  Wamsley v. Lindenberger, 2 *Randolph*, 478.   Lord Mansfield, in Zouch v. Parsons, 3 *Burr*, 1804, held the law to have been truly laid down by *Perkins*, sec. 12, that " all such gifts, grants, or deeds, made by an infant, which do not take effect by delivery of his hand, are void. But such gifts, grants, or deeds, made by an infant by matter in deed, or in writing, which take effect by delivery of his own hand, are voida-ble."   Chancellor Jones, in Stafford v. Roof, 9 *Cowen*, 626, adhered to this distinction, and held, that manual delivery was requisite to render

Google

low as a consequence, that the contract could have no effect, and the party contracting with the infant, would be equally discharged.[a]   The doctrine of the case of *Zouch* v. *Parsons*, has been recognised as law in this country, and it is not now to be shaken.   On the authority of that case, even the bond of an infant has been held to be voidable only at his election.[b]   It is an equitable rule, and most for the infant's benefit, that his conveyances to and from himself, and his contracts, in most cases, should be considered to be voidable only.[c]   Lord Ch. J. Eyre, in *Keane* v. *Boycott*,[d] undertook to reconcile the doctrine of void and voidable contracts, on the ground, that when the court could pronounce the contract to be to the infant's prejudice, it was void, and when to his benefit, as for necessaries, it was good ; and when the contract was of an uncertain nature as to benefit or prejudice, it was voidable only at the election of the infant.   Judge Story declared these distinctions to be founded in solid reason,[e] and they are considered to be so, and the point is not susceptible of greater precision.

If the deed or contract of an infant be voidable only, it is nevertheless binding on the adult with whom he dealt, so long as it remains executory, and is not rescinded by the infant.[f]   It is also a general rule, that no one but the infant

---

the infant's deed of lands or chattels voidable only.  I apprehend that the modern rule, as now understood, is not quite so precise.

*a* 1 *Fonb. Tr. of Eq.* 74.   In Goodsell v. Myers, 3 *Wendell*, 479, and Dubose v. Wheddon, 4 *M'Cord*, 221, it was held, that the note of an infant was voidable and not void.

*b* Conroe v. Birdsall, 1 *Johns. Cas.* 127.

*c* Jackson v. Carpenter, 11 *Johns. Rep.* 539.   Oliver v. Houdlet, 13 *Mass. Rep.* 237.   Roberts v. Wiggin, 1 *N. H. Rep.* 73.   Wright v. Steele, 2 *N. H. Rep.* 55.   Kline v. Beebe, 6 *Conn. Rep.* 494.

*d* 2 *H. Blacks.* 511.

*e* 1 *Mason's Rep.* 82.

*f* Smith v. Bowin, 1 *Mod.* 25.   Holt v. Ward, *Str.* 937.   Warwick v. Bruce, 2 *Maul. & Selw.* 205.   Brown v. Caldwell, 10 *Serg. & Rawle*, 114.

himself, or his legal representatives, can avoid his voidable deed or contract ; for while living, he ought to be the exclusive judge of the propriety of the exercise of a personal privilege intended for his benefit ; and when dead, those alone should interfere who legally represent him. [a]   The infant's privilege of avoiding acts which are matters of record, as fines, recoveries, and recognisances, is much more limited, in point of time, than his privilege of avoiding matters *en pais*. The former must be avoided by him by writ of error, or *audita querela*, during his minority, when his nonage can be tried by the court by inspection ; but deeds, writings, and parol contracts may be avoided during infancy, or after he is of age, by his dissent, entry, suit, or plea, as the case may require.[b] If any act of confirmation be requisite after he comes of age, to give binding force to a voidable act of his infancy, slight acts and circumstances will be a ground from which to infer the assent ; but the books appear to leave the question in some obscurity, when and to what extent a positive act of confirmation on the part of the infant is requisite. · In *Holmes*

---

[a] 8 *Co*. 42. b.   Keane v. Boycott, 2 *H. Blacks*. 511.   Van Bramer v. Cooper, 2 *Johns. Rep.* 279.   Jackson v. Todd, 6 *ibid.* 257.   Oliver v. Houdlet, 13 *Mass. Rep.* 237.   Roberts v. Wiggin, 1 *N. H. Rep.* 73.
[b] *Co. Litt.* 380. b. *Comyn's Dig.* tit. *Enfant*, C. 3. 5. 9. 11. *Cro.* C. 303. 306.   In Roof v. Stafford, 7 *Cowen*, 175, it was held, by the Supreme Court of New-York, that a sale of chattels by an infant, was not any more than a conveyance of land, voidable till he came of age. This was settled as to conveyances of land, by the case of *Zouch* v. *Parsons.*   But in the same case on Error, 9 *Cowen*, 626, Chancellor Jones held, that the infant might avoid a sale of chattels while an infant, but not a sale of land.   In the latter case, he could enter and take the profits until of age, but where the possession was changed, and he had no legal means to regain it, he might exercise the power of rescission immediately.   The act of avoidance is only allowed during infancy, when necessary, inasmuch as the infant lacks discretion to exercise it. The case in *Cowen* is an authority that an infant may avoid, during infancy, a sale of chattels, and bring trover by his guardian to recover them.

Google

:25-cv-10389-GAO   Document 40-2   Filed 11/20/25   Page 1

v. *Blogg*,[a] the Ch. Justice observed, that in every instance of a contract, voidable only by an infant on coming of age, he was bound to give notice of disaffirmance of the contract in a reasonable time. The inference from that doctrine is, that without some act of dissent, all the voidable contracts of the infant would become binding. But there are other cases which assume that a voidable contract becomes binding upon an infant after he comes of age, only by reason of acts or circumstances, amounting to an affirmance of the contract.[b] In the cases of *Jackson* v. *Carpenter*, and *Jackson* v. *Burchin*,[c] the infant had disaffirmed the voidable deed of his infancy, by an act equally solemn, after he became of age. This is the usual and the suitable course, when the infant does not mean to stand by his contract ; and his confirmation of the act or deed of his infancy, may be justly inferred against him after he has been of age for a reasonable time, either from his positive acts in favour of the contract, or from his tacit assent under circumstances not to excuse his silence. In *Curtin* v. *Patton*,[d] the court required some dis-

---

*a* 8 *Taunton*, 35.

*b* Evelyn v. Chichester, 3 *Burr.* 1717. 1 *Rol. Abr.* tit. *Enfants.* K. *Co. Litt.* 51. b. Hubbard v. Cummings, 1 *Greenleaf*, 11. In Holmes v. Blogg, 8 *Taunton*, 508, it is remarkable that the distinguished counsel in that case, one of whom is now (1827) Lord Chancellor, and the other Ch. J. of the C. B., treat this as an open and debatable point. Sergeant *Copley* insisted, that the infant's contract was binding on him when he became adult, because there had been no disaffirmance of it ; and Sergeant *Best* contended, that disaffirmance was not necessary, and that infants were not bound by any contract, unless the same was affirmed by them after arriving at full age, and this is the decision in 4 *Pickering*, 48.

*c* 11 *Johns. Rep.* 539. 14 *ibid.* 124.

*d* 11 *Serg. & Rawle*, 305. In Kline v. Beebe, 6 *Conn. Rep.* 494, this subject was very fully discussed and considered, and it was held, that there were three modes of affirming the voidable contracts of infants, when they arrived at full age. 1. By an express ratification. 2. By acts which reasonably imply an affirmance. 3. By the omission to

tinct act, by which the infant either received a benefit from the contract after he arrived at full age, or did some act of express and direct assent and ratification ; but that was the case of a contract considered to be absolutely void. In the case of voidable contracts, it will depend upon circumstances, such as the nature of the contract, and the situation of the infant, whether any overt act of assent or dissent on his part be requisite to determine the fact of his future responsibility.

Infants are capable, for their own benefit, and for the safety of the public, of doing many binding acts. Contracts for necessaries are binding upon an infant, and he may be sued and charged in execution on such a contract, provided the articles were necessary for him under the circumstances and condition in which he was placed.[a] The question of necessaries is governed by the real circumstances of the infant, and not by his ostensible situation ; and, therefore, the tradesman who trusts him is bound to make due inquiry, and if the infant has been properly supplied by his friends, the tradesman cannot recover.[b] Lord Coke considers the necessaries of the infant to include victuals, clothing, medical aid, and " good teaching or instruction, whereby he may profit himself afterwards."[c] If the infant lives with his father or guardian, and their care and protection are duly exercised, he cannot bind himself even for necessaries.[d] It is also un-

---

disaffirm within a reasonable time. By the English statute of 9th May, 1828, entitled " an act for rendering a written memorandum necessary to the validity of certain promises and engagements," an infant is not chargeable upon any promise or ratification after full age, of any promise or simple contract made during infancy, unless such promise or ratification be made by writing signed by the party to be charged.

  a Ive v. Chester, *Cro. J.* 560.   Clarke v. Leslie, 5 *Esp. N. P.* 28. Coates v. Wilson, *ibid.* 152.   Berolles v. Ramsay, 1 *Holt's N. P.* 77.

  b Ford v. Fothergill, *Peake's N. P.* 229.   Story v. Pery, 4 *Carr. & Payne,* 526.

  c *Co. Litt.* 172, a.

  d Bainbridge v. Pickering, 2 *Blacks. Rep.* 1325.   Wailing v. Toll,

Google

240     OF THE RIGHTS OF PERSONS.     [Part **IV**

derstood, that necessaries for the infant's wife and children, are necessaries for him;[a] and in all cases of contracts for necessaries, the real consideration may be inquired into. The infant is not bound to pay for the articles furnished, more than they were really worth to him as articles of necessity, and, consequently, he may not be bound to the extent of his contract; nor can he be precluded, by the form of the contract, from inquiring into the real value of the necessaries furnished.[b]

Infancy is not permitted to protect fraudulent acts; and, therefore, if an infant takes an estate, and agrees to pay rent, he cannot protect himself from the rent, by pretence of infancy, after enjoying the estate, when of age. If he receives rents, he cannot demand them again when of age according to the doctrine as now understood. If an infant pays money on his contract, and enjoys the benefit of it, and then avoids it when he comes of age, he cannot recover back the consideration paid.[c] On the other hand, if he avoids an executed contract when he comes of age on the ground of infancy, he must restore the consideration which he had received. The privilege of infancy is to be used as a shield and not as a sword. He cannot have the benefit of the contract on one side, without returning the equivalent on the other.[d] But there are many hard cases in which the infant cannot be held bound by his contracts, though made in fraud; for infants would lose all protection if they were to be bound by their contracts made by improper artifices, in the heedless-

---

9 *Johns. Rep.* 141.   Hull v. Connolly, 3 *M'Cord's L. R.* 6.   Kline v. L'Amoureux, 2 *Paige*, 419.

a Turner v. Trisby, *Str.* 168.

b Makarell v. Bachelor, *Cro. Eliz.* 583.

c Kirton v. Elliott, 2 *Bulst.* 69.   Lord Mansfield, in Earl of Buckingbamshire v. Drury, 2 *Eden*, 72.   Holmes v. Blogg, 8 *Taunton*, 508. M'Coy v. Huffman, 8 *Cowen*, 84.

d Badger v. Phinney, 15 *Mass. Rep.* 359.   Roberts v. Wiggin, 1 *N. H. Rep.* 73.   Roof v. Stafford, 7 *Cowen*, 179.

**53**

### AN ACT

#### To regulate the Militia.

Sec. 1. *Be it enacted by the General Assembly of the State of Ohio,* That the training of the rank and file of the militia shall hereafter be dispensed with, in time of peace, except as provided for in this act. <span style="float:right">Training of militia, in time of peace, dispensed with.</span>

Sec. 2. That every able bodied white male inhabitant, resident within this state, who is or shall be of the age of twenty one years, and under the age of forty five years, excepting persons who may be members of volunteer companies, persons absolutely exempted by law, idiots and lunatics, shall be enrolled in the militia. <span style="float:right">Who liable to do military duty;— exemptions.</span>

Sec. 3. That it shall be the duty of the township assessors, annually, to prepare a list of all persons liable to be enrolled, as aforesaid, in their respective townships, and every keeper of any tavern or boarding house, and every master of any dwelling house, shall, upon application of the assessor, within whose township such house may be situated, or of any person acting under them, give information of the names of all persons residing in such house and liable to enrollment, as aforesaid; and every such person, so liable, shall, upon like application, give his name and age, and if any such keeper, master, or person, liable as aforesaid, shall refuse to give such information or shall give false information, he or they shall be fined in any sum not less than five dollars for each offence, to be collected in an action of debt before any justice of the peace for the proper township, and it is hereby made the duty of the assessor, forthwith, after the occurrence of any such offence, to commence such action, in his official capacity, in the name of the state of Ohio, against any person or persons so offending, and prosecute the same to final judgment and collection, if possible; and all moneys so collected shall be by such [assessor] immediately paid over to the treasurer of the proper township; and it is hereby made the duty of such treasurer to appropriate the same for the use of common schools in the proper township, in like manner as other school funds are now, by law, appropriated; and it shall be the duty of the township trustees to require and accept such additional security as will, in the opinion of such trustees, be sufficient to insure the faithful performance of the duties enjoined upon said assessors by this act. <span style="float:right">Township assessors, annually, to prepare a list of all persons liable to be enrolled.</span> <span style="float:right">Keepers of taverns, boarding houses, &c., to give information.</span> <span style="float:right">Penalty for refusing.</span> <span style="float:right">Fines—when collected, how disposed of.</span>

Sec. 4. That the township assessor shall, annually, at the time of assessing taxable property, make out a roll or list of all names of persons, liable to be enrolled as aforesaid, and shall place it in the hands of the clerk of the proper township, who shall record the same in the book of record of such township, and it shall be the duty of such clerk to return, annually, in the month of May or June, an accurate copy of such record of enrollment, to the commandant of the proper brigade, said commandant of brigade shall make return to the com- <span style="float:right">Assessor to make roll list of those liable to enrollment, and place the same in the hands of the township clerk, who shall record, &c.</span>

manner of apportioning the road hands in the county of St. Clair," be, and the same is hereby repealed. **Repealed.**

SEC. 2. *Be it further enacted*, That from and after the passage of this act, the Judge of Probate and Sheriff of St. Clair county, for services required of them in Article 1. Part 1. Title 13, Chapter 14, Code of Alabama. shall each receive annually fifty dollars, instead of ninety dollars as authorized by Section 1186, Code of Alabama.

APPROVED, Feb. 2, 1856.

---

[No. 26.]         AN ACT

### To amend the criminal law.

SECTION 1. *Be it enacted by the Senate and House of Representatives of the State of Alabama in General Assembly convened*, That any one who shall sell or give or lend, to any male minor, a bowie knife, or knife or instument of the like kind or description, by whatever name called, or air gun or pistol. shall, on conviction be fined not less than three hundred, nor more than one thousand dollars. **Penalty.**

APPROVED, Feb. 2, 1856.

---

[No. 27.]         AN ACT

### To declare Luxapalila Creek in Fayette county a public highway.

SECTION 1. *Be it enacted by the Senate and House of Representatives of the State of Alabama in General Assembly convened*, That from and after the passage of this act, Luxapalila Creek in Fayette county, from the State line up to Wood's Mill on said stream, be, and the same is hereby, declared a public highway.

APPROVED, February 15, 1856.

92

## CHAPTER 81.

AN ACT to amend the Criminal Laws of this State.

SECTION 1. *Be it enacted by the General Assembly of the State of Tennessee,* That when any person shall be indicted in the Circuit Courts, or any other court having criminal jurisdiction, for malicious shooting, and the jury trying the cause, after having all the evidence, shall be of the opinion that the defendant is not guilty of the malice, they shall have the power to find the defendant guilty of an assault, or an assault and battery, and judgment shall be given accordingly.

SEC. 2. *Be it enacted,* That, hereafter, it shall be unlawful for any person to sell, loan, or give, to any minor a pistol, bowie-knife, dirk, or Arkansas tooth-pick, or hunter's knife ; and whoever shall so sell, loan, or give, to any minor any such weapon, on conviction thereof, upon indictment or presentment, shall be fined not less than twenty-five dollars, and be liable to imprisonment, at the discretion of the Court : *Provided,* that this act shall not be construed so as to prevent the sale, loan, or gift, to any minor of a gun for hunting.

SEC. 3. *Be it enacted,* That it shall be the duty of the Circuit Judges and the Judges of the Criminal Courts to give this act in charge to the Grand Juries : *Provided,* said minor be travelling on a journey, he shall be exempted.

SEC. 3. *Be it enacted,* That this act shall be in force from and after its passage.

NEILL S. BROWN,
*Speaker of the House of Representatives.*
EDWARD S. CHEATHAM,
*Speaker of the Senate.*

Passed February 26, 1856.

———

## CHAPTER 82.

AN ACT to amend the Internal Improvement acts of 1852 and 1854.

*Be it enacted by the General Assembly of the State of Tennessee,* That, hereafter, it shall not be necessary for the Engineer in Chief to swear to the subscription list, solvency, and condition of any Railroad Company applying for State aid, but the oath required of the Engineer shall be taken by the President and Treasurer of the Com-

day; that in addition to the taxes, already imposed by law, all persons appointed to an office, by the governor, or elected, under the provisions of any law of this commonwealth, the gross receipts of whose office shall exceed six hundred dollars, and not exceed twelve hundred dollars, shall pay into the treasury of the state, a tax of one per centum, and on all amounts, over twelve hundred dollars, and not exceeding twenty-five hundred dollars, two per centum, and on all amounts, exceeding twenty-five hundred dollars, five per centum annually : *Provided,* That the revenue derived from this act shall, so far as is necessary, be first applicable to the payment of the ordinary expenses of government, and the residue, not needed for such purposes, shall be transferred to the sinking fund, as directed by the act of the twenty-second of April, one thousand eight hundred and fifty-eight.

*Five per centum to be added on all unpaid, on first of August. Tax upon the gross receipts of certain officers.*

*How revenue derived from this act to be applied.*

Section 8. That so much of the act to reduce the state debt, and incorporate the Pennsylvania railroad company, approved twenty-ninth day of April, one thousand eight hundred and forty-four, and the several supplements thereto, requiring the appointment of revenue commissioners, from the several judicial districts of the state, be and the same are hereby repealed; and that all the powers granted to the said board, and the duties enjoined thereupon, shall hereafter be vested in a state board, to consist of the auditor general, the state treasurer, and the secretary of the commonwealth ; and that all acts of assembly, inconsistent with the provisions of this act, be and the same are hereby repealed.

*Revenue board abolished.*

*State board created, in lieu thereof.*

*Repeal.*

HENRY C. JOHNSON,
Speaker of the House of Representatives.

JOHN P. PENNEY,
Speaker of the Senate.

Approved—The thirtieth day of April, Anno Domini one thousand eight hundred and sixty-four.

A. G CURTIN.

————

No. 211.

## An Act

For the Organization, Discipline, and Regulation of the Militia of the Commonwealth of Pennsylvania.

Section 1. *Be it enacted by the Senate and House of Represen-tatives of the Commonwealth of Pennsylvania in General Assembly met, and it is hereby enacted by the authority of the same.* That every able bodied white male citizen, resident within this state, of the age of twenty-one years, and under the age

222                        LAWS OF PENNSYLVANIA,

**Who shall be enrolled in militia, and who exempt.**

of forty-five years, excepting persons enlisted into volunteer companies, persons exempted by the following sections, idiots, lunatics, common drunkards, vagabonds, paupers, and persons convicted of any infamous crime, shall be enrolled in the militia; persons so convicted, after enrolment, shall forthwith be dis-enrolled; and in all cases of doubt, respecting the age of a person enrolled, the burden of proof shall be upon him.

**Assessors to make a list of persons liable to enrolment.**

SECTION 2. *First.* Assessors shall annually, and at the same time they are engaged in taking the assessment, or valuation of real and personal property, in their respective cities, wards, boroughs, or townships, make a list of persons living within their respective limits, liable to enrolment, and place a certified

**Record thereof to be kept in office of county commissioners.**

copy, in the office of the county commissioners, of each county, in the state, whose duty it shall be to record said roll, or list of names, in a book, to be provided for that purpose, in the same manner as other books of record are provided; and such record shall be deemed a sufficient notification to all persons whose names are thus recorded, that they have been enrolled in the militia.

**Assessors' notices to be put up in public places.**

*Second.* As soon as the roll is completed, the assessors shall, forthwith, cause notices thereof to be put up, in three of the most public places in the city, ward, borough, or township, which notices shall set forth, that the assessors have made their roll of all persons liable to enrolment, according to law, and that a copy thereof has been left, for record, in the office

**Commissioners, and assessors, to review enrolment.**

of the county commissioners, where the same may be seen, or examined, by any person interested therein, until some day and place, to be specified in such notice, when, and where, the said assessors, and commissioners, of the county will meet to review such enrolment; such review shall be made at the same time, and place, the said assessors and commissioners meet to review the assessment of real and personal property, or for appeals.

**Persons claiming to be exempt to make affidavit.**

*Third.* Any person claiming that he is not liable to military duty, on account of some physical defect, or bodily infirmity, or that he is exempt from the performance of military duty, by any law of this state, or of the United States, may, on or before the day specified in such notice, and not after, deliver to said assessors, an affidavit, stating such facts, on which he claims to be exempt, or not liable to do military duty; such affidavit may be made before any person authorized to administer oaths; and the assessors shall cause all such affidavits to be filed in the office of the county commissioners; and if any person shall swear falsely, in such affidavit, he shall be guilty of perjury.

**Commissioners to determine who are exempt**

*Fourth.* On the day the county, or city, commissioners meet, to review the assessment of real and personal property, or for holding appeals, they shall, also, determine who are exempt, or not liable to do military duty; and in a column prepared for that purpose, in such roll, opposite the name of each person not liable to do duty, shall insert "exempt," or "not liable," as the case may be; and opposite the names of all members of uniformed companies on such roll, shall insert "U. C;" and against the name of any military officer in commission, and liable to do duty, the title of his office; and shall, also,

DECEDENTS' ESTATES.                                    59

# CHAPTER XL.

AN ACT to prohibit the sale, gift, or bartering of deadly weapons or ammunition therefor, to minors.

## [APPROVED FEBRUARY 27, 1875.]

SECTION 1. *Be it enacted by the General Assembly of* the State of Indiana, That it shall be unlawful for any person to sell, barter, or give to any other person, under the age of twenty-one years, any pistol, dirk, or bowie-knife, slung-shot, knucks, or other deadly weapon that can be worn, or carried, concealed upon or about the person, or to sell, barter, or give to any person, under the age of twenty-one years, any cartridges manufactured and designed for use in a pistol. <small>Unlawful to sell, barter or give to minors deadly weapons or cartridges for pistol.</small>

SEC. 2. *Be it further enacted,* That any person who shall violate any of the provisions of the foregoing section shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be fined in any sum not less than five dollars, nor more than fifty dollars. <small>Penalty.</small>

---

# CHAPTER XLI.

AN ACT in relation to the settlement of claims against decedents' estates.

## [APPROVED MARCH 11, 1875.]

SEC. 1. *Be it enacted by the General Assembly of the* State of Indiana, That whenever a claim shall exist in favor of an executor or administrator against the estate he represents, which accrued before the death of such decedent, the same shall be filed against said estate, with the affidavit of the claimant attached, to the effect that the same is justly due and wholly unpaid, and placed upon the dockets of the court having jurisdiction of the estate against which said claim is filed, thirty days before the commencement of the term of said court, during which said claim is to be presented for allowance. And the Judge of said court shall represent said estate, and shall examine into the nature of <small>Claims against decedent's estate, filing examination, allowance, and payment of same.</small> <small>Judge shall represent estate.</small>

60                           GENERAL LAWS.

said claim, and if the same be by said court deemed just
and right, said court shall allow said claim and order the
same paid out of said estate, as other claims of the same
class, and said court may, in its discretion, examine under
oath such executor or administrator, or any other person
**When Court** touching such claim; and if such court shall be of the
**shall appoint** opinion that the interests of said estate will be promoted by
**attorney to** active opposition to such claim, it shall be the duty of such
**oppose allow-**
**ance of claims.** court to appoint a practising attorney of said court to repre-
**Pleadings, &c.,** sent said estate, and the same pleadings, issues and trial may
**in such cases.** be had as in other civil cases, which shall be governed by
the same rules and regulations that prevail in pleading and
practice in the Circuit Court of the county where such trial
**Allowance for** is had; and such court shall allow to such attorney, to be
**service of such**
**attorney.** paid out of said estate, such fees for his services as may be
deemed by said court just and right, and no attorney shall
be allowed compensation for representing the estate of a
decedent, except when appointed in pursuance of this act.
**On petition,**       SEC. 2.   In all cases where a claim is filed against the
**heir, legatee, et.** estate of a decedent, any one or more of the heirs, legatees,
**al., shall be al-**
**lowed to defend** or devisees of such decedent, or creditors of his estate, upon
**such claim, &c.** written petition to the court, shall be allowed, at his or
their own expense, to defend such claim, notwithstanding
the executor or administrator of the decedent may prefer to
allow, or shall have allowed such claim, but such petition
must be filed with the clerk of the proper court within six
months after such claim shall be filed against such estate,
**Payment of cost** and not afterwards.   And if in any such case, such claim
**in such cases,**
**by whom to be** shall be reduced twenty-five per cent., or more, below the
**paid.** amount claimed, the court shall order the costs and all
expenses, incurred in contesting said claim, paid out of such
estate, but in case of failure to so reduce said claim, said
person or persons, so contesting said claim, shall pay all costs
occasioned thereby.
**Laws repealed.**       SEC. 3.   All laws and parts of laws coming in conflict
with any of the provisions of this act are hereby repealed.

**112**   PART I.—TIT. 12.—PENAL CODE.

Penalties—Cruelty to animals; Furnishing weapons to minors; Escapes from chain gang.

### No. CXXVII.—(O. No. 230.)

SECTION 1.  Punishment for cruelty to animals.

*An Act to alter and amend an Act entitled an Act for the prevention of cruelty to animals, approved March 1, 1875.*

Punishment for cruelty to animals

SECTION I.   *Be it enacted, etc.,* That from and after the passage of this Act, that the Act entitled an Act for the prevention of cruelty to animals be altered and amended by striking out the words, in the last line of said Act, "be fined in a sum not to exceed fifty dollars," and insert in lieu thereof the words "be punished as prescribed in section 4310 of the Code of 1873."

SEC. II.   Repeals conflicting laws.

Approved February 23, 1876.

---

### No. CXXVIII.—(O. No. 63.)

SECTION 1.  Furnishing deadly weapons to minors prohibited.

*An Act to punish any person or persons who shall sell, give, lend or furnish any minor or minors with deadly weapons herein mentioned, and for other purposes.*

Furnishing deadly weapons to minors prohibited

Penalty for violation

Proviso

SECTION I.   *Be it enacted, etc.,* That from and after the passage of this Act it shall not be lawful for any person or persons knowingly to sell, give, lend or furnish any minor or minors any pistol, dirk, bowie knife or sword cane.   Any person found guilty of a violation of this Act shall be guilty of a misdemeanor, and punished as prescribed in section 4310 of the Code of 1873 : *Provided,* that nothing herein contained shall be construed as forbidding the furnishing of such weapons under circumstances justifying their use in defending life, limb or property.

SEC. II.   Repeals conflicting laws.

Approved February 17, 1876.

---

### No. CXXIX.—(O. No. 184.)

SECTION.
1. Penalty for escapes.

SECTION.
2. *Particeps criminis.*

*An Act to provide a penalty for escapes from the "chain gang," and for other purposes.*

Penalty for escapes

SECTION I.   *Be it enacted, etc.,* That from and after the passage of this Act, if any person or persons shall be convicted of any offense below the grade of felony, and such person or persons shall escape from the "chain gang," or from any other place of

PART I.—TIT. 12.—PENAL CODE.                **113**

Penalties—Fœticide or criminal abortion, use of medicines, etc.

confinement or imprisonment, for the violation of any municipal, county or State laws, and be thereafter retaken, such person or persons shall be indicted as for a misdemeanor, and on conviction thereof shall be punished in the "chain gang" by a re-sentence, at least double the term for which such person or persons was so originally sentenced.

SEC. II.   *Be it further enacted,* That if any person or persons Particeps shall aid or assist, or attempt to aid or assist, a prisoner to escape criminis so confined or imprisoned as aforesaid, shall be deemed guilty of a misdemeanor, and on conviction shall receive a like punishment as is provided in the above recited Act as for escape from the "chain gang."

SEC. II.   Repeals conflicting laws.

Approved February 23, 1876.

---

### No. CXXX.—(O. No. 264.)

SECTION.
  1.  Fœticide—how punished.
  2.  Use of medicine, etc , assault with intent to murder.

SECTION.
  3.  Abortion—punishment of.

*An Act to prevent and punish fœticide or criminal abortion in the State of Georgia.*

SECTION I.   *Be it enacted, etc.,* That from and after the passage Fœticide— of this Act, the wilful killing of an unborn child, so far devel- punishm't oped as to be ordinarily called "quick," by any injury to the for mother of such child, which would be murder if it resulted in the death of such mother, shall be guilty of a felony, and punishable by death or imprisonment for life, as the jury trying the case may recommend.

SEC. II.   *Be it further enacted,* That every person who shall Use of med- administer to any woman pregnant with a child, any medicine, icine or drug, or substance whatever, or shall use or employ any instru- instrument ment or other means, with intent thereby to destroy such child, made unless the same shall have been necessary to preserve the life of intent to such mother, or shall have been advised by two physicians to be murder necessary for such purpose, shall, in case the death of such child or mother be thereby produced, be declared guilty of an assault with intent to murder.

SEC. III.   *Be it further enacted,* That any person who shall wil- Abortion— fully administer to any pregnant woman any medicine, drug or punishm't substance, or anything whatever, or shall employ any instrument of or means whatever, with intent thereby to procure the miscarriage or abortion of any such woman, unless the same shall have been necessary to preserve the life of such woman, or shall have been advised by two physicians to be necessary for that purpose, shall, upon conviction, be punished as prescribed in section 4310 of the Revised Code of Georgia.

SEC. IV.   Repeals conflicting laws.

Approved February 25, 1876.

## CHAPTER XLVI.

AN ACT to prevent the carrying of concealed weapons, and for other purposes.

SECTION 1. *Be it enacted by the Legislature of the State of Mississippi,* That any person, not being threatened with, or having good and sufficient reason to apprehend an attack, or traveling (not being a tramp) or setting out on a journey, or peace officers, or deputies in discharge of their duties, who carries concealed, in whole or in part, any bowie knife, pistol, brass knuckles, slung shot or other deadly weapon of like kind or description, shall be deemed guilty of a misdemeanor, and on conviction, shall be punished for the first offence by a fine of not less than five dollars nor more than one hundred dollars, and in the event the fine and cost are not paid shall be required to work at hard labor under the direction of the board of supervisors or of the court, not exceeding two months, and for the second or any subsequent offence, shall, on conviction, be fined not less than fifty nor more than two hundred dollars, and if the fine and costs are not paid, be condemned to hard labor not exceeding six months under the direction of the board of supervisors, or of the court. That in any proceeding under this section, it shall not be necessary for the State to allege or prove any of the exceptions herein contained, but the burden of proving such exception shall be on the accused.

*When concealed weapons may be carried.*

*Penalty for carrying weapons.*

*Burden of proof on accused.*

SEC. 2. *Be it further enacted,* That it shall not be lawful for any person to sell to any minor or person intoxicated, knowing him to be a minor or in a state of intoxication, any weapon of the kind or description in the first section of this Act described, or any pistol cartridge, and on conviction shall be punished by a fine not exceeding two hundred dollars, and if the fine and costs are not paid, be condemned to hard labor under the direction of the board of supervisors or of the court, not exceeding six months.

*Minors, or persons intoxicated.*

176                        LAWS OF THE

SEC. 3. *Be it further enacted,* That any
father, who shall knowingly suffer or permit
any minor son under the age of sixteen years
to carry concealed, in whole or in part, any
weapon of the kind or description in the first
section of this Act described, shall be deemed
guilty of a misdemeanor, and on conviction,
shall be fined not less than twenty dollars, nor
more than two hundred dollars, and if the fine
and costs are not paid, shall be condemned to
hard labor under the direction of the board of
supervisors or of the court.

*Minor under 16 years.*

SEC. 4. *Be it further enacted,* That any
student of any university, college or school,
who shall carry concealed, in whole or in part,
any weapon of the kind or description in the
first section of this Act described, or any
teacher, instructor, or professor who shall,
knowingly, suffer or permit any such weapon
to be carried by any student or pupil, shall
be deemed guilty of a misdemeanor, and, on
conviction, be fined not exceeding three hun-
dred dollars, and if the fine and costs are not
paid, condemned to hard labor under the
direction of the board of supervisors or of the
court.

*Students.*

SEC. 5. *Be it further enacted,* That each
justice of the peace before whom a conviction
is had, shall, in addition to the costs now
allowed by law, be entitled to a tax fee of two
dollars and a half.

*Tax fee of justice.*

SEC. 6. *Be it further enacted,* That imme-
diately after the passage of this Act, the Sec-
retary of State shall transmit a copy to each
circuit judge in the State, who shall cause the
same to be read in open court on the day for
the calling of the State docket of the court.

*Act to be read in courts*

SEC. 7. *Be it further enacted,* That this Act
take effect from and after its passage.

APPROVED, February 28, 1878.

79

conformity to law; or, with the consent and approbation of the probate court, in productive real estate within this state, the title to which shall be taken in the name of the guardian as such; and to manage such investments, and when deemed proper, change the same into any other investment of the above classes; but no real estate so purchased shall be sold by the guardian, except with the consent and approbation of the probate court; and if said guardian fail to loan or invest the money of his ward within such reasonable time, he shall account on settlement for such money and interest thereon, calculated with annual rests; and also to settle and adjust, when necessary or desirable, the assets which he may receive, in kind, from an executor or administrator, as may be most advantageous to his wards, but before such settlement and adjustment shall be valid and binding, it shall be approved by the probate court, and such approval entered on its journal; and with the like approval, to hold the assets as received from the executor or administrator, or what may be received in the settlement and adjustment of said assets.

Eighth—To obey and perform all orders and judgments of the proper courts touching the guardianship.

SEC. 3.   That sections six thousand one hundred and eighty-nine and six thousand two hundred and sixty-nine be and the same are hereby repealed.   *Repeals.*

SEC. 4.   This act shall take effect and be in force from and after its passage.

THOS. A. COWGILL,
*Speaker of the House of Representatives.*
R. G. RICHARDS,
*President pro tem. of the Senate.*

Passed March 25, 1880.

---

[Senate Bill No. 1.]

AN ACT

Supplementary to chapter eight (8), title one (1), part four (4), of the revised statutes of Ohio.

SECTION 1.   *Be it enacted by the General Assembly of the State of Ohio,* That the following section be enacted as supplementary to chapter 8, title 1, part 4, of the revised statutes with sectional number as herein provided:

Section 6986a.   That whoever sells, barters, or gives away to any minor under the age of fourteen years, any air-gun, musket, rifle-gun, shot-gun, revolver, pistol, or other fire-arm, of any kind or description whatever, or ammunition for the same, or whoever being the owner, or having charge or control of any such air-gun, musket, rifle-gun, shot-gun, revolver, pistol or other fire-arm knowingly permits the same to be used by such minor, shall be deemed guilty of a misdemeanor, and   *Penalty for selling or giving, etc., fire-arms to minors.*

60

upon conviction thereof shall be fined in any sum not exceeding one hundred dollars, or be imprisoned in jail not exceeding thirty days or both.

SEC. 2.    This act shall take effect and be in force from and after its passage.

THOS. A. COWGILL,
*Speaker of the House of Representatives.*
R. G. RICHARDS,
*President pro tem. of the Senate.*

Passed March 25, 1880.

---

[Substitute for House Bill No. 72.]

AN ACT

To amend section 3897 of the revised statutes.

SECTION 1.    *Be it enacted by the General Assembly of the State of Ohio,* That section three thousand eight hundred and ninety-seven of the revised statutes be so amended to read as follows:

Section 3897.    In city districts of the first class, the board of education shall consist of two members for each ward, except in districts organized under a law providing for one member only for each ward, in which districts the board may at any time, by a vote of a majority of its members, provide that thereafter each ward shall be represented by two members, and thereupon proceed to choose one additional member for each ward, to serve until the next annual election for city officers, and until the election and qualification of his successor; and each member of the board shall be an elector of the ward for which he is elected or appointed: provided, that in city districts of the first class, having a population, according to the last federal census, of one hundred and fifty thousand and over, the board of education shall consist of thirty-seven members, twelve of whom shall be elected at the April election of the current year, to hold office as follows:    The four members who receive the highest number of votes for three years, the four who receive the next highest number of votes for two years, the four who receive the next highest number of votes for one year: and thereafter there shall be elected, annually, four members to serve for three years.    In case of a tie vote the choice of terms shall be determined by lot.    And the remaining twenty-five members shall consist of those members of the board of education elected at the April election in 1879, and whose terms of office do not expire until April, 1881; that, beginning with the April election of 1881, one member shall be elected from each ward of said cities; and such of said members as shall have been elected by wards having an odd numerical

*Board of education in city districts of the first class; how constituted.*

716                                    LAWS OF DELAWARE.

OF CRIMES AND PUNISHMENTS.

be found the court shall impose a fine on the person so found
guilty of the breaking and entering. not exceeding three hun-
Penalty.    dred dollars, or shall imprison him for a term not exceeding
three years, or both, at the discretion of the court.

*Passed at Dover, February 24, 1881.*

CHAPTER 548.

OF OFFENSES AGAINST PUBLIC JUSTICE.

Title.    AN ACT providing for the punishment of persons carrying concealed
deadly weapons.

*Be it enacted by the Senate and House of Representatives of the
State of Delaware, in General Assembly met:*

Unlawful
to carry
concealed
deadly
weapons.

Punish-
ment.

SECTION 1.    That if any person shall carry concealed a deadly
weapon upon or about his person other than an ordinary pocket
knife, or shall knowingly sell a deadly weapon to a minor other
than an ordinary pocket knife, such person shall, upon convic-
tion thereof, be fined not less than twenty-five nor more than one
hundred dollars or imprisoned in the county jail for not less than
ten nor more than thirty days, or both at the discretion of the
court: *Provided,* that the provisions of this section shall not
apply to the carrying of the usual weapons by policemen and
other peace officers.

Discharg-
ing fire-
arms in
any public
road, a mis-
demeanor.

Penalty.

SECTION 2.    That if any person shall, except in lawful self-
defence discharge any fire-arm in any public road in this State,
shall be deemed guilty of a misdemeanor and upon conviction
thereof shall be punished by fine not exceeding fifty dollars or
by imprisonment not exceeding one month, or both at the
discretion of the court.

Unlawful
to point a
gun or
pistol at
another.

SECTION 3.    That it shall be unlawful for any person, either
in jest or otherwise, intentionally to point a gun, pistol or other
fire-arms at or towards any other person at any time or place. Any
person violating any provision of this section shall, upon convic-
tion thereof, pay a fine of not less than ten dollars nor more
than one hundred dollars and the cost of prosecution, and should

## OF CRIMES AND PUNISHMENTS.

·death result to any person by the discharge of such gun, pistol or other fire-arm while so pointed, the person pointing the same Penalty. shall be guilty of manslaughter when such killing shall not .amount to murder, and shall be punished accordingly.

*Passed at Dover, April 8, 1881.*

---

## CHAPTER 519.

### GENERAL PROVISIONS CONCERNING CRIMES AND PUNISHMENTS.

AN ACT to amend Chapter 133 of the Revised Code, (General Provisions Title. Concerning Crimes, &c.)

*Be it enacted by the Senate and House of Representatives of the State of Delaware, in General Assembly met:*

SECTION 1.   That Section 10 of Chapter 133 of the Revised Section 10, Code, be amended by adding thereto as follows:  If no order R. Code. has been made by the court at the term when the sentence was amended. made, or at a succeeding term, the resident judge of the county, shall have power to make such order upon petition and proof of inability; and the said order when made and filed with the Clerk of the Peace, shall be sufficient authority for the discharge of the prisoner.  It shall be the duty of the Clerk of the Peace to furnish the sheriff at once with a certified copy of said order.

*Passed at Dover, January 26, 1881.*

LAWS OF FLORIDA.

CHAPTER 3284—[No. 66.]

AN ACT to Make the Public Use of Indecent or Obscene Language a Misdemeanor, and Provide for the Punishment thereof.

*The People of the State of Florida, represented in Senate and Assembly, do enact as follows:* SECTION 1. Any person who shall publicly use or utter any indecent or obscene language shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined in a sum not to exceed twenty-five dollars, or be imprisoned in the county jail not exceeding thirty days, in the discretion of the court.

*Public use of obscene language.*

Approved January 24, 1881.

———

CHAPTER 3285—[No. 67.]

AN ACT to Prevent the Selling, Hiring, Bartering, Lending or Giving to Minors under Sixteen Years of Age, or to any Person of Unsound Mind, Certain Fire-arms or other Dangerous Weapons.

*The People of the State of Florida, represented in Senate and Assembly, do enact as follows:* SECTION 1. It shall be unlawful for any person or persons to sell, hire, barter, lend or give to any minor under sixteen years of age any pistol, dirk or other arm or weapon, other than an ordinary pocket-knife, or a gun or rifle used for hunting, without the permission of the parent of such minor, or the person having charge of such minor, and it shall be unlawful for any person or persons to sell, hire, barter, lend or give to any person or persons of unsound mind any dangerous weapon, other than an ordinary pocket-knife.

*Selling, lending, &c., weapons to minors under 16 years without permission of parent, unlawful.*

SEC. 2. Any person or persons so offending shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not less than twenty nor more than fifty dollars, or imprisoned in the county jail not more than three months.

*Penalty.*

Approved February 4, 1881.

———

CHAPTER 3286—[No. 68.]

AN ACT to Enforce a Distinctive Wrapping and Proper Labeling of Preparations of Morphine.

WHEREAS, Numerous deaths have occurred in this State by mistakes having been made in giving sulphate and other preparations of morphine as quinine; *and whereas,* such mistakes

*Preamble.*

# CRIMINAL CODE.

## DEADLY WEAPONS.

### REGULATES TRAFFIC AND PREVENTS SALE TO MINORS.

§ 1. Forbids possession or sale of slung-shots or knuckles—penalty.

§ 2. Forbids sale, loan or gift to minors, of fire-arms or other deadly weapons—penalty.

§ 3. Provides for registry of sales by dealers in deadly weapons—Form of register—penalty for failure to keep same.

§ 4. Penalty for carrying deadly weapons or display of same.

§ 5. Fines and penalties—how recovered – Increased penalty for second offense.

§ 6. Exempts sheriffs, coroners, constables, policemen or peace officers from provisions of this act.

§ 7. Repealing clause for acts in conflict.

In force July 1, 1881.

AN ACT *to regulate the traffic in deadly weapons, and to prevent the sale of them to minors.*

SECTION 1. *Be it enacted by the People of the State of Illinois, represented in the General Assembly,* That whoever shall have in his possession, or sell, give or loan, hire or barter, or whoever shall offer to sell, give, loan, hire or barter, to any person within this state, any slung-shot or metallic knuckles, or other deadly weapon of like character, or any person in whose possession such weapons shall be found, shall be guilty of a misdemeanor, and upon conviction shall be fined in any sum not less than ten dollars ($10) nor more than two hundred dollars ($200).

§ 2. Whoever, not being the father, guardian or employer of the minor herein named, by himself or agent, shall sell, give, loan, hire or barter, or shall offer to sell, give, loan, hire or barter to any minor within this state, any pistol, revolver, derringer, bowie knife, dirk or other deadly weapon of like character, capable of being secreted upon the person, shall be guilty of a misdemeanor, and shall be fined in any sum not less than twenty-five dollars ($25) nor more than two hundred dollars ($200).

§ 3. All persons dealing in deadly weapons, hereinbefore mentioned, at retail within this state shall keep a register of all such weapons sold or given away by them. Such register shall contain the date of the sale or gift, the name and age of the person to whom the weapon is sold or given, the price of the said weapon, and the purpose for which it is purchased or obtained. The said register shall be in the following form:

| No. of weapon. | To whom sold or given. | Age of purchaser. | Kind and description of weapon. | For what purpose purchased or obtained. | Price of weapon. |
|---|---|---|---|---|---|

Said register shall be kept open for the inspection of the public, and all persons who may wish to examine the same may do so at all reasonable times during business hours. A failure to keep such register, or to allow an examination of the same, or to record

therein any sale or gift of a deadly weapon, or the keeping of a false register, shall be a misdemeanor, and shall subject the offender to a fine of not less than twenty-five dollars ($25) nor more than two hundred dollars ($200).

§ 4.  Whoever shall carry a concealed weapon upon or about his person of the character in this act specified, or razor as a weapon, or whoever, in a threatening or boisterous manner, shall display or flourish any deadly weapon, shall be guilty of a misdemeanor, and shall be fined in any sum not less than twenty-five dollars ($25) nor more than two hundred dollars ($200).

§ 5.  All fines and penalties specified in this act may be recovered by information, complaint or indictment, or other appropriate remedy, in any court of competent jurisdiction; and, when recovered, shall be paid into the county treasury of the county where the conviction is had, and become a part of the current revenue of the county; or the said fines and penalties may be recovered by *qui tam* action, one-half to be paid to the informer, and the other half to be paid into the county treasury, as aforesaid.  For a second violation of any of the provisions of this act the offender shall be fined in double the amount herein specified, or may be committed to the county jail for any term not exceeding twenty days, in the discretion of the court.

§ 6.  Section four (4) of this act shall not apply to sheriffs, coroners, constables, policemen or other peace officers, while engaged in the discharge of their official duties, or to any person summoned by any of such officers to assist in making arrest, or preserving the peace, while such person so summoned is engaged in assisting such officer.

§ 7.  All acts and parts of acts in conflict with this act are hereby repealed.

APPROVED April 16, 1881.

————

PENALTY FOR ADULTERATION OF BUTTER AND CHEESE.

| § 1. Manufacture of imitations or adulteration of butter and cheese prohibited—Penalty. | § 2. Repealing clause. In force July 1, 1881. |
|---|---|

AN ACT *to prevent the adulteration of butter and cheese, or the sale or disposal of the same, or the manufacture or sale of any article as a substitute for butter or cheese, or any article to be used as butter and cheese.*

SECTION 1.  *Be it enacted by the People of the State of Illinois, represented in the General Assembly,* That whoever manufactures out of any oleaginous substances, or any compound of the same other than that produced from unadulterated milk, or cream from the same,

any article designed to take the place of butter or cheese produced from pure, unadulterated milk, or cream of the same, and shall sell, or offer for sale, the same as butter or cheese, or give to any person the same as an article of food, as butter or cheese, shall, on conviction thereof, be fined not less than twenty-five dollars ($25) nor more than two hundred dollars ($200).

§ 2. All acts or parts of acts inconsistent with this act are hereby repealed.

APPROVED June 1, 1881.

## ADULTERATION OF ARTICLES OF FOOD, DRINK OR MEDICINE.

| | |
|---|---|
| § 1. Prohibits adulteration of food, and forbids sale of. | § 5. Prescribes penalty for violation of this act. |
| § 2. Prohibits mixing drugs and medicine. | § 6. Convictions not to be had if persons can show a lack of knowledge of the law. |
| § 3. Requires notice of adulterated articles, and stamping of same when offered for sale. | § 7. State's attorney's charged with the execution of law. |
| § 4. Prohibits adulteration of butter and cheese with oleomargarine, unless stamped. | § 8. Repeals conflicting acts. |
| | In force July 1, 1881. |

AN ACT *to prevent and punish the adulteration of articles of food, drink and medicine, and the sale thereof when adulterated.*

SECTION 1. *Be it enacted by the People of the State of Illinois, represented in the General Assembly,* That no person shall mix, color, stain or powder, or order or permit any other person in his or her employ to mix, color, stain or powder any article of food with any ingredient or material, so as to render the article injurious to health, or depreciate the value thereof, with intent that the same may be sold; and no person shall sell or offer for sale any such article so mixed, colored, stained or powdered.

§ 2. No person shall, except for the purpose of compounding in the necessary preparation of medicine, mix, color, stain or powder, or order or permit any other person to mix, color, stain or powder, any drug or medicine with any ingredient or material, so as to affect injuriously the quality or potency of such drug or medicine, with intent to sell the same, or shall sell or offer for sale any such drug or medicine so mixed, colored, stained or powdered.

§ 3. No person shall mix, color, stain or powder any article of food, drink or medicine, or any article which enters into the composition of food, drink or medicine, with any other ingredient or material, whether injurious to health or not, for the purpose of gain or profit, or sell, or offer the same for sale, or order or permit any other person to sell or offer for sale any article so mixed, colored, stained or powdered, unless the same be so manufactured, used or sold, or offered for sale under its true and appropriate

SEC. 8.  The Board of County Commissioners of said county are hereby authorized and empowered to grant to the said parties, named in Section One of this Act, their associates or assigns, such additional rights, privileges and grants as said parties, their associates and assigns, may desire or deem necessary for the full and complete enjoyment of the franchise and privileges created and granted by this Act. *Commissioners empowered to grant additional rights.*

SEC. 9.  The Board of County Commissioners shall require of said railroad company the payment of a quarterly license for each and every car run on said railroad; also regulate the charge for fare and freights thereon; and do such other matters and things relating to said railroad as they may deem just and proper. *License required.*

---

CHAP. CIII.—*An Act to Repeal an Act entitled "An Act to Authorize the Publication of the Laws Enacted in the Legislature of the State of Nevada," approved March 2, 1877.*

[Approved March 4, 1881.]

*The People of the State of Nevada, represented in Senate and Assembly, do enact as follows:*

SECTION 1.  An Act entitled "An Act to Authorize the Publication of the Laws Enacted by the Legislature of the State of Nevada," approved the second day of March, A. D. one thousand eight hundred and seventy-seven, is hereby repealed. *Publication of Statutes, law repealed.*

---

CHAP. CIV.—*An Act to Prohibit the Carrying of Concealed Weapons by Minors.*

[ Approved March 4, 1881.]

*The People of the State of Nevada, represented in Senate and Assembly, do enact as follows:*

SECTION 1.—Every person under the age of eighteen (18) years who shall wear or carry any dirk, pistol, sword in case, slung shot, or other dangerous and deadly weapon concealed upon his person shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, be fined not less than twenty nor more than two hundred ($200) dollars, or by *Minors prohibited from carrying concealed weapons, penalty, etc.*

144                    LAWS OF NEVADA,

imprisonment in the County Jail not less than thirty days nor more than six months, or by both such fine and imprisonment.

SEC. 2.    All Acts and parts of Acts in conflict with the provisions of this Act are hereby repealed.

SEC. 3.    This Act shall take effect and be in force from and after its passage.

---

CHAP. CV.—*An Act Fixing the Salaries of the District Judges in the Several Judicial Districts and Matters Relating Thereto.*

[ Approved March 4, 1881. ]

*The People of the State of Nevada, represented in Senate and Assembly, do enact as follows :*

District
Judges' sal-
aries pre-
scribed, to
take effect
in 1883.

SECTION 1.    The annual salaries of the Judges of the several Judicial Districts shall be as follows :

Of the First District—Six thousand ($6,000) dollars.

Of the Second District—Four thousand ($4,000) dollars; of which sum the county of Ormsby shall pay twenty-eight hundred ($2,800) dollars and the county of Douglas shall pay twelve hundred ($1,200) dollars.

Of the Third District—Five thousand ($5,000) dollars; the county of Lyon shall pay twenty-five hundred ($2,500) dollars and the county of Esmeralda shall pay twenty-five hundred ($2,500) dollars.

Of the Fourth District—Forty-five hundred ($4,500) dollars; of which sum the county of Humboldt shall pay eighteen hundred ($1,800) dollars and the county of Elko shall pay twenty-seven hundred ($2,700) dollars.

Of the Fifth District—Five thousand ($5,000) dollars ; of which sum the county of Lander shall pay twenty-two hundred and fifty ($2,250) dollars, the county of Nye shall pay nineteen hundred ($1,900) dollars, and the county of Churchill eight hundred and fifty ($850) dollars.

Of the Sixth District—Six thousand five hundred ($6,500) dollars; of which sum the county of Eureka shall pay thirty-five hundred ($3,500) dollars, the county of White Pine shall pay eighteen hundred ($1,800) dollars, and the county of Lincoln shall pay twelve hundred ($1,200) dollars.

Of the Seventh Judicial District—Thirty-six hundred ($3,600) dollars.

SEC. 2.    This Act shall take effect and be in force on the first Monday in January, eighteen hundred and eighty-three, and all Acts heretofore passed and in conflict with this Act are hereby repealed.

drawing the casing, fill up the well with sand or rock sediment to the depth of at least twenty feet above the third sand or oil-bearing rock, and drive a round, seasoned, wooden plug at least two feet in length, equal in diameter to the diameter of the well below the casing, to a point at least five feet below the bottom of the casing, and, immediately after the drawing of the casing, shall drive a round wooden plug into the well at the point just below where the lower end of the casing shall have rested, which plug shall be at least three feet in length, tapering in form and to be of the same diameter at the distance of eighteen inches from the smaller end as the diameter of the well below the point at which it is to be driven ; after it has been properly driven shall fill in on top of same with sand or rock sediment to the depth of at least five feet.

Section 2. Any person who shall violate the provisions of this act shall be liable to a penalty of two hundred dollars, one half to be for the use of the informer and one half to the use of the school district in which such well may be situated, to be recovered as debts of like amount are by law recoverable. <span style="float:right">Penalty.</span>

Section 3. Whenever any owner or operator shall neglect or refuse to comply with the provisions of this section one of this act, the owner of, or operator upon any land adjoining that upon which such abandoned well may be, may enter, take possession of said abandoned well and plug the same as provided by this act, at the expense of the owner or operator whose duty it may be to plug the same. <span style="float:right">Adjoining owner may plug abandoned well.</span>

Section 4.   All acts or parts of acts inconsistent herewith are hereby repealed.

Approved—The 10th day of June, A. D. 1881.

HENRY M. HOYT.

---

## No. 124.

### AN ACT

To prohibit the sale to any person under sixteen years of age of deadly weapons, gunpowder and explosive substances, in the commonwealth of Pennsylvania.

Section 1. *Be it enacted, &c.,* That any person, who shall knowingly and willfully sell or cause to be sold, to any person under sixteen years of age, any cannon, revolver, pistol or other such deadly weapon, or who shall knowingly and willfully sell or cause to be sold to any such minor, any imitation or toy cannon, revolver or pistol so made, constructed or arranged as to be capable of being loaded with gunpowder or other explosive substance, cartridges, shot, slugs or balls, and being exploded, fired off and discharged, and thereby become a dangerous or deadly weapon, or who shall knowingly and willfully sell or cause to be sold to any such minor any cartridge, gunpowder or other dangerous and explosive substance, shall, in every such case, be guilty of a misdemeanor, <span style="float:right">Sale of deadly weapons and explosives to minors prohibited.</span>

112                         LAWS OF PENNSYLVANIA,

Punishment.    and upon conviction thereof shall be sentenced to pay a fine
not exceeding three hundred dollars.

APPROVED—The 10th day of June, A. D. 1881.
HENRY M. HOYT.

---

No. 125.

AN ACT

Providing for taxing owners and harborers of dogs in cities of the
commonwealth, and for the destroying of dogs.

Cities may tax owners of dogs, &c.    SECTION 1. *Be it enacted, &c.*, That every city of the com-
monwealth shall have power to pass ordinances taxing the
owners and harborers of dogs and providing for the destroy-
ing of all dogs found at large, contrary to any ordinance.

Repeal.    SECTION 2. All acts or parts of acts inconsistent with this
act be and the same are hereby repealed.

APPROVED—The 10th day of June, A. D. 1881.
HENRY M. HOYT.

---

No. 126.

A FURTHER SUPPLEMENT

To an act approved April twenty-ninth, Anno Domini one thousand
eight hundred and seventy-four, entitled " An act to provide for
the incorporation and regulation of certain corporations."

Courts may hear and determine complaints of impurity, &c., of gas and water.    SECTION 1. *Be it enacted, &c.*, That the provisions of the
third clause of section thirty-four of the act, approved April
twenty-ninth, Anno Domini one thousand eight hundred and
seventy-four, entitled " An act to provide for the incorpora-
tion and regulation of certain corporations," which reads as
follows : *Provided*, That the said corporations shall at all
times furnish pure gas and water, and any citizen using the
same may make complaint of impurity or deficiency in quan-
tity, or both, to the court of common pleas of the proper
county, by bill filed, and after hearing the parties touching
the same, the said court shall have power to make such order
in the premises as may seem just and equitable, and may
dismiss the complaints or compel the corporation to correct
the evil complained of," be and the same is hereby extended
and made applicable to all gas and water companies incor-
porated under any of the laws of this commonwealth.

Practice in such cases.    SECTION 2. That all proceedings authorized by said pro-
viso shall be in accordance with the rules of equity practice
now existing : *Provided*, That all lawful fees and costs ac-

Costs.    cruing in such proceeding shall be taxed and allowed as pro-
vided by the equity fee bill in the respective court and paid
by the unsuccessful party.

656                LAWS OF MARYLAND

### Chapter 424.

AN ACT to prohibit the sale of " Deadly Weapons to Minors."

SECTION 1. *Be it enacted by the General Assembly of Maryland,* That it shall be unlawful for any person or persons within the State of Maryland to manufacture or to sell, barter or give away the cartridge toy pistol to any one whomsoever.

*Cartridge toy pistol.*

SEC. 2. *Be it enacted,* That it shall be unlawful for any person, be he or she licensed dealer or not, to sell, barter or give away any firearm whatsoever or other deadly weapons, except shot gun, fowling pieces and rifles, to any person who is a minor under the age of twenty-one years. Any person or persons violating any of the provisions of this act shall, on conviction thereof, pay a fine of not less than fifty nor more than two hundred dollars, together with the cost of prosecution, and upon failure to pay said fine and cost, be committed to jail and confined therein until such fine and costs are paid, or for the period of sixty days, whichever shall first occur.

*Prohibiting selling to minors.*

SEC. 3. *And be it enacted,* That this act shall take effect from the date of its passage.

*Effective.*

Approved May 3, 1882.

———————•••———————

### Chapter 425.

AN ACT to authorize the Commissioners of Talbot county to open water courses through private property in said county to secure the proper drainage of the public roads therein.

SECTION 1. *Be it enacted by the General Assembly of Maryland,* That whenever any supervisor or contractor of the public roads in Talbot county shall find it necessary to open a water course through private property in said county, to secure the proper drainage of any public road therein, he shall forthwith so inform the County Commissioners of Talbot county, and if the owner or owners of said

*Open water course.*

of his duty as such, or by any means obstruct or impede,
or attempt to obstruct or impede the administration of
justice in any court, he shall be guilty of a misdemeanor,
and unless otherwise provided by law he shall be fined not <span>Punishment prescribed.</span>
less than twenty-five nor more than two hundred dollars,
and be imprisoned in the county jail not exceeding six
months.

[Approved March 29, 1882.]

[Note by the Clerk of the House of Delegates.]

The foregoing act takes effect at the expiration of ninety
days after its passage.

————

## CHAPTER CXXXV.

AN ACT amending and re-enacting section seven of chap-
ter one hundred and forty-eight of the code of West
Virginia, and adding additional sections thereto for the
punishment of unlawful combinations and conspiracies
to injure persons or property.

[Passed March 24, 1882.]

Be it enacted by the Legislature of West Virginia:

1. That section seven of chapter one hundred and forty- <span>Code amended; section 7 of chapter 148 of.</span>
eight of the code of West Virginia be, and the same is
hereby, amended and re-enacted so as to read as follows:

7. If a person carry about his person any revolver or <span>Deadly weapons; penalty for carrying.</span>
other pistol, dirk, bowie knife, razor, slung shot, billy,
metalic or other false knuckles, or any other dangerous or
deadly weapon of like kind or character, he shall be guilty
of a misdemeanor, and fined not less than twenty-five nor
more than two hundred dollars, and may, at the discretion
of the court, be confined in jail not less than one, nor more
than twelve months; and if any person shall sell or fur-
nish any such weapon as is hereinbefore mentioned to a
person whom he knows, or has reason, from his appear-
ance or otherwise, to believe to be under the age of twenty- <span>Selling certain weapons to minors;</span>
one years, he shall be punished as hereinbefore provided; <span>penalty.</span>
but nothing herein contained shall be so construed as to <span>Acts of persons to which sec-</span>
prevent any person from keeping or carrying about his <span>tions do not apply.</span>
dwelling house or premises any such revolver or other
pistol, or from carrying the same from the place of pur-
chase to his dwelling house, or from his dwelling house to
any place where repairing is done, to have it repaired, and
back again. And if upon the trial of an indictment for <span>Upon trial of indictment for carrying deadly</span>
carrying any such pistol, dirk, razor or bowie knife, the

Digitized from Best Copy Available

**cealed weapons, when jury to find accused not guilty.** defendant shall prove to the satisfaction of the jury that he is a quiet and peaceable citizen, of good character and standing in the community in which he lives, and at the time he was found with such pistol, dirk, razor or bowie knife, as charged in the indictment, he had good cause to believe and did believe that he was in danger of death or great bodily harm at the hands of another person, and that he was, in good faith, carrying such weapon for self defense and for no other purpose, the jury shall find him **Provisions of section not to apply to officers of the law.** not guilty. But nothing in this section contained shall be so construed as to prevent any officer charged with the execution of the laws of the state from carrying a revolver or other pistol, dirk or bowie knife.

**Additional sections added.** 2. That the said chapter be and the same is hereby amended by adding thereto the following additional sections, as parts thereof, to-wit:

**Combinations or conspiracies to injure  etc , persons and property, deemed a misdemeanor.** 9. If two or more persons under the name of "Red Men," "Regulators," "Vigilance Committee," or any other name or without a name, combine or conspire together for the purpose of inflicting any punishment, or bodily injury upon any other person, or persons, or for the purpose of destroying, injuring, or taking and carrying away  any property, real  or personal, not their own, every such person, whether he has done any act in pursuance of such combination or conspiracy or not, shall be guilty of a misde- **Penalty.** meanor and fined not less than fifty, nor more than five hundred dollars, and may, at the discretion of the court, be confined in jail not less than one, nor more than twelve months.

**Injury, etc., inflicted by such combination, etc , upon any person or property, deemed a felony** 10. If any person, in pursuance of such combination or conspiracy as is mentioned in the next preceding section, shall inflict any punishment or bodily injury upon another person, or shall destroy, injure, or take and carry away, any property, real or personal, not his own, he shall be guilty of a felony, and confined in the penitentiary not **Punishment. When such combination or conspiracy to be presumed.** less than two nor more than ten years. And if, on the trial of an indictment under this section it be proved that two or more persons, the defendant being one, were present, aiding and abetting in the commission of the offense charged therein, it shall be presumed that such offense was committed in pursuance of such combination or conspiracy, in the absence of satisfactory proof to the contrary. And all persons who shall be present, aiding and abetting, **Aiders and abettors deemed conspirators.** at the commission of any offense mentioned in this section shall be deemed  conspirators within the meaning of this, and the next preceding section.

**No witness excused from answering, because such answers would,** 11. No person called as a witness for the state on the trial of any person for an offense mentioned in either of the two next preceding sections, shall be excused from answering any question which may be asked him as such

Digitized from Best Copy Available

witness, and which would be otherwise legal and proper, *etc., degrade him or expose him to punishment.* on the ground that the answer to such question would or might degrade him, or expose him to punishment; but no such witness, who shall fully and truly answer all such *Such witness answering truly and fully* questions as may be asked him touching his connection with, or knowledge of such combination or conspiracy, or *exempted from prosecution, etc, for same offense, etc.* of the commission of the offense charged in the indictment, in pursuance of such combination or conspiracy, shall thereafter be prosecuted or punished for the same offense mentioned in the indictment upon which the accused is being tried.

12. Persons offending against any of the provisions of *May be indicted jointly or separately.* the ninth and tenth sections of this chapter, may be indicted therefor, either jointly or separately.

13. If the death of any person shall result from the *If person die conspirators guilty of murder of first degree.* commission of any offense mentioned in the tenth section of this chapter, every person engaged in the commission of such offense shall be guilty of murder of the first degree, and punished as in other cases of murder of the first degree.

14. If any person by force, or other unlawful means, *To release or rescue, or attempt to release, etc., person charged, etc., with an offense under sections 9 and 10 a felony. Punishment.* shall release or rescue, or attempt to release or rescue a person in prison or other custody, charged with, or convicted of an offense under the provisions of the ninth or tenth section of this chapter, he shall be guilty of felony and confined in the penitentiary as provided in said tenth section.

15. If any person shall, by threats, menaces, or other- *Intimidating, etc., witness, a felony.* wise, intimidate, or attempt to intimidate, a witness for the state in any prosecution under the ninth, or any succeeding section of this chapter, for the purpose of preventing the attendance of such witness at the trial of such case, or shall in any way or manner prevent, or attempt to prevent, the attendance of any such witness at *Punishment.* such trial, he shall be guilty of felony and confined in the penitentiary not less than one, nor more than ten years, or he may, at the discretion of the court, be confined in the jail of the county not less than three, nor more than twelve months, and fined not less than one hundred, nor more than five thousand dollars.

16. The governor is hereby authorized, whenever in *Governor to employ any and all means, etc., to secure arrest of persons belonging to such unlawful combinations, etc.* his opinion it is proper to do so, to offer rewards, and employ special policemen and detectives, and to employ any and all means in his power, including the employment of any portion of the military forces of the state, to secure the apprehension of any and all persons belonging to any such unlawful combination, or who shall be charged with the commission of any offense mentioned in the tenth, or any succeeding section of this chapter.

[Approved March 29, 1882.]

Digitized from Best Copy Available

ADD212

424      CONCERNING INQUESTS, ETC.      [CH. 136

[NOTE BY THE CLERK OF THE HOUSE OF DELEGATES.]

The foregoing act takes effect from its passage, two-thirds of the members elected to each House, by a vote taken by yeas and nays, having so directed.

---

## CHAPTER CXXXVI.

AN ACT amending and re-enacting chapter one hundred and fifty-four of the code of West Virginia, concerning inquests on dead bodies.

[Passed March 24, 1882.]

Be it enacted by the Legislature of West Virginia:

1. That chapter one hundred and fifty-four of the code of West Virginia, be and the same is hereby amended and re-enacted so as to read as follows:

*Code amended; chapter 154 of.*

### CHAPTER CLIV.

*Of Inquest Upon Dead Bodies—Coroner; When and by Whom Appointed, &c.*

1. It shall be the duty of the county court of every county, from time to time, to appoint a coroner for such county, who shall hold his office during the pleasure of said court, and shall take the oath of office prescribed for other county officers. It shall be his duty, or if he be absent, or unable to act, or the office be vacant, the duty of any justice of the peace, upon being notified the dead body of a person, whose death is supposed to have been caused by violence or other unlawful act, and not by casualty, is within his county, to forthwith issue his warrant directed to a constable thereof who shall proceed to execute and make return of the same, commanding such constable to summon twelve suitable residents of the county to be in attendance on such coroner or justice, as jurors, at a place and on a day and hour to be designated in the warrant, to make inquisition, upon the view of the body of the person named therein, or of a person unknown, as the case may be, how such person came to his death; and may, by indorsement on such warrant, or by subpoena, command the officer to whom the same is delivered, to summon such witnesses as the coroner or justice may designate, or as the constable may be informed, or have reason to believe, have knowledge of the circumstances attending such death, to be in attendance upon the said inquest at such time as may be designated in such indorsement or subpoena. In case of the inability or failure of

*Coroner; when and how appointed. Term of office and oath. Duty of coroner or justice upon being notified of death by violence, etc.*

*Warrant to issue; to whom directed and what to command.*

*Witnesses to be summoned.*

Digitized from Best Copy Available

SEC. 9. A copy of the articles of association, certified by the Secretary of the Territory of Arizona, of the Arizona Narrow Gauge Railroad Company, and endorsed as filed by said Secretary on the 23d day of November, A. D. 1882, shall be sufficient proof to the Board of Supervisors of Pima County or officers herein named of the identification of said Arizona Narrow Gauge Railroad Company herein mentioned. The route of said road shall in all respects, so far as practicable, conform substantially to the route set forth in the articles of incorporation of said company now on file in the office of the Secretary of this Territory.

SEC. 10. This Act shall take effect and be in force from and after its passage.

Approved February 21st, 1883.

———

No. 36.                    AN ACT

Supplemental to and amendatory of an Act entitled "An Act to prevent the improper use of deadly weapons, and the indiscriminate use of firearms in the towns and villages of the Territory."

*Be it enacted by the Legislative Assembly of the Territory of Arizona:*

SECTION 1. Any person in this Territory having, carrying or procuring from another person, any dirk, bowie-knife, pistol, gun, or other deadly weapon, who shall in the presence of two or more persons draw or exhibit any of said deadly weapons in a rude, angry or threatening manner, not in necessary self-defense, or who shall unlawfully use the same in any fight or quarrel, or who shall handle the same in a careless manner, thereby endangering the life or person of another, shall, upon conviction thereof in any Court of competent jurisdiction, be fined in any sum not exceeding three hundred dollars, or shall be imprisoned in the County Jail not more than six months, or shall be punished by both such fine and imprisonment, in the discretion of the Court trying the cause.

SEC. 2. Any person who shall purposely or carelessly discharge any gun, pistol, or other firearm in any saloon,

5-b

dance-house, store, or other public house or business house in this Territory, thereby endangering the life or person of another, or thereby disturbing any of the inmates thereof, or who shall thereby injure, destroy or damage any property therein, or who shall discharge the same in any city, village or town of this Territory, except in necessary self-defense, shall, upon conviction thereof in any Court of competent jurisdiction, be fined in any sum not exceeding three hundred dollars, or be imprisoned in the County Jail for a period not exceeding six months, or shall be punished by both such fine and imprisonment, in the discretion of the Court trying the cause.

SEC. 3.   Any person in this Territory over the age of ten and under the age of seventeen years, having or carrying, concealed or unconcealed, any dirk, dirk-knife, bowie-knife, slung-shot, brass-knuckles, or pistol within any city, village or town in this Territory shall, upon conviction thereof in any Court of competent jurisdiction, be fined in any sum not more than fifty dollars, or be imprisoned in the County Jail not more than one month, or be punished by both such fine and imprisonment, in the discretion of the Court trying the case.

SEC. 4.   All Acts and parts of Acts in conflict with this Act are hereby repealed.

SEC. 5.   This Act shall take effect and be in force from and after its passage.

Approved February 24th, 1883.

———

No. 37.                    AN ACT

To incorporate the City of Prescott, to define its limits and rights, to specify its privileges and powers, and provide for an efficient government for the same.

*Be it enacted by the Legislative Assembly of the Territory of Arizona:*

ARTICLE I.—INCORPORATION AND CITY BOUNDARIES.

SECTION 1.  The village of Prescott, in the Territory of Arizona, is hereby constituted and formed into a body politic and corporate, with the name and style of "The City of Prescott."

within thirty days after the said misdemeanor is alleged to have been committed.

SEC. 3. This act shall take effect and be in force from and after its publication in the official state paper.

Approved March 5, 1883.

I hereby certify that the foregoing is a true and correct copy of the original enrolled bill now on file in my office, and that the same was published in the official state paper, March 6, 1883.                JAMES SMITH, *Secretary of State.*

---

## CHAPTER CV.

CRIMES AND PUNISHMENTS — RELATING TO MINORS AND DEADLY WEAPONS OR TOY PISTOLS.

[House Bill No. 99.]

AN ACT to prevent selling, trading or giving deadly weapons or toy pistols to minors, and to provide punishment therefor.

*Be it enacted by the Legislature of the State of Kansas:*

SECTION 1. Any person who shall sell, trade, give, loan or otherwise furnish any pistol, revolver or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind, shall be deemed guilty of a misdemeanor, and shall, upon conviction before any court of competent jurisdiction, be fined not less than five nor more than one hundred dollars.

SEC. 2. Any minor who shall have in his possession any pistol, revolver or toy pistol, by which cartridges may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot or other dangerous weapon, shall be deemed guilty of a misdemeanor, and upon conviction before any court of competent jurisdiction shall be fined not less than one nor more than ten dollars.

SEC. 3. This act to take effect and be in force from and after its publication in the official state paper.

Approved March 5, 1883.

76        CRIMES AND CRIMINAL PROCEDURE.

*Be it enacted by the General Assembly of the State of Missouri, as follows:*

SECTION 1.   Any person or persons doing a commission business in this state who shall receive cattle, hogs, sheep, grain, cotton or other commodities consigned or shipped to him or them for sale on commission, and who shall wilfully make a false return to his or their consignor or shipper, in an account of sale or sales of any such cattle, hogs, sheep, grain, cotton or other commodities made and rendered by such person or persons for and to such consignor or shipper, either as to weights or prices, shall be guilty of a misdemeanor and shall, on conviction, be punished by imprisonment in the county jail not exceeding one year, or by a fine not exceeding five hundred dollars nor less than two hundred dollars, or by fine not less than one hundred dollars and imprisonment in the county jail not less than three months.

Approved April 2, 1883.

———————

CRIMES AND CRIMINAL PROCEDURE: CONCEALED WEAPONS.

AN ACT to amend section 1274, article 2, chapter 24 of the Revised Statutes of Missouri, entitled ''Of Crimes and Criminal Procedure.''

SECTION 1.   Carrying concealed weapon, etc., penalty for increased.

*Be it enacted by the General Assembly of the State of Missouri, as follows:*

SECTION 1.   That section 1274 of the Revised Statutes of Missouri be and the same is hereby amended by inserting the word '' twenty '' before the word '' five '' in the sixteenth line of said section, and by striking out the word '' one '' in the same line and inserting in lieu thereof the word ''two,'' and by striking out the word '' three '' in the seventeenth line of said section and inserting in lieu thereof the word ''six,'' so that said section, as amended, shall read as follows: Section 1274. If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under the militia law of this state, having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slung-shot or other deadly weapon, or shall in the presence of one or more persons exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment.

Approved March 5, 1883.

290                    LAWS OF WISCONSIN.—Ch. 329 -330.

[No. 5, S.]                              [Published April 7, 1883.]
                    CHAPTER 329.
AN ACT to prohibit the use and sale of pistols and revolvers.
*The people of the state of Wisconsin, represented
    in senate and assembly, do enact as follows:*

Relating to
the sale of
pistols.

SECTION 1.   It shall be unlawful for any minor,
within this state, to go armed with any pistol or
revolver, and it shall be the duty of all sheriffs,
constables, or other public police officers, to take
from any minor, any pistol or revolver, found in
his possession.

SECTION 2.   It shall be unlawful for any dealer
in pistols or revolvers, or any other person, to sell,
loan, or give any pistol or revolver to any minor
in this state.

SECTION 3.   It shall be unlawful for any person
in a state of intoxication, to go armed with any
pistol or revolver.   Any person violating the pro-
visions of this act, shall be punished by imprison-
ment in the county jail not exceeding six months,
or by fine not exceeding one hundred dollars
($100).

SECTION 4.   This act shall take effect and be in
force from and after its passage and publication.

    Approved April 3, 1883.

———————————————

[No. 38, S.]                             [Published April 13, 1883.]
                    CHAPTER 330.
AN ACT to provide for the punishment of attempts to commit
    felonies or other crimes, and amendatory of section 4385,
    revised statutes.
*The people of the state of Wisconsin, represented
    in senate and assembly, do enact as follows:*

Relating to
punishment for
attempt to com-
mit felonies
and other
crimes.

SECTION 1.   Section 4385 of the revised statutes,
is hereby amended so as to read as follows;   Sec-
tion 4385.   Any person who shall assault another
with intent to commit any burglary, robbery, rape
or mayhem, or who shall advise or attempt to
commit any arson, or any other felony, that shall
fail in being committed, the punishment for
which such assault, advice or attempt is not herein
prescribed, shall be punished by imprisonment in
the state prison not more than three years nor
less than one year, or by fine, not exceeding one

## CHAPTER 78.

### RELATING TO SALE OF FIRE ARMS TO MINORS.

H. F. 104.    AN ACT to Prohibit the Selling or Giving of Fire Arms to Minors.

*Be it enacted by the General Assembly of the State of Iowa:*

Unlawful to sell or give to minors fire arms or toy pistols.    SECTION 1.  That it shall be unlawful for any person to knowingly sell, present or give any pistol, revolver or toy pistol to any minor.

Fine or imprisonment.    SEC. 2.  Any violation of this act shall be punishable by a fine of not less than twenty-five nor more than one hundred dollars or by imprisonment in the county jail of not less than ten nor more than thirty days.

Publication.    SEC. 3.  This act being deemed of immediate importance shall be in full force and take effect from and after its publication in the Iowa State Leader and Iowa State Register, newspapers published at Des Moines, Iowa.

Approved, March 29, 1884.

I hereby certify that the foregoing act was published in the *Iowa State Leader* April 2, and *Iowa State Register* April 3, 1884.
J. A. T. HULL, *Secretary of State.*

## CHAPTER 79.

### CITIES AND TOWNS.

S. F. 380.    AN ACT to Amend Chapter ninety-five (95) of Laws of Sixteenth General Assembly.

*Be it enacted by the General Assembly of the State of Iowa:*

Chap. 95, 16th G. A., amended.    SECTION 1.  That chapter ninety-five (95) of the laws of the sixteenth general assembly be amended by striking out the number "4,500" in the fifth line of section one of said chapter and inserting the number "3,500" in lieu thereof.

Loans.

Publication.    SEC. 2.  This act being deemed of immediate importance the same shall take effect from and after its publication in the Iowa State Register and Iowa State Leader, newspapers published in Des Moines, Iowa.

Approved, March 29, 1884.

I hereby certify that the foregoing act was published in the *Iowa State Register* April 3, and in the *Iowa State Leader* April 2, 1884.
J. A. T. HULL, *Secretary of State.*

not, such person or persons, owner or owners, shall be subject to such damages as shall be equal to twice the value of the property broken into, eaten up or destroyed.

SEC. 3.   All actions for damages arising under the provisions of this Act shall be tried and determined in the court having jurisdiction thereof, as in other cases made and provided. *Damages.*

SEC. 4.   All Acts and parts of Acts, in conflict with the provisions of this Act, are hereby repealed.

SEC. 5.   This Act shall take effect and be in force from and after thirty days after its approval.

———

CHAP. LI.—*An Act to amend an Act entitled "An Act to prohibit the carrying of concealed weapons by minors," approved March 4, 1881.*

[Approved March 2, 1885.]

*The People of the State of Nevada, represented in Senate and Assembly, do enact as follows:*

SECTION 1.   Section one of said Act is hereby amended so as to read as follows:

Section one.   Every person under the age of twenty-one (21) years who shall wear or carry any dirk, pistol, sword in case, slung shot, or other dangerous or deadly weapon concealed upon his person, shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, be fined not less than twenty nor more than two hundred ($200) dollars, or by imprisonment in the county jail not less than thirty days nor more than six months, or by both such fine and imprisonment. *Minors not to carry concealed weapons.* *Penalty.*

———

CHAP. LII.—*An Act for the relief of William C. Ross.*

[Approved March 2, 1885.]

*The People of the State of Nevada, represented in Senate and Assembly, do enact as follows:*

SECTION 1.   The State Land Register is hereby authorized to enter into contract with William C. Ross, on land applied for by said William C. Ross, February twenty-eighth, eighteen hundred and eighty-one, and described as follows: Lots one, two and three, and the southwest quarter of the northeast quarter of section five, in township number eleven, north of range number twenty-six east. *State Land Register to contract.*

[ 39 ]

filed by the defendant, or by his counsel, the party cast in the suit, shall be considered duly notified of the judgment by the fact of its being signed by the judge;

*Provided,* that in the country parishes no execution shall issue in cases where an appeal lies, until ten days after the adjournment of the court by which the judgment was rendered, within which delay a party may take a suspensive appeal on filing petition and appeal bond as now provided by law. *Relative to appeals in the country parishes.*

S. P. HENRY,
Speaker of the House of Representatives.
JAMES JEFFRIES.
Lieut.-Governor and President of the Senate.
Approved July 1st, 1890.
FRANCIS T. NICHOLLS,
Governor of the State of Louisiana.
A true copy from the original:
L. F. MASON
Secretary of State.

---

No. 46.]              **AN ACT**

Making it a misdemeanor for any person to sell, give or lease, to any minor, any pistol, bowie-knife, dirk or any weapon, intended to be carried or used as a concealed weapon.

SECTION 1. *Be it enacted by the General Assembly of the State of Louisiana,* That, hereafter, it shall be unlawful, for any person to sell, or lease or give through himself or any other person, any pistol, dirk, bowie-knife or any other dangerous weapon, which may be carried concealed to any person under the age of twenty-one years. *Making it a misdemeanor to sell to any minor any pistol, bowie-knife, dirk or other weapon.*

SECTION 2. *Be it further enacted, etc ,* That any person violating the provisions of this act shall be deemed guilty of a misdemeanor and upon conviction thereof, shall pay a fine of not less than twenty-five dollars nor more than one hundred dollars, and in default of the payment of said fine, by imprisonment not exceeding twenty days. *Penalty.*

SEC. 3. *Be it further enacted, etc.,* That all laws or parts of laws in conflict with this act be and the same are hereby repealed, and that this act take effect from and after its passage. *Repealing clause.*

S. P. HENRY,
Speaker of the House of Representatives.
JAMES JEFFRIES,
Lieut.-Governor and President of the Senate.
Approved July 1, 1890.
FRANCIS T. NICHOLLS,
Governor of the State of Louisiana.
A true copy from the original:
L. F. MASON,
Secretary of State.

(2430) § **6.** Every person who, with intent to extort any <span style="float:right">Chap. 25.</span> money or other property from another, sends to any person any <span style="float:right">Sending</span> letter or other writing, whether subscribed or not, expressing or <span style="float:right">threatening letter.</span> implying, or adapted to imply, any threat, such as is specified in the second section of this article, is punishable in the same manner as if such money or property were actually obtained by means of such threat.

(2431) § **7.** Every person who unsuccessfully attempts by means <span style="float:right">Attempting to export money.</span> of any verbal threat such as is specified in the second section of this article, to extort money or other property from another is guilty of a misdemeanor.

### ARTICLE 47.—CONCEALED WEAPONS.

| SECTION. | SECTION. |
|---|---|
| 1. Prohibited weapons enumerated. | 6. Degree of punishment. |
| 2. Same. | 7. Public buildings and gatherings. |
| 3. Minors. | 8. Intent of persons carrying weapons. |
| 4. Public officials, when privileged. | 9. Pointing weapon at another. |
| 5. Arms, when lawful to carry. | 10. Violation of certain sections. |

(2432) § **1.** It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided. <span style="float:right">Prohibited weapons enumerated.</span>

(2433) § **2.** It shall be unlawful for any person in the Territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided. <span style="float:right">Same.</span>

(2434) § **3.** It shall be unlawful for any person within this Territory, to sell or give to any minor any of the arms or weapons designated in sections one and two of this article. <span style="float:right">Minors.</span>

(2435) § **4.** Public officers while in the discharge of their duties or while going from their homes to their place of duty, or returning therefrom, shall be permitted to carry arms, but at no other time and under no other circumstances: *Provided, however,* That if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person. <span style="float:right">Public officials, when privileged.</span>

(2436) § **5.** Persons shall be permitted to carry shot-guns or rifles for the purpose of hunting, having them repaired, or for killing animals, or for the purpose of using the same in public muster or military drills, or while travelling or removing from one place to another, and not otherwise. <span style="float:right">Arms, when lawful to carry.</span>

(2437) § **6.** Any person violating the provisions of any one of the foregoing sections, shall on the first conviction be adjudged guilty of a misdemeanor and be punished by a fine of not less than twenty-five dollars nor more than fifty dollars, or by imprisonment in the county jail not to exceed thirty days or both at the discretion of the court. On the second and every subsequent con- <span style="float:right">Degree of punishment.</span>

**Chap. 25.**   viction, the party offending shall on conviction be fined not less than fifty dollars nor more than two hundred and fifty dollars or be imprisoned in the county jail not less than thirty days nor more than three months or both, at the discretion of the court.

**Public buildings and gatherings.**   (2438) § **7.**   It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.

**Intent of persons carrying weapons.**   (2439) § **8.**   It shall be unlawful for any person in this Territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man.

**Pointing weapons at another.**   (2440) § **9.**   It shall be unlawful for any person to point any pistol or any other deadly weapon whether loaded or not, at any other person or persons either in anger or otherwise.

**Violation of section seven.**   (2441) § **10.**   Any person violating the provisions of section seven, eight or nine of this article; shall on conviction, be punished by a fine of not less than fifty dollars, nor more than five hundred and shall be imprisoned in the county jail for not less than three not more than twelve months.

### ARTICLE 48.—FALSE PERSONATION AND CHEATS.

| SECTION. | SECTION. |
|---|---|
| 1. False impersonation, punishment for. | 7. False representation of charitable purposes. |
| 2. False impersonation and receiving money. | 8. Falsely representing banking corporations. |
| 3. Personating officers and others. | 9. Using false check. |
| 4. Unlawful wearing of grand army badge. | 10. Holding mock auction. |
| 5. Fines, how paid. | |
| 6. Obtaining property under false pretenses. | |

**Punishment for false impersonation.**   (2442) § **1.**   Every person who falsely personates another, and in such assumed character, either:

First.   Marries or pretends to marry, or to sustain the marriage relation toward another, with or without the connivance of such other person; or,

Second.   Becomes bail or surety for any party, in any proceeding whatever, before any court or officer authorized to take such bail or surety; or,

Third.   Subscribes, verifies, publishes, acknowledges or proves, in the name of another person, any written instrument, with intent that the same may be delivered or used as true; or,

Fourth.   Does any other act whereby, if it were done by the person falsely personated, he might in any event become liable to any suit or prosecution, or to pay any sum of money, or to incur any charge, forfeiture or penalty, or whereby any benefit might accrue to the party personating, or to any other person.

waiving the homestead," or "upon a claim against which the homestead cannot be demanded." This statement shall be endorsed upon the executions issued upon said judgments or decrees.

2. In any action or suit when it is not apparent from the face of the pleadings that the demand is not subject to the homestead exemption, the plaintiff shall not have the benefit of the foregoing section unless in his declaration he alleges that his demand is not subject to such homestead exemption.

3. But no presumption of non-waiver, or presumption that the judgment or decree was rendered upon a demand against which homestead could be claimed, is to be drawn from the silence of any judgment, execution, or decree on the matters provided for by this act.

Commencem't.    4. This act shall be in force from its passage.

---

CHAP. 152.—An ACT to prevent selling or furnishing cigarettes or tobacco in any form, or pistols, dirks, or bowie-knives to minors under sixteen years of age.

Approved February 28, 1890.

1. Be it enacted by the general assembly of Virginia, That if any person sell, barter, give or furnish or cause to be sold, bartered, given, or furnished to any minor under sixteen years of age cigarettes, or pistols, or dirks, or bowie-knives, having good cause to believe him or her to be a minor under sixteen years of age, said person shall be fined not less than ten nor more than one hundred dollars.

Commencem't.    2. This act shall be in force from its passage.

---

CHAP. 153.—An ACT for the relief of V. B. Gilmer, treasurer of Russell county.

Approved March 3, 1890.

1. Be it enacted by the general assembly of Virginia, That the county school board for the county of Russell be, and they are hereby, empowered to allow V. B. Gilmer, county treasurer of said county, in his annual settlement with them on account of school funds to be apportioned said county for the year eighteen hundred and ninety, a sum which shall be equal to not exceeding two per centum on school funds apportioned said county under act of March sixth, eighteen hundred and eighty-two, for the

years eighteen hundred and eighty-three, eighteen hundred and eighty-four, eighteen hundred and eighty-five, eighteen hundred and eighty-six, and eighteen hundred and eighty-seven, those being the years for which he did not receive compensation, as by law he was entitled, for disbursing said funds.

2. This act shall be in force from its passage.           *Commencem't.*

CHAP. 154.—An ACT to amend and re-enact section 2197 of the code of Virginia, in reference to burial of hogs that die from disease and accidental injury.

*Approved March 3, 1890.*

1. Be it enacted by the general assembly of Virginia, That section twenty-one hundred and ninety-seven of the code of Virginia, edition of eighteen hundred and eighty-seven, be amended and re-enacted so as to read as follows:

§2197. The owner of hogs that die from disease or accidental injury, knowing of such death, shall bury them not less than two feet below the surface of the ground as soon as practicable after their death, and if he fails to do so, any justice, after notice to the owner, if he can be ascertained, shall cause any such dead animal to be buried by a constable or other person to be designated for the purpose, and the constable or other person shall be entitled to recover of the owner of every hog so buried a fee of one dollar, to be recovered in the same manner as officer's fees are recovered, free from all exemptions in favor of such owner.

2. This act shall be in force from its passage.           *Commencem't.*

CHAP. 155.—An ACT to extend the time for making returns of assessment for the city of Norfolk and county of Norfolk.

*Approved March 3, 1890.*

1. Be it enacted by the general assembly of Virginia, That the judge of the corporation court of the city of Norfolk be, and he is hereby, authorized and empowered, in his discretion, to extend the time of making the returns of the assessment for the city of Norfolk until September first, eighteen hundred and ninety, of the assessment provided for under chapter twenty-three of the code of Virginia.

2. That the time for the application to said judge for

*Empowered to extend the time of making assessments.*

# COMMENTARIES

ON THE

# LAWS OF ENGLAND.

## IN FOUR BOOKS.

BY

Sir WILLIAM BLACKSTONE, Knt.

ONE OF THE JUSTICES OF HIS MAJESTY'S COURT OF COMMON PLEAS

WITH

NOTES SELECTED FROM THE EDITIONS OF ARCHBOLD, CHRISTIAN, COLERIDGE, CHITTY, STEWART, KERR, AND OTHERS,

BARRON FIELD'S ANALYSIS,

AND

Additional Notes, and a Life of the Author,

BY

GEORGE SHARSWOOD,

CHIEF JUSTICE OF THE SUPREME COURT OF PENNSYLVANIA.

IN TWO VOLUMES.

VOL. I.—BOOKS I. & II.

PHILADELPHIA:

J. B. LIPPINCOTT COMPANY.

1893.

## Edition Used:

*Commentaries on the Laws of England in Four Books. Notes selected from the editions of Archibold, Christian, Coleridge, Chitty, Stewart, Kerr, and others, Barron Field's Analysis, and Additional Notes, and a Life of the Author by George Sharswood. In Two Volumes.* (Philadelphia: J.B. Lippincott Co., 1893). Vol. 1 - Books I & II.

Author: Sir William Blackstone
Editor: George Sharswood

ADD226

[Back to Table of Contents]

# CHAPTER XV.

# OF HUSBAND AND WIFE.

The second private relation of persons is that of marriage, which includes the reciprocal rights and duties of husband and wife; or, as most of our elder law-books call them, of *baron* and *feme*. In the consideration of which I shall in the first place inquire, how marriages may be contracted or made; shall next point out the manner in which they may be dissolved; and shall, lastly, take a view of the legal effects and consequence of marriage.

I. Our law considers marriage in no other light than as a civil contract.1 The *holiness* of the matrimonial state is left entirely to the ecclesiastical law: the temporal courts not having jurisdiction to consider unlawful marriage as a sin, but merely as a civil inconvenience. The punishment therefore, or annulling, of incestuous or other unscriptural marriage, is the province of the spiritual courts; which act *pro salute animæ.(a)* And, taking it in this civil light, the law treats it as it does all other contracts: allowing it to be good and valid in all cases, where the parties at the time of making it were, in the first place, *willing* to contract; secondly, *able* to contract; and, lastly, actually *did* contract, in the proper forms and solemnities required by law.

*

First, they must be *willing* to contract. "*Consensus, non concubitus, facit nuptias,*" is the maxim of the civil law in this case:(*b*) and it is adopted by the common lawyers,(*c*) who indeed have borrowed, especially in ancient times, almost all their notions of the legitimacy of marriage from the canon and civil laws.2

*434]

Secondly, they must be *able* to contract. In general, all persons are able to contract themselves in marriage, unless they labour under some particular disabilities and incapacities. What those are, it will be here our business to inquire.

Now these disabilities are of two sorts: first, such as are canonical, and therefore sufficient by the ecclesiastical laws to avoid the marriage in the spiritual court; but these in our law only make the marriage voidable, and not *ipso facto* void, until sentence of nullity be obtained. Of this nature are precontract; consanguinity, or relation by blood; and affinity, or relation by marriage; and some particular corporal infirmities. And these canonical disabilities are either grounded upon the express words of the divine law, or are consequences plainly deducible from thence: it therefore being sinful in the persons who labour under them, to attempt to contract matrimony together, they are properly the object of the ecclesiastical magistrate's coercion; in order to separate the offenders, and inflict penance for the offence, *pro salute animarum.* But such marriages not being void *ab initio,* but voidable only by sentence of separation, they are esteemed valid to all civil purposes, unless such separation is actually made during the life of the parties.3 For, after the death of either

ADD227

of them, the courts of common law will not suffer the spiritual courts to declare such marriages to have been void; because such declaration cannot now tend to the reformation of the parties.(d) And therefore when a man had married his first wife's sister, and after her death the bishop's court was *
proceeding to annul the marriage and bastardize the issue, the court of King's Bench granted a prohibition *quoad hoc;* but permitted them to proceed to punish the husband for incest.(e) These canonical disabilities being entirely the province of the ecclesiastical courts, our books are perfectly silent concerning them. But there are a few statutes, which serve as directories to those courts, of which it will be proper to take notice. By statute 32 Hen. VIII. c. 38, it is declared, that all persons may lawfully marry, but such as are prohibited by God's law;4 and that all marriages contracted by lawful persons in the face of the church, and consummated with bodily knowledge, and fruit of children, shall be indissoluble. And, because in the times of popery, a great variety of degrees of kindred were made impediments to marriage, which impediments might however be bought off for money, it is declared, by the same statute, that nothing, God's law except, shall impeach any marriage, but within the Levitical degrees;5 the furthest of which is that between uncle and niece.(f) By the same statute, all impediments arising from precontracts to other persons, were abolished and declared of none effect, unless they had been consummated with bodily knowledge: in which case the canon law holds such contract to be a marriage *de facto.* But this branch of the statute was repealed by statute 2 & 3 Edw. VI. c. 23. How far the act of 26 Geo. II. c. 33,6 which prohibits all suits in ecclesiastical courts to compel a marriage, in consequence of any contract, may collaterally extend to revive this clause of Henry VIII.'s statute, and abolish the impediment of precontract, I leave to be considered by the canonists.7

[*435

The other sort of disabilities are those which are created, or at least enforced, by the municipal laws. And, though some of them may be grounded on natural law, yet they are regarded by the laws of the land, not so much in the light of any moral offence, as on account of the civil inconveniences they draw after them. These civil disabilities make the contract void *ab initio,* and not merely voidable; not that they *
dissolve a contract already formed, but they render the parties incapable of forming any contract at all: they do not put asunder those who are joined together, but they previously hinder the junction. And, if any persons under these legal incapacities come together, it is a meretricious, and not a matrimonial, union.8

*436]

1. The first of these legal disabilities is a prior marriage, or having another husband or wife living; in which case, besides the penalties consequent upon it as a felony, the second marriage is to all intents and purposes void:(g) polygamy being condemned both by the law of the New Testament, and the policy of all prudent states, especially in these northern climates. And Justinian, even in the climate of modern Turkey, is express,(h) that "*duas uxores eodem tempore habere non licet.*"

2. The next legal disability is want of age. This is sufficient to avoid all other contracts, on account of the imbecility of judgment in the parties contracting; *a fortiori* therefore it ought to avoid this, the most important contract of any. Therefore if a boy under fourteen, or a girl under twelve years of age, marries, this marriage is

ADD228

only inchoate and imperfect;*9* and, when either of them comes to the age of consent aforesaid, they may disagree and declare the marriage void, without any divorce or sentence in the spiritual court. This is founded on the civil law.*(i)* But the canon law pays a greater regard to the constitution, than the age, of the parties;*(j)* for if they are *habiles ad matrimonium,* it is a good marriage, whatever their age may be. And in our law it is so far a marriage, that, if at the age of consent they agree to continue together, they need not be married again.*(k)* If the husband be of years of discretion, and the wife under twelve, when she comes to years of discretion he may disagree as well as she may: for in contracts the obligation must be mutual; both must be bound, or neither:*10* and so it is, *vice versâ,* when the wife is of years of discretion, and the husband under.*(l)*

\*

3. Another incapacity arises from want of consent of parents or guardians. By the common law, if the parties themselves were of

[*437

the age of consent, there wanted no other concurrence to make the marriage valid: and this was agreeable to the canon law. But, by several statutes,*(m)* penalties of 100*l.* are laid on every clergyman who marries a couple either without publication of banns, which may give notice to parents or guardians, or without a license, to obtain which the consent of parents or guardians must be sworn to. And by the statute 4 & 5 Ph. and M. c. 8, whosoever marries any woman child under the age of sixteen years, without consent of parents or guardians, shall be subject to fine, or five years' imprisonment: and her estate during the husband's life shall go to and be enjoyed by the next heir.*11* The civil law indeed required the consent of the parent or tutor at all ages, unless the children were emancipated, or out of the parents' power:*(n)* and if such consent from the father was wanting, the marriage was null, and the children illegitimate:*(o)* but the consent of the mother or guardians, if unreasonably withheld, might be redressed and supplied by the judge, or the president of the province:*(p)* and if the father was *non compos,* a similar remedy was given.*(q)* These provisions are adopted and imitated by the French and Hollanders, with this difference: that in France the sons cannot marry without consent of parents till thirty years of age, nor the daughters till twenty-five;*(r)12* and in Holland, the sons are at their own disposal at twenty-five, and the daughters at twenty.*(s)13* Thus hath stood, and thus at present stands, the law in other neighbouring countries. And it has lately been thought proper to introduce somewhat of the same policy into our laws, by statute 26 Geo. II. c. 33,*14* whereby it is enacted, that all marriages celebrated by license (for banns suppose notice) where either of the parties is under twenty-one, (not being \*

a widow or widower, who are supposed emancipated,) without the consent of the father, or, if he be not living, of the mother or

*438]

guardians, shall be absolutely void.*15* A like provision is made as in the civil law, where the mother or guardian is *non compos,* beyond sea, or unreasonably froward, to dispense with such consent at the discretion of the lord chancellor; but no provision is made, in case the father should labour under any mental or other incapacity.*16* Much may be, and much has been, said both for and against this innovation upon our ancient laws and constitution. On the one hand, it prevents the clandestine marriages of minors, which are often a terrible inconvenience to those private families wherein they happen. On the other hand, restraints upon marriages, especially among the lower class, are evidently detrimental to the public, by hindering the increase of the

ADD229

people; and to religion and morality, by encouraging licentiousness and debauchery among the single of both sexes; and thereby destroying one end of society and government, which is *concubitu prohibere vago.* And of this last inconvenience the Roman laws were so sensible, that at the same time that they forbade marriage without the consent of parents or guardians, they were less rigorous upon that very account with regard to other restraints: for, if a parent did not provide a husband for his daughter, by the time she arrived at the age of twenty-five, and she afterwards made a slip in her conduct, he was not allowed to disinherit her upon that account: "*quia non sua culpa, sed parentum, id commisisse cognoscitur.([t])17*

4. A fourth incapacity is want of reason; without a competent share of which, as no other, so neither can the matrimonial contract, be valid.([u]) It was formerly adjudged, that the issue of an idiot was legitimate, and consequently that his marriage was valid. A strange determination! since consent is absolutely requisite to matrimony, and neither idiots nor lunatics are capable of consenting to any thing. And therefore the civil law judged much more sensibly when it made such deprivations of reason a previous impediment; *

though not a cause of divorce, if they happened after marriage.([v]) [*439 And modern resolutions have adhered to the reason of the civil law, by determining([w]) that the marriage of a lunatic, not being in a lucid interval, was absolutely void. But as it might be difficult to prove the exact state of the party's mind at the actual celebration of the nuptials, upon this account, concurring with some private family([x]) reasons, the statute 15 Geo. II. c. 30, has provided that the marriage of lunatics and persons under phrenzies, if found lunatics under a commission, or committed to the care of trustees by any act of parliament, before they are declared of sound mind by the lord chancellor or the majority of such trustees, shall be totally void.18

Lastly, the parties must not only be willing and able to contract, but actually must contract themselves in due form of law, to make it a good civil marriage.19 Any contract made, *per verba de presenti,* or in words of the present tense, and in case of cohabitation *per verba de futuro* also, between persons able to contract, was before the late act deemed a valid marriage to many purposes; and the parties might be compelled in the spiritual courts to celebrate it *in facie ecclesiæ.* But these verbal contracts are now of no force to compel a future marriage.([y]) Neither is any marriage at present valid, that is not celebrated in some parish-church or public chapel,20 unless by dispensation from the archbishop of Canterbury. It must also be preceded by publication of banns, or by license from the spiritual judge. Many other formalities are likewise prescribed by the act; the neglect of which, though penal, does not invalidate the marriage. It is held to be also essential to a marriage, that it be performed by a person in orders;([z]) though the intervention of a priest to solemnize this contract is merely *juris positivi,* and not *juris naturalis aut divini:* it being said that pope Innocent the Third was the first who ordained the celebration of marriage in the church;([a]) before *

which it was totally a civil contract. And, in the times of the grand rebellion, all marriages were performed by the justices of [*440] the peace; and these marriages were declared valid, without any fresh solemnization, by stat. 12 Car. II. c. 33. But, as the law now stands, we may upon the whole collect,

ADD230

that no marriage by the temporal law is *ipso facto void,* that is celebrated by a person in orders,—in a parish-church or public chapel, or elsewhere, by special dispensation,—in pursuance of banns or a license,—between single persons,—consenting,—of sound mind,—and of the age of twenty-one years;—or of the age of fourteen in males and twelve in females, with consent of parents or guardians, or without it, in case of widowhood. And no marriage is *voidable* by the ecclesiastical law, after the death of either of the parties; nor during their lives, unless for the canonical impediments of precontract, if that indeed still exists; of consanguinity; and of affinity, or corporal imbecility, subsisting previous to their marriage.

II. I am next to consider the manner in which marriages may be dissolved; and this is either by death, or divorce. There are two kinds of divorce, the one total, the other partial; the one *a vinculo matrimonii,(b)* the other merely *a mensa et thoro.* The total divorce, *a vinculo matrimonii,* must be for some of the canonical causes of impediment before mentioned, and those existing *before* the marriage, as is always the case in consanguinity; not supervenient, or arising *afterwards,* as may be the case in affinity or corporal imbecility.21 For in cases of total divorce, the marriage is declared null, as having been absolutely unlawful *ab initio:* and the parties are therefore separated *pro salute animarum:* for which reason, as was before observed, no divorce can be obtained, but during the life of the parties. The issue of such marriage as is thus entirely dissolved, are bastards.(c)22

Divorce *a mensa et thoro* is when the marriage is just and lawful *ab initio,* and therefore the law is tender of dissolving *

it; but, for some supervenient cause, it becomes improper or impossible for the parties to live together: as in the case of

[*441

intolerable ill temper,23 or adultery, in either of the parties. For the canon law, which the common law follows in this case, deems so highly and with such mysterious reverence of the nuptial tie, that it will not allow it to be unloosed for any cause whatsoever, that arises after the union is made.24 And this is said to be built on the divine revealed law; though that expressly assigns incontinence as a cause, and indeed the only cause, why a man may put away his wife and marry another.(d) The civil law, which is partly of pagan original, allows many causes of absolute divorce; and some of them pretty severe ones: as, if a wife goes to the theatre or the public games, without the knowledge and consent of the husband;(e) but among them adultery is the principal, and with reason named the first.(f) But with us in England adultery is only a cause of separation from bed and board:(g) for which the best reason that can be given, is, that if divorces were allowed to depend upon a matter within the power of either of the parties, they would probably be extremely frequent; as was the case when divorces were allowed for canonical disabilities, on the mere confession of the parties,(h) which is now prohibited by the canons.(i)25 However divorces *a vinculo matrimonii,* for adultery, have of late years been frequently granted by act of parliament.26

In case of divorce *a mensa et thoro,* the law allows alimony to the wife: which is that allowance which is made to a woman for her support out of the husband's estate: being settled at the discretion of the ecclesiastical judge, on consideration of all the

circumstances of the case. This is sometimes called her *estovers,*27 for which, if he refuses payment, there is, besides the ordinary process of excommunication, a writ at common law *de estoveriis habendis,* in order to recover it.(*j*) It is generally proportioned to the rank and quality of *

the parties. But in case of elopement, and living with an adulterer, the law allows her no alimony.(*k*)

*442]

III. Having thus shown how marriages may be made, or dissolved, I come now, lastly, to speak of the legal consequences of such making, or dissolution.

By marriage, the husband and wife are one person in law:(*l*) that is, the very being or legal existence of the woman is suspended during the marriage, or at least is incorporated and consolidated into that of the husband: under whose wing, protection, and *cover,* she performs every thing; and is therefore called in our law-french a *feme-covert, fœmina viro co-operta;* is said to be *covert-baron,* or under the protection and influence of her husband, her *baron,* or lord; and her condition during her marriage is called her *coverture.*28 Upon this principle, of a union of person in husband and wife, depend almost all the legal rights, duties, and disabilities, that either of them acquire by the marriage. I speak not at present of the rights of property, but of such as are merely *personal.* For this reason, a man cannot grant any thing to his wife, or enter into covenant with her:(*m*) for the grant would be to suppose her separate existence; and to covenant with her, would be only to covenant with himself: and therefore it is also generally true, that all compacts made between husband and wife, when single, are voided by the intermarriage.(*n*)29 A woman indeed may be attorney for her husband;(*o*) for that implies no separation from, but is rather a representation of, her lord. And a husband may also bequeath any thing to his wife by will; for that cannot take effect till the coverture is determined by his death.(*p*)30 The husband is bound to provide his wife with necessaries by law, as much as himself; and, if she contracts debts for them, he is obliged to pay them;(*q*) but for any thing besides necessaries he is not chargeable.(*r*) Also if a wife elopes, and lives with another man, the husband is *

not chargeable even for necessaries;(*s*) at least if the person who furnishes them is sufficiently apprized of her elopement.(*t*)31 If

*443]

the wife be indebted before marriage, the husband is bound afterwards to pay the debt; for he has adopted her and her circumstances together.(*u*)32 If the wife be injured in her person or her property, she can bring no action for redress without her husband's concurrence, and in his name, as well as her own:(*v*) neither can she be sued without making the husband a defendant.(*w*) There is indeed one case where the wife shall sue and be sued as a feme sole, viz. where the husband has abjured the realm, or is banished,(*x*) for then he is dead in law; and, the husband being thus disabled to sue for or defend the wife, it would be most unreasonable if she had no remedy, or could make no defence at all.33 In criminal prosecutions, it is true, the wife may be indicted and punished separately;(*y*) for the union is only a civil union.34 But in trials of any sort they are not allowed to be witnesses for, or against, each other:(*z*) partly because it is impossible their testimony should be indifferent, but principally because of the union of person; and therefore, if they were admitted to be witnesses *for* each other, they would contradict one maxim of law, "*nemo in propria causa testis esse debet;*"(*a*) and if *against* each other, they would contradict another

ADD232

maxim, "*nemo tenetur seipsum accusare.*"(*b*)35 But, where the offence is directly against the person of the wife, this rule has been usually dispensed with;(*c*) and therefore, by statute 3 Hen. VII. c. 2, in case a woman be forcibly taken away, and married, she may be a witness against such her husband, in order to convict him of felony. For in this case she can with no propriety be reckoned his wife; because a main ingredient, her consent, was wanting to the contract: and also there is another maxim of law, that no man shall take advantage of his own wrong; which the * ravisher here would do, if, by forcibly marrying a woman, he could prevent her from being a witness who is perhaps the only witness to that very fact.

*444]

In the civil law the husband and the wife are considered as two distinct persons, and may have separate estates, contracts, debts, and injuries;(*d*) and therefore in our ecclesiastical courts, a woman may sue and be sued without her husband.(*e*)

But though our law in general considers man and wife as one person, yet there are some instances in which she is separately considered; as inferior to him, and acting by his compulsion. And therefore all deeds executed, and acts done, by her, during her coverture, are void; except it be a fine, or the like matter of record, in which case she must be solely and secretly examined, to learn if her act be voluntary.(*f*) She cannot by will devise lands to her husband, unless under special circumstances; for at the time of making it she is supposed to be under his coercion.(*g*)36 And in some felonies, and other inferior crimes, committed by her, through constraint of her husband, the law excuses her:(*h*) but this extends not to treason or murder.37

The husband also, by the old law, might give his wife moderate correction.(*i*) For, as he is to answer for her misbehaviour, the law thought it reasonable to intrust him with this power of restraining her, by domestic chastisement, in the same moderation that a man is allowed to correct his apprentices or children; for whom the master or parent is also liable in some cases to answer. But this power of correction was confined within reasonable bounds,(*j*) and the husband was prohibited from using any violence to his wife, *aliter quam ad virum, ex causa regiminis et castigationis uxoris suæ, licite et rationabiliter pertinet.* The civil law gave the husband the * same, or a larger, authority over his wife: allowing him, for some misdemeanours, *flagellis et fustibus acriter verberare uxorem:* for others, only *modicam castigationem adhibere.*(*k*) But with us, in the politer reign of Charles the Second, this power of correction began to be doubted;(*l*) and a wife may now have security of the peace against her husband;(*m*) or, in return, a husband against his wife.(*n*) Yet the lower rank of people, who were always fond of the old common law, still claim and exert their ancient privilege: and the courts of law will still permit a husband to restrain a wife of her liberty, in case of any gross misbehaviour.(*o*)

[*445

These are the chief legal effects of marriage during the coverture; upon which we may observe, that even the disabilities which the wife lies under are for the most part intended for her protection and benefit: so great a favourite is the female sex of the laws of England.38

[Back to Table of Contents]

# CHAPTER XVI.

# OF PARENT AND CHILD.

The next, and the most universal relation in nature, is immediately derived from the preceding, being that between parent and child.

Children are of two sorts; legitimate, and spurious, or bastards, each of which we shall consider in their order; and, first, of legitimate children.

I. A legitimate child is he that is born in lawful wedlock, or within a competent time afterwards. "*Pater est quem nuptiæ demonstrant,*" is the rule of the civil law;(*a*) and this holds with the civilians, whether the nuptials happen before or after the birth of the child. With us in England the rule is narrowed, for the nuptials must be precedent to the birth; of which more will be said when we come to consider the case of bastardy. At present, let us inquire into, 1. The legal duties of parents to their legitimate children. 2. Their power over them. 3. The duties of such children to their parents.

1. And, first, the duties of parents to legitimate children: which principally consist in three particulars; their maintenance, their protection, and their education.

\*

The duty of parents to provide for the *maintenance* of their children is a principle of natural law; an obligation, says Puffendorf,(*b*) laid on them not only by nature herself, but by their own proper act, in bringing them into the world: for they would be in the highest manner injurious to their issue, if they only gave their children life that they might afterwards see them perish. By begetting them, therefore, they have entered into a voluntary obligation to endeavour, as far as in them lies, that the life which they have bestowed shall be supported and preserved. And thus the children will have the perfect *right* of receiving maintenance from their parents. And the president Montesquieu(*c*) has a very just observation upon this head: that the establishment of marriage in all civilized states is built on this natural obligation of the father to provide for his children; for that ascertains and makes known the person who is bound to fulfil this obligation: whereas, in promiscuous and illicit conjunctions, the father is unknown; and the mother finds a thousand obstacles in her way, shame, remorse, the constraint of her sex, and the rigour of laws, that stifle her inclinations to perform this duty; and, besides, she generally wants ability.

*447]

The municipal laws of all well-regulated states have taken care to enforce this duty: though Providence has done it more effectually than any laws, by implanting in the breast of every parent that natural στοργη, or insuperable degree of affection, which not even the deformity of person or mind, not even the wickedness, ingratitude, and rebellion of children, can totally suppress or extinguish.

ADD234

The civil law(*d*) obliges the parent to provide maintenance for his child; and, if he refuses, "*judex de ea re cognoscet.*" Nay, it carries this matter so far, that it will not suffer a parent at his death totally to disinherit his child, without expressly giving * his reason for so doing; and there are fourteen such reasons reckoned up,(*e*) which may justify such disinherison. If the parent alleged no reason, or a bad or a false one, the child might set the will aside, *tanquam testamentum inofficiosum,* a testament contrary to the natural duty of the parent. And it is remarkable under what colour the children were to move for relief in such a case: by suggesting that the parent had lost the use of his reason when he made the *inofficious* testament. And this, as Puffendorf observes,(*f*) was not to bring into dispute the testator's power of disinheriting his own offspring, but to examine the motives upon which he did it; and, if they were found defective in reason, then to set them aside. But perhaps this is going rather too far: every man has, or ought to have, by the laws of society, a power over his own property; and, as Grotius very well distinguishes,(*g*) natural right obliges to give a *necessary* maintenance to children; but what is more than that they have no other right to, than as it is given them by the favour of their parents, or the positive constitutions of the municipal law.

[*448

Let us next see what provision our own laws have made for this natural duty. It is a principle of law,(*h*) that there is an obligation on every man to provide for those descended from his loins; and the manner in which this obligation shall be performed is thus pointed out.(*i*)1 The father and mother, grandfather and grandmother, of poor impotent persons, shall maintain them at their own charges, if of sufficient ability, according as the quarter-session shall direct: and(*k*) if a parent runs away, and leaves his children, the church-wardens and overseers of the parish shall seize his rents, goods, and chattels, and dispose of them toward their relief. By the interpretations which the courts of law have made upon these statutes, if a mother or grandmother marries again, and was before such second marriage of sufficient ability to keep the child, the husband shall be charged to * maintain it:(*l*) for this, being a debt of hers when single, shall like others extend to charge the husband.2 But at her death, the relation being dissolved, the husband is under no further obligation.3

*449]

No person is bound to provide a maintenance for his issue, unless where the children are impotent and unable to work, either through infancy, disease, or accident, and then is only obliged to find them with necessaries, the penalty on refusal being no more than 20s. a month.4 For the policy of our laws, which are ever watchful to promote industry, did not mean to compel a father to maintain his idle and lazy children in ease and indolence: but thought it unjust to oblige the parent, against his will, to provide them with superfluities, and other indulgences of fortune; imagining they might trust to the impulse of nature, if the children were deserving of such favours. Yet, as nothing is so apt to stifle the calls of nature as religious bigotry, it is enacted,(*m*) that if any popish parent shall refuse to allow his protestant child a fitting maintenance, with a view to compel him to change his religion, the lord chancellor shall by order of court constrain him to do what is just and reasonable. But this did not extend to persons of another religion, of no less bitterness and bigotry than the popish: and therefore in the very next year we find an instance of a Jew of immense riches, whose only daughter having embraced Christianity, he turned her out of doors; and, on her

application for relief, it was held she was entitled to none.(*n*)5 But this gave occasion(*o*) to another statute,(*p*) which ordains, that if Jewish parents refuse to allow their protestant children a fitting maintenance suitable to the fortune of the parent, the lord chancellor on complaint may make such order therein as he shall see proper.6

Our law has made no provision to prevent the disinheriting of children by will; leaving every man's property in his *

own disposal, upon a principle of liberty in this as well as every other action: though perhaps it had not been amiss if the parent [*450

had been bound to leave them at least a necessary subsistence. Indeed, among persons of any rank or fortune, a competence is generally provided for younger children, and the bulk of the estate settled upon the eldest, by the marriage-articles. Heirs also, and children, are favourites of our courts of justice, and cannot be disinherited by any dubious or ambiguous words; there being required the utmost certainty of the testator's intentions to take away the right of an heir.(*q*)7

From the duty of maintenance we may easily pass to that of *protection,* which is also a natural duty, but rather permitted than enjoined by any municipal laws: nature, in this respect, working so strongly as to need rather a check than a spur. A parent may by our laws maintain and uphold his children in their lawsuits, without being guilty of the legal crime of maintaining quarrels.(*r*) A parent may also justify an assault and battery in defence of the persons of his children:(*s*) nay, where a man's son was beaten by another boy, and the father went near a mile to find him, and there revenged the son's quarrel by beating the other boy, of which beating he afterwards unfortunately died, it was not held to be murder, but manslaughter merely.(*t*)8 Such indulgence does the law show to the frailty of human nature, and the workings of parental affection.

The last duty of parents to their children is that of giving them an *education* suitable to their station in life: a duty pointed out by reason, and of far the greatest importance of any. For, as Puffendorf very well observes,(*u*) it is not *

easy to imagine or allow, that a parent has conferred any considerable benefit upon his child by bringing him into the *451]

world, if he afterwards entirely neglects his culture and education, and suffers him to grow up like a mere beast, to lead a life useless to others, and shameful to himself. Yet the municipal laws of most countries seem to be defective in this point, by not constraining the parent to bestow a proper education upon his children. Perhaps they thought it punishment enough to leave the parent, who neglects the instruction of his family, to labour under those griefs and inconveniences which his family, so uninstructed, will be sure to bring upon him. Our laws, though their defects in this particular cannot be denied, have in one instance made a wise provision for breeding up the rising generation: since the poor and laborious part of the community, when past the age of nurture, are taken out of the hands of their parents, by the statutes for apprenticing poor children,(*w*) and are placed out by the public in such a manner, as may render their abilities, in their several stations, of the greatest advantage to the commonwealth. The rich, indeed, are left at their own option, whether they will breed up their children to be ornaments or disgraces to their family. Yet in one case, that of religion, they are under peculiar restrictions; for(*x*) it is provided, that if any person

sends any child under his government beyond the seas, either to prevent its good education in England, or in order to enter into or reside in any popish college, or to be instructed, persuaded, or strengthened in the popish religion; in such case, besides the disabilities incurred by the child so sent, the parent or person sending shall forfeit 100*l.,* which(y) shall go to the sole use and benefit of him that shall discover the offence. And(z) if any parent, or other, shall send or convey any person beyond sea, to enter into, or be resident in, or trained up in, any priory, abbey, nunnery, popish university, college, or school, or house of jesuits, or priests, or in any private popish family, in order to be instructed, persuaded, or confirmed in the *

popish religion, or shall contribute any thing towards their maintenance when abroad by any pretext whatever, the person

[*452

both sending and sent shall be disabled to sue in law or equity, or to be executor or administrator to any person, or to enjoy any legacy or deed of gift, or to bear any office in the realm, and shall forfeit all his goods and chattels, and likewise all his real estate for life.9

2. The *power* of parents over their children is derived from the former consideration, their duty: this authority being given them, partly to enable the parent more effectually to perform his duty, and partly as a recompense for his care and trouble in the faithful discharge of it. And upon this score the municipal laws of some nations have given a much larger authority to the parents than others. The ancient Roman laws gave the father a power of life and death over his children; upon this principle, that he who gave had also the power of taking away.(a) But the rigour of these laws was softened by subsequent constitutions; so that(b) we find a father banished by the emperor Hadrian for killing his son, though he had committed a very heinous crime, upon this maxim, that "*patria potestas in pietate debet, non in atrocitate, consistere.*" But still they maintained to the last a very large and absolute authority: for a son could not acquire any property of his own during the life of his father; but all his acquisitions belonged to the father, or at least the profits of them, for his life.(c)

The power of a parent by our English laws is much more moderate; but still sufficient to keep the child in order and obedience.10 He may lawfully correct his child, being under age, in a reasonable manner;(d) for this is for the benefit of his education.11 The consent or concurrence of the parent to the marriage of his child under age, was also *directed* by our ancient law to be obtained: but now it is absolutely *necessary,* for without it the contract is void.(e) And this also is another means, which the law has put into the parent's hands, in *

order the better to discharge his duty; first, of protecting his children from the snares of artful and designing persons; and,

*453]

next, of settling them properly in life, by preventing the ill consequences of too early and precipitate marriages. A father has no other power over his son's *estate* than as his trustee or guardian; for though he may receive the profits during the child's minority, yet he must account for them when he comes of age.12 He may indeed have the benefit of his children's labour while they live with him, and are maintained by him; but this is no more than he is entitled to from his apprentices or servants.13 The legal power of a father,—for a mother, as such, is entitled to no power, but only to reverence and respect;14 the power of a father, I say, over the persons of his children ceases at the age of twenty-one: for they are then enfranchised by arriving at years of

discretion, or that point which the law has established, as some must necessarily be established, when the empire of the father, or other guardian, gives place to the empire of reason. Yet, till that age arrives, this empire of the father continues even after his death; for he may by his will appoint a guardian to his children. He may also delegate part of his parental authority, during his life, to the tutor or schoolmaster of his child; who is then *in loco parentis,* and has such a portion of the power of the parent committed to his charge, viz. that of restraint and correction, as may be necessary to answer the purposes for which he is employed.15

3. The *duties* of children to their parents arise from a principle of natural justice and retribution. For to those who gave us existence we naturally owe subjection and obedience during our minority, and honour and reverence ever after: they who protected the weakness of our infancy are entitled to our protection in the infirmity of their age; they who by sustenance and education have enabled their offspring to prosper, ought in return to be supported by that offspring, in case they stand in need of assistance. Upon this principle proceed all the duties of children to their parents which are enjoined by positive laws. And the Athenian laws*(f)* carried *

this principle into practice with a scrupulous kind of nicety; obliging all children to provide for their father when fallen into poverty; with an exception to spurious children, to those whose chastity had been prostituted by consent of the father, and to those whom he had not put in any way of gaining a livelihood. The legislature, says baron Montesquieu,*(g)* considered, that in the first case the father, being uncertain, bad rendered the natural obligation precarious; that in the second case he had sullied the life he had given, and done his children the greatest of injuries, in depriving them of their reputation; and that, in the third case, he had rendered their life, so far as in him lay, an insupportable burden, by furnishing them with no means of subsistence.

[*454]

Our laws agree with those of Athens with regard to the first only of these particulars, the case of spurious issue. In the other cases the law does not hold the tie of nature to be dissolved by any misbehaviour of the parent; and therefore a child is equally justifiable in defending the person, or maintaining the cause or suit, of a bad parent, as a good one; and is equally compellable,*(h)* if of sufficient ability, to maintain and provide for a wicked and unnatural progenitor, as for one who has shown the greatest tenderness and parental piety.16

II. We are next to consider the case of illegitimate children, or bastards; with regard to whom let us inquire, 1. Who are bastards. 2. The legal duties of the parents towards a bastard child. 3. The rights and incapacities attending such bastard children.

1. Who are bastards. A bastard, by our English laws, is one that is not only begotten, but born, out of lawful matrimony. The civil and canon laws do not allow a child to remain a bastard, if the parents afterwards intermarry:*(i)* and herein they differ most materially from our law; which, though not so strict as to require that the child shall be *begotten,* *

yet makes it an indispensable condition, to make it legitimate, that it shall be *born,* after lawful wedlock. And the reason of our English law is surely much superior to that of the Roman, if we consider the principal

[*455]

ADD238

end and design of establishing the contract of marriage, taken in a civil light, abstractly from any religious view, which has nothing to do with the legitimacy or illegitimacy of the children. The main end and design of marriage, therefore, being to ascertain and fix upon some certain person, to whom the care, the protection, the maintenance, and the education of the children should belong; this end is, undoubtedly, better answered by legitimating all issue born after wedlock, than by legitimating all issue of the same parties, even born before wedlock, so as wedlock afterwards ensues: 1. Because of the very great uncertainty there will generally be, in the proof that the issue was really begotten by the same man; whereas, by confining the proof to the birth, and not to the begetting, our law has rendered it perfectly certain what child is legitimate, and who is to take care of the child. 2. Because by the Roman law a child may be continued a bastard, or made legitimate, at the option of the father and mother, by a marriage *ex post facto;* thereby opening a door to many frauds and partialities, which by our law are prevented. 3. Because by those laws a man may remain a bastard till forty years of age, and then become legitimate, by the subsequent marriage of his parents; whereby the main end of marriage, the protection of infants, is totally frustrated. 4 Because this rule of the Roman law admits of no limitations as to the time or number of bastards so to be legitimated; but a dozen of them may, twenty years after their birth, by the subsequent marriage of their parents, be admitted to all the privileges of legitimate children. This is plainly a great discouragement to the matrimonial state; to which one main inducement is usually not only the desire of having *children,* but also the desire of procreating lawful *heirs* Whereas our constitutions guard against this indecency, and at the same time give sufficient allowance to the frailties of human nature. For, if a child be begotten while the parents are single, and they will endeavour to make an early reparation for the offence, by *

marrying within a few months after our law is so indulgent as not to bastardize the child, if it be born though not begotten, in
<mark>*456]</mark>
lawful wedlock; for this is an incident that can happen but once, since all future children will be begotten, as well as born, within the rules of honour and civil society. Upon reasons like these we may suppose the peers to have acted at the parliament of Merton, when they refused to enact that children born before marriage should be esteemed legitimate.*(k)*17

From what has been said, it appears, that all children born before matrimony are bastards by our law; and so it is of all children born so long after the death of the husband, that, by the usual course of gestation, they could not be begotten by him. But, this being a matter of some uncertainty, the law is not exact as to a few days.*(l)*18 And this gives occasion to a proceeding at common law, where a widow is suspected to feign herself with child, in order to produce a supposititious heir to the estate: an attempt which the rigour of the Gothic constitutions esteemed equivalent to the most atrocious theft, and therefore punished with death.*(m)* In this case, with us, the heir-presumptive may have a writ *de ventre inspiciendo* to examine whether she be with child, or not;*(n)*19 and, if she be, to keep her under proper restraint till delivered; which is entirely conformable to the practice of the civil law:*(o)* but, if the widow be, upon due examination, found not pregnant, the presumptive heir shall be admitted to the inheritance, though liable to lose it again on the birth of a child within forty weeks from the death of a husband.*(p)* But, if a man dies, and his widow soon after marries

ADD239

again, and a child is born within such a time as that by the course of nature it might have been the child of either *
husband; in this case he is said to be more than ordinarily legitimate; for he may, when he arrives to years of discretion, choose which of the fathers he pleases.*(q)*20 To prevent this, among other inconveniences, the civil law ordained that no widow should marry *infra annum luctus,(r)* a rule which obtained so early as the reign of Augustus,*(s)* if not of Romulus: and the same constitution was probably handed down to our early ancestors from the Romans, during their stay in this island; for we find it established under the Saxon and Danish governments.*(t)*

[*457

As bastards may be born before the coverture or marriage state is begun, or after it is determined, so also children born during wedlock may in some circumstances be bastards. As if the husband be out of the kingdom of England, or, as the law somewhat loosely phrases it, *extra quatuor maria,(u)* for above nine months, so that no access to his wife can be presumed, her issue during that period shall be bastards.*(v)* But, generally, during the coverture, access of the husband shall be presumed, unless the contrary can be shown;*(w)* which is such a negative as can only be proved by showing him to be elsewhere: for the general rule is, *præsumitur pro legitimatione.(x)*21 In a divorce *a mensa et thoro,(y)* if the wife breeds children, they are bastards; for the law will presume the husband and wife conformable to the sentence of separation, unless access be proved; but, in a voluntary separation by agreement, the law will suppose access, unless the negative be shown.*(z)* So also, if there is an apparent impossibility of procreation on the part of the husband, as if he be only eight years old, or the like, there the issue of the wife shall be bastards.*(a)* Likewise, in case of divorce in the spiritual court, *a vinculo matrimonii,(b)* all the issue born during the coverture are bastards;*(c)* because such divorce is always upon * some cause that rendered the marriage unlawful and null from the beginning.

*458]

2. Let us next see the duty of parents to their bastard children, by our law; which is principally that of maintenance. For, though bastards are not looked upon as children to any civil purposes, yet the ties of nature, of which maintenance is one, are not so easily dissolved: and they hold indeed as to many other intentions; as, particularly, that a man shall not marry his bastard sister or daughter.*(d)* The civil law, therefore, when it denied maintenance to bastards begotten under certain atrocious circumstances,*(e)* was neither consonant to nature nor reason, however profligate and wicked the parents might justly be esteemed.

The method in which the English law provides maintenance for them is as follows.*(f)* When a woman is delivered, or declares herself with child, of a bastard, and will by oath before a justice of peace charge any person as having got her with child, the justice shall cause such person to be apprehended, and commit him till he gives security, either to maintain the child, or appear at the next quarter-sessions to dispute and try the fact. But if the woman dies, or is married before delivery, or miscarries, or proves not to have been with child, the person shall be discharged; otherwise the sessions, or two justices out of sessions, upon original application to them, may take order for the keeping of the bastard, by charging the mother or the reputed father with

the payment of money or other sustentation for that purpose. And if such putative father, or lewd mother, run away from the parish, the overseers, by direction of two justices, may seize their rents, goods, and chattels, in order to bring up the said bastard child. Yet such is the humanity of our laws, that no woman can be compulsively questioned concerning the father of her child till one month after her delivery; which indulgence is, however, very frequently a hardship upon parishes, by giving the parents opportunity to escape.22

\*

3. I proceed next to the rights and incapacities which appertain to a bastard. The rights are very few, being only such as he can [\*459] *acquire;* for he can *inherit* nothing, being looked upon as the son of nobody; and sometimes called *filius nullius,* sometimes *filius populi.*(*g*) Yet he may gain a sirname by reputation,(*h*) though he has none by inheritance.23 All other children have their primary settlement in their father's parish; but a bastard in the parish where born, for he hath no father.(*i*) However, in case of fraud, as if a woman be sent either by order of justices, or comes to beg as a vagrant, to a parish where she does not belong to, and drops her bastard there, the bastard shall, in the first case, be settled in the parish from whence she was illegally removed;(*j*) or, in the latter case, in the mother's own parish, if the mother be apprehended for her vagrancy.(*k*) Bastards also born in any licensed hospital for pregnant women, are settled in the parishes to which the mothers belong.(*l*) The incapacity of a bastard consists principally in this, that he cannot be heir to any one, neither can he have heirs, but of his own body; for, being *nullius filius,* he is therefore of kin to nobody, and has no ancestor from whom any inheritable blood can be derived. A bastard was also, in strictness, incapable of holy orders; and, though that were dispensed with, yet he was utterly disqualified from holding any dignity in the church:(*m*) but this doctrine seems now obsolete; and, in all other respects, there is no distinction between a bastard and another man. And really any other distinction, but that of not inheriting, which civil policy renders necessary, would, with regard to the innocent offspring of his parents' crimes, be odious, unjust, and cruel to the last degree: and yet the civil law, so boasted of for its equitable decisions, made bastards, in some cases, incapable even of a gift from their parents.(*n*) A bastard may, lastly, be made legitimate, and capable of inheriting, by the transcendent power of an act of parliament, and not otherwise:(*o*) as was done in the case of John of Gaunt's bastard children, by a statute of Richard the Second.

ADD241

[Back to Table of Contents]

# CHAPTER XVII.

# OF GUARDIAN AND WARD.

The only general private relation, now remaining to be discussed, is that of guardian and ward;1 which bears a very near resemblance to the last, and is plainly derived out of it: the guardian being only a temporary parent, that is, for so long time as the ward is an infant, or under age. In examining this species of relationship, I shall first consider the different kinds of guardians, how they are appointed, and their power and duty: next, the different ages of persons, as defined by the law: and lastly, the privileges and disabilities of an infant, or one under age, and subject to guardianship.

1. The guardian with us performs the office both of the *tutor* and *curator* of the Roman laws; the former of which had the charge of the maintenance and education of the minor, the latter the care of his fortune; or, according to the language of the court of chancery, the *tutor* was the committee of the person, the *curator* the committee of the estate. But this office was frequently united in the civil law;(*a*) as it is always in our law with regard to minors, though as to lunatics and idiots it is commonly kept distinct.

*

Of the several species of guardians, the first are guardians *by nature:* viz. the father, and, in some cases, the mother of the child. For if an estate be left to an infant, the father is by common law the guardian, and must account to his child for the profits.(*b*)2 And, with regard to daughters, it seems by construction of statute 4 & 5 Ph. and Mar. c. 8, that the father might by deed or will assign a guardian to any woman-child under the age of sixteen; and, if none be so assigned, the mother shall in this case be guardian.(*c*)3 There are also guardians *for nurture;*(*d*) which are, of course, the father or mother, till the infant attains the age of fourteen years:(*e*) and in default of father or mother, the ordinary usually assigns some discreet persons to take care of the infant's personal estate, and to provide for his maintenance and education.(*f*)4 Next are guardians *in socage,*5 (an appellation which will be fully explained in the second book of these commentaries,) who are also called guardians *by the common law.* These take place only when the minor is entitled to some estate in lands, and then by the common law the guardianship devolves upon his next of kin, to whom the inheritance cannot possibly descend; as, where the estate descended from his father, in this case his uncle by the mother's side cannot possibly inherit this estate, and therefore shall be the guardian.(*g*) For the law judges it improper to trust the person of an infant in his hands, who may by possibility become heir to him; that there may be no temptation, nor even suspicion of temptation, for him to abuse his trust.(*h*) The Roman laws proceed on a quite contrary principle, committing the care of the minor to him who is the next to succeed to the inheritance, presuming that the next heir would take the best care of an estate, to which he has a prospect of succeeding: and this they boast to be "*summa*

*461]

*providentia.*"(*i*) But in the mean time they seem to have forgotten, how much it is the

guardian's interest to remove the encumbrance of his pupil's life from that estate for which he is supposed to have so great a regard.(*k*) And this affords Fortescue,(*l*) and Sir Edward Coke,(*m*) an ample opportunity for triumph; they affirming, that to commit the custody of an infant to him that is next in succession is "*quasi agnum committere lupo, ad devorandum.*"(*n*)6 These guardians in socage, like those for nurture, continue only till the minor is fourteen years of age; for then, in both cases, he is presumed to have discretion, so far as to choose his own guardian. This he may do, unless one be appointed by the father, by virtue of the statute 12 Car. II. c. 24, which, considering the imbecility of judgment in children of the age of fourteen, and the abolition of guardianship *in chivalry,* (which lasted till the age of twenty-one, and of which we shall speak hereafter,) enacts that any father, under age or of full age, may by deed or will dispose of the custody of his child, either born or unborn, to any person, except a popish recusant, either in possession or reversion, till such child attains the age of one-and-twenty years.7 These are called guardians *by statute,* or *testamentary* guardians. There are also special guardians *by custom* of London, and other places;(*o*) but they are particular exceptions, and do not fall under the general law.8

[*462

The power and reciprocal duty of a guardian and ward are the same, *protempore,* as that of a father and child; and therefore I shall not repeat them, but shall only add, that the guardian, when the ward comes of age, is bound to give him an account of all that he has transacted on his behalf, and must answer for all losses by his wilful default or negligence.9 In order therefore to prevent disagreeable contests with young gentlemen, it has become a practice of many guardians, of large estates especially, to indemnify themselves by applying to the court of chancery, acting under its direction, and accounting annually before the officers of that court. For the lord chancellor is, by right derived from the crown, the general and supreme guardian of all infants, as well as idiots and lunatics; that is, of all such persons as have not discretion enough to manage their own concerns. In case therefore any guardian abuses his trust, the court will check and punish him; nay, sometimes will proceed to the removal of him, and appoint another in his stead.(*p*)10

[*463

2. Let us next consider the ward or person within age, for whose assistance and support these guardians are constituted by law; or who it is, that is said to be within age. The ages of male and female are different for different purposes. A male at *twelve* years old may take the oath of allegiance; at *fourteen* is at years of discretion, and therefore may consent or disagree to marriage, may choose his guardian, and, if his discretion be actually proved, may make his testament of his personal estate; at *seventeen* may be an executor; and at *twenty-one* is at his own disposal, and may aliene his lands, goods, and chattels A female also at *seven* years of age may be betrothed or given in marriage; at *nine* is entitled to dower; at *twelve* is at years of maturity, and therefore may consent or disagree to marriage, and, if proved to have sufficient discretion, may bequeath her personal estate; at *fourteen* is at years of legal discretion, and may choose a guardian; at *seventeen* may be executrix; and at *twenty-one* may dispose of herself and her lands. So that full age in male or female is twenty-

ADD243

one years, which age is completed on the day preceding the anniversary of a person's birth,*(q)*11 who till that time is an infant, and so styled in law. Among the ancient Greeks and Romans, *women* were never *

[*464

of age, but subject to perpetual guardianship,*(r)* unless when married, "*nisi convenissent in manum viri:*"*(s)* and, when that perpetual tutelage wore away in process of time, we find that, in females as well as males, full age was not till twenty-five years.*(t)* Thus by the constitution of different kingdoms, this period, which is merely arbitrary, and *juris positivi,* is fixed at different times. Scotland agrees with England in this point; both probably copying from the old Saxon constitutions on the continent, which extended the age of minority "*ad annum vigesimum primum, et eo usque juvenes sub tutelam reponunt;*"*(u)(v)* but in Naples they are of full age at *eighteen;* in France, with regard to marriage, not till *thirty;* and in Holland at *twenty-five.*

3. Infants have various privileges, and various disabilities: but their very disabilities are privileges; in order to secure them from hurting themselves by their own improvident acts. An infant cannot be sued but under the protection, and joining the name, of his guardian; for he is to defend him against all attacks as well by law as otherwise:*(w)*12 but he may sue either by his guardian, or *prochein amy,* his next friend who is not his guardian. This *prochein amy* may be any person who will undertake the infant's cause, and it frequently happens, that an infant, by his *prochein amy,* institutes a suit in equity against a fraudulent guardian. In criminal cases an infant of the age of *fourteen* years may be capitally punished for any capital offence:*(x)* but under the age of *seven* he cannot. The period between *seven* and *fourteen* is subject to much uncertainty: for the infant shall, generally speaking, be judged *prima facie* innocent; yet if he was *doli capax,* and could discern between good and evil at the time of the offence committed, he may be convicted and undergo judgment and execution of death, though he hath not attained to years of puberty or * discretion.*(y)* And Sir Matthew Hale gives us two instances, one of a girl of thirteen, who was burned for killing her mistress;

*465]

another of a boy still younger, that had killed his companion, and hid himself, who was hanged; for it appeared by his hiding that he knew he had done wrong, and could discern between good and evil: and in such cases the maxim of law is, that *malitia supplet ætatem.* So also, in much more modern times, a boy of ten years old, who was guilty of a heinous murder, was held a proper subject for capital punishment, by the opinion of all the judges.*(z)*

With regard to estates and civil property, an infant hath many privileges, which will be better understood when we come to treat more particularly of those matters: but this may be said in general, that an infant shall lose nothing by non-claim, or neglect of demanding his right; nor shall any other *laches* or negligence be imputed to an infant, except in some very particular cases.

It is generally true, that an infant can neither aliene his lands, nor do any legal act, nor make a deed, nor indeed any manner of contract that will bind him. But still to all these rules there are some exceptions: part of which were just now mentioned in reckoning up the different capacities which they assume at different ages: and there are others, a few of which it may not be improper to recite, as a general specimen of

the whole. And, first, it is true, that infants cannot aliene their estates: but infant trustees, or mortgagees, are enabled to convey, under the direction of the court of chancery or exchequer, or other courts of equity, the estates they hold in trust or mortgage, to such person as the court shall appoint.*(a)* Also it is generally true, that an infant can do no legal act: yet an infant, who has an advowson, may present to the benefice when it becomes void.*(b)* For the law in this case dispenses with one rule, in order to maintain others of far *

greater consequence: it permits an infant to present a clerk, who, if unfit, may be rejected by the bishop, rather than either suffer

*466]

the church to be unserved till he comes of age, or permit the infant to be debarred of his right by lapse to the bishop. An infant may also purchase lands, but his purchase is incomplete: for, when he comes to age, he may either agree or disagree to it, as he thinks prudent or proper, without alleging any reason; and so may his heirs after him, if he dies without having completed his agreement.*(c)* It is, further, generally true, that an infant, under twenty-one, can make no deed but what is afterwards voidable: yet in some cases*(d)* he may bind himself apprentice by deed indented or indentures, for seven years; and*(e)* he may by deed or will appoint a guardian to his children, if he has any. Lastly, it is generally true, that an infant can make no other contract that will bind him:[13] yet he may bind himself to pay for his necessary meat, drink, apparel, physic, and such other necessaries;[14] and likewise for his good teaching and instruction whereby he may profit himself afterwards.*(f)* And thus much, at present, for the privileges and disabilities of infants.[15]

468                              1893.—Chapter 512—513—514.

## CHAPTER 512.

### An act to amend section thirteen, chapter three hundred and twenty, acts eighteen hundred and ninety-one.

*The General Assembly of North Carolina do enact :*

Chapter 320, laws 1891 (railroad commission act) amended. Telephone companies included.

SECTION 1. That chapter three hundred and twenty, section thirteen, laws eighteen hundred and ninety-one, be amended by adding after the word "telegraph" in line five, section thirteen, the words "and telephone."

To make rates for telephone lines.

SEC. 2. That section twenty-six be amended by inserting after the word "telegraph" in line seven the words "or telephone."

SEC. 3. That this act shall be in force from and after its ratification. Ratified the 6th day of March, A. D. 1893.

## CHAPTER 513.

### An act to amend chapter five hundred and thirty, laws of one thousand eight hundred and ninety-one.

*The General Assembly of North Carolina do enact :*

Chapter 530, laws 1891, amended. Appropriation for colored orphan asylum at Oxford, N. C.

SECTION 1. That chapter five hundred and thirty of the laws of one thousand eight hundred and ninety-one be and the same is hereby amended by striking out all after the word "asylum" in line two section one of said chapter down to and including the word "orphanage" in line three of said section and inserting in lieu thereof the words "located at Oxford, North Carolina," and by striking out "one thousand dollars" and inserting the words "fifteen hundred dollars," the latter sum being the entire amount of the annual appropriation to said orphanage.

SEC. 2. That this act shall be in force from and after its ratification. Ratified the 6th day of March, A. D. 1893.

## CHAPTER 514.

### An act to prevent the sale of deadly weapons to minors.

*The General Assembly of North Carolina do enact:*

Unlawful to knowingly sell, &c., to minor certain deadly weapons.

SECTION 1. That it shall be unlawful for any person, corporation or firm knowingly to sell or offer for sale, give or in any way dispose of to a minor any pistol or pistol cartridge, brass knucks, bowie-knife, dirk, loaded cane, or sling-shot.

Sec. 2. That any person, corporation or firm violating this act shall *Misdemeanor.* be guilty of a misdemeanor, and upon conviction for each and every offence shall be fined or imprisoned, one or both, in the discretion of the court.

Sec. 3. That this act shall be in force from and after its ratification.

Ratified the 6th day of March, A. D. 1893.

---

## CHAPTER 515.

### An act to amend chapter sixty, section three, of the laws of eighteen hundred and eighty-nine.

*The General Assembly of North Carolina do enact:*

Section 1. That section three, chapter sixty of the laws of one thousand eight hundred and eighty-nine be and the same is hereby repealed. *Section 3, chapter 60, laws 1889, (reducing school age of Croatan Indians to ten years) repealed.*

Sec. 2. That persons of the Croatan race of either sex who are not under thirteen years of age may attend the normal school for the Croatans: *Provided,* that children not under eleven years of age may be admitted who can stand an approved examination in spelling, reading, writing, primary geography and the fundamental rules of arithmetic. *School age for Croatan Indian children.*

Sec. 3. That this act shall be in force from and after its ratification.

Ratified the 6th day of March, A. D. 1893.

---

## CHAPTER 516.

### An act to provide for the working of convicts on the public roads of Wayne county.

*The General Assembly of North Carolina do enact:*

Section 1. It shall be the duty of the county commissioners of Wayne county immediately after the passage of this act to provide means and make all necessary arrangements and rules for the work- ing on the public roads of said county of the convicts which shall hereafter be sentenced to work thereon under the provisions of this act; and to that end it shall be lawful for the said county commis- *Commissioners of Wayne county to provide means, &c., for working convicts on roads.*

yeas 86, nays 1; and passed the Senate by a two-thirds vote, yeas 21, nays 6.]

[NOTE.—The foregoing act was presented to the Governor of Texas for his approval, on Friday, the twenty-first day of May, A. D. 1897, but was not signed by him nor returned to the house in which it originated with his objections thereto within the time prescribed by the Constitution, and thereupon became a law without his signature.—JNO. H. CULLOM, Acting Secretary of State.]

---

H. B. No. 263.]          CHAPTER 154.

An Act to prohibit persons, firms or corporations engaged in running pool or billiard tables in a public place, or for profit, knowingly permitting minors in their places of business without the written consent of their parents or guardians, and to provide a penalty therefor.

SECTION 1. *Be it enacted by the Legislature of the State of Texas:* That any person, firm, or corporation engaged in running any pool or billiard table or tables, in a public place, or for profit, or agent of such person, firm, or corporation, who shall knowingly permit any minor, without the written consent of such minor's parent or guardian, in such place of business, shall be fined not exceeding two hundred dollars.

[NOTE.—The foregoing act was presented to the Governor of Texas for his approval, on Friday, the fourteenth day of May, A. D. 1897, but was not signed by him nor returned to the house in which it originated with his objections thereto within the time prescribed by the Constitution, and thereupon became a law without his signature.—J. W. MADDEN, Secretary of State.]

Takes effect 90 days after adjournment.

---

H. B. No. 264.]          CHAPTER 155.

An Act to prevent the barter, sale and gift of any pistol, dirk, dagger, slung shot, sword-cane, spear, or knuckles made of any metal or hard substance to any minor without the written consent of the parent or guardian of such minor, or of some one standing in lieu thereof, and providing a penalty for the violation.

SECTION 1. *Be it enacted by the Legislature of the State of Texas:* That if any person in this State shall knowingly sell, give or barter, or cause to be sold, given or bartered to any minor, any pistol, dirk, dagger, slung shot, sword-cane, spear, or knuckles made of any metal or hard substance, bowie knife or any other knife manufactured or sold for the purpose of offense or defense, without the written consent of the parent or guardian of such minor, or of some one standing in lieu thereof, he shall be punished by fine of not less than twenty-five dollars nor more than two hundred dollars, or by imprisonment in the county jail not less than ten nor more than thirty days, or by both such fine and imprisonment. And during the time of such imprisonment such offender may be put to

work upon any public work in the county in which such offense is committed.

[Note.—The foregoing act was presented to the Governor of Texas for his approval, on Friday, the fourteenth day of May, A. D. 1897, but was not signed by him nor returned to the house in which it originated with his objections thereto within the time prescribed by the Constitution, and thereupon became a law without his signature.—J. W. Madden, Secretary of State.]

Takes effect 90 days after adjournment.

H. B. No. 391.]          CHAPTER 156.

An Act to relinquish the title and confirm the patents to certain lands herein named.

Section 1. *Be it enacted by the Legislature of the State of Texas:* That the land patents numbered three hundred and eighty-eight (388), five hundred and eighty-three (583) and five hundred and eighty-four (584), Vol. No. Four (4) (of the records of the general land office of the State of Texas), and issued to Thomas M. Joseph and Henry M. Truehart on the 20th day of December, A. D. 1859, and the 23rd day of August, A. D. 1860, covering certain lands in Galveston County, State of Texas, be, and the same are hereby confirmed, and that all right and title of the State of Texas to the lands therein named, be, and the same are hereby relinquished to the parties to whom the said patents were issued, and sale made in accordance with an act approved on the 20th day of February, A. D. 1858, and an act amendatory of the same, approved on the 1st day of February, A. D. 1860, as also by a special act of the legislature of the State of Texas, approved July 29th, A. D. 1870.

[Note.—The foregoing act was presented to the Governor of Texas for his approval, on Wednesday, the twelfth day of May, A. D. 1897, but was not signed by him nor returned to the house in which it originated with his objections thereto within the time prescribed by the Constitution, and thereupon became a law without his signature.—J. W. Madden, Secretary of State.]

Takes effect 90 days after adjournment.

S. S. B. No. 320.]          CHAPTER 157.

An Act to amend Title XXIII, Chapter 4, of the Revised Civil Statutes of the State of Texas, relating to county lines, by adding thereto Article 808a.

Section 1. *Be it enacted by the Legislature of the State of Texas:* That Chapter 4, Title XXIII, of the Revised Civil Statutes of the State of Texas, be amended by adding thereto an Article to be known as 808a, which shall read as follows:

Article 808a.  Notwithstanding the preceding articles of this chapter, any county in this State may bring suit against any adjoining coun-

thirty or more than ninety days, or by both such fine and imprisonment, at the discretion of the justice. [Id., § 3.]

§ 2388. **Fees.**    § 389. The justice of the peace, sheriff, constable, police officer or janitor performing the duties required of them under this act shall receive the same fees as provided for in other cases of misdemeanors. All fines collected under the provisions of this act shall be paid into the county treasury of the county in which such offense is committed, for the use of the county school fund. [Id., § 4.]

§ 2389. **Notice posted.**    § 390. It shall be the duty of the officer or officers in charge of any of the public buildings and grounds within this state to keep posted in a conspicuous place in such building or on said grounds a printed copy of this act, with the word "Caution" in large letters at the top. [Id., § 5.]

§ 2390. **Definition.**    § 391. The words "public building," mentioned in this act, shall include any building owned or occupied or used by either the state, county, city, township, or school district. [Id., § 6.]

§ 2391. **Deface property.**    § 392. Any person who shall willfully and maliciously destroy, deface, remove or injure the property of another, public or private, shall on conviction be deemed guilty of a misdemeanor, and punished by fine not less than five dollars nor more than five hundred dollars, or by imprisonment in the county jail not to exceed six months, or by both such fine and imprisonment. [L. 1886, ch. 104, § 1; Feb. 27.]

§ 2392. **Scandalous prints.**    § 393. Every person or persons who shall within this state edit, publish, circulate or disseminate any newspaper, pamphlet, magazine or any printed paper devoted largely to the publication of scandals, lechery, assignation, intrigues between men and women, and immoral conducts of persons, or any person or persons who shall knowingly have in his or her possession for sale, or shall keep for sale, or expose for sale, or distribute, or in any way assist in the sale, or shall gratuitously distribute or give away any such newspaper, pamphlet, magazine or printed paper in this state, shall be deemed guilty of a felony, and on conviction thereof shall be punished by imprisonment in the penitentiary for a term of not less than two or more than five years. [L. 1891, ch. 161, § 1; March 21.]

This act valid; what within statute: 56 K. 242.

§ 2393. **Deemed publishing.**    § 393a. A publishing, or editing, in another state and sending said paper into this state, shall be deemed, taken and held to be a publishing, editing and circulating within this state. [Id., § 2.]

§ 2394. **Weapons to minors.**    § 394. Any person who shall sell, trade, give, loan or otherwise furnish any pistol, revolver or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie-knife, brass knuckles, slungshot, or other dangerous weapons, to any minor, or to any person of notoriously unsound mind, shall be deemed guilty of a misdemeanor, and shall upon conviction before any court of competent jurisdiction be fined not less than five nor more than one hundred dollars. [L. 1883, ch. 105, § 1; March 6.]

§ 2395. **Possession of minor.**    § 395. Any minor who shall have in his possession any pistol, revolver or toy pistol, by which cartridges may be exploded, or any dirk, bowie-knife, brass knuckles, slung-shot, or other dangerous weapon, shall be geemed guilty of a misdemeanor, and upon conviction before any court of competent jurisdiction shall be fined not less than one nor more than ten dollars. [Id., § 2.]

in any county into which the person so kidnaped may be carried or sent; and upon the trial thereof the consent thereto of the person so seized, confined, inveigled or kidnaped shall not be a defense unless it shall be made satisfactorily to appear that such consent was not obtained by fraud, nor extorted or forced by duress or threats. [*R. S. 1849 c. 133 s. 42; R. S. 1858 c. 164 s. 42; R. S. 1878 s. 4387; 1883 c. 257; 1889 c. 219; Ann. Stats. 1889 s. 4387; Stats. 1898 s. 4387*]

**Taking and detention of minors.** SECTION 4387a. Any person who shall, without lawful authority and for any immoral or unlawful purpose, forcibly take or carry away and remove, entice or inveigle any person under eighteen years of age from the home or residence of such person or from the care and custody of his parent or guardian, or, without such authority, forcibly detain such person who is absent from his home or residence or the custody of his parent or guardian, or persuade or entice him to remain absent therefrom, shall be punished by fine not exceeding five thousand dollars and by imprisonment in the state prison not more than three years or in the county jail not more than one year. It shall not be a defense to any prosecution brought under this section that such person consented to such removal or detention. [*1887 c. 236; Ann. Stats. 1889 s. 4387a; Stats. 1898 s. 4387a*]

**Kidnaping penalty; consent of parent.** SECTION 4387m. Any person who shall take, carry away, decoy, entice away, or secrete any child under the age of sixteen years, without the consent of the parent, guardian, or lawful custodian of said child, with the intent of causing any relative or other person to pay or offer to pay any sum as ransom or reward for the return or release of such child, shall be deemed guilty of a felony and upon conviction thereof shall be punished by imprisonment in the state prison during the life of the person so convicted. Upon the trial thereof the consent of the parent, guardian, or lawful custodian of such child shall not be a defense unless it shall be made satisfactorily to appear that such consent was not obtained by fraud, duress, or threats. [*1909 c. 239*]

**Assault and battery.** SECTION 4388. Any person who shall commit an assault and battery upon another shall be punished by imprisonment in the county jail not more than six months nor less than ten days, or by fine not exceeding one hundred dollars nor less than one dollars, or by both such fine and imprisonment in the discretion of the court. [*1856 c. 129 s. 2, 3; R. S. 1858 c. 164 s. 49; R. S. 1878 s. 4388; Ann. Stats. 1889 s. 4388; Stats. 1898 s. 4388*]

**Abuse of inmates of institutions.** SECTION 4389. Any officer or other person in charge of or employed in any hospital or asylum for the insane, poorhouse, workhouse, state prison, state reformatory, jail, police station or other place of confinement, school for the deaf and dumb or blind, the state public school, home for the feeble-minded, house of correction, industrial school for boys or girls or orphan asylum who shall abuse, neglect or illtreat any person confined therein or an inmate thereof, or who shall permit any other person so to do shall be punished by imprisonment in the county jail not more than one year or by fine not exceeding two hundred dollars. [*1872 c. 176 s. 8; R. S. 1878 s. 4389; 1880 c. 265; Ann. Stats. 1889 s. 4389; Stats. 1898 s. 4389; 1911 c. 375*]

**Doors to open outwardly; fire escapes.** SECTION 4390. Every building now or hereafter used, in whole or in part, as a public building, public or private institution, hotel, inn, schoolhouse, church, public hall, place of assemblage or place of public resort, factory or workshop, opera house or office building, must be provided with exits having doors that open or swing outward, whether such doors are outer doors or open upon vestibules or stairways, and when storm doors are used at the entrance of any such building, either inside or outside, said storm doors shall have a glass therein, not less than fifteen inches square, and such doors through which employes must pass to gain access to the outside of the building, in which they are employed, must remain unlocked during working hours. Any owner, tenant, corporation, person or persons in charge of any of the above-named buildings, who shall fail to comply with this section, or any architect who shall prepare plans for any building which is required by this section to be provided with such doors, without providing in such plans for the same, shall be punished by a fine of not exceeding five hundred dollars or by imprisonment in the county jail not longer than ninety days. The provisions of this act shall not apply to rural school buildings of but one story in height. [*1876 c. 412; R. S. 1878 s. 4390; 1887 c. 46 s. 1, 2; Ann. Stats. 1889 s. 4390, 4390a, 4390b; Stats. 1898 s. 4390; 1901 c. 380 s. 1; Supl. 1906 s. 4390; 1907 c. 118; 1909 c. 328; 1911 c. 378*]

**Aiming gun at another.** SECTION 4391. Any person who shall intentionally point or aim any gun, pistol or other firearm at or towards another, except in self-defense or in the lawful discharge of official duty, shall be punished by fine not exceeding fifty

1928

dollars; and any person who shall discharge any such firearm so intentionally pointed or aimed shall be punished by imprisonment in the county jail not more than six months or by fine not exceeding one hundred dollars, and any person who shall by such discharge maim or injure another shall be punished by imprisonment in the county jail not more than one year or by fine not exceeding five hundred dollars.  [*1873 c. 212; R. S. 1878 s. 4391; Ann. Stats. 1889 s. 4391; Stats. 1898 s. 4391*]

**Use of firearms, etc., near park, etc.**  SECTION 4391a.  Any person who shall discharge or cause the discharge of any missile from any firearm, slung shot, bow and arrow or other weapon, within forty rods of any public park, square or inclosure owned or controlled by any municipality within this state and resorted to for recreation or pleasure, when such park, square or inclosure is wholly situated without the limits of such municipality, shall be punished by imprisonment in the county jail not exceeding sixty days or by fine of not more than twenty-five dollars nor less than one dollar.  [*1895 c. 107; Stats. 1898 s. 4391a*]

**Wilful neglect of railroad employes.**  SECTION 4392.  Any officer, agent, conductor, engineer or employe of any railroad company operating within this state who shall wilfully neglect or omit to ring or cause to be rung the bell on the engine of any train of cars or on an engine alone when about to cross or before crossing any street opened and used for travel in any city or village, or to blow the whistle eighty rods before crossing and ring the bell while crossing any highway, or to bring or cause to be brought to a full stop any railroad train or engine before arriving at or passing upon the track of another railroad and within four hundred feet of the junction or crossing of such railroad, or before arriving at or passing upon any drawbridge over any stream navigated by boats, vessels or other craft during the season of such navigation and when the draw of such bridge is necessary to be used for the passage of such boats, vessels or other craft, within six hundred feet of such drawbridge, when required by law, or to allow and permit the railroad train first arriving at such railroad crossing or junction to first pass over shall be punished by imprisonment in the county jail not more than six months or by fine not exceeding one hundred dollars.  [*1868 c. 44 s. 1, 2; R. S. 1878 s. 4392; Ann. Stats. 1889 s. 4392; Stats. 1898 s. 4392*]

**Locking cars; dangerous articles.**  SECTION 4393.  Any officer, agent, conductor or any employe of any railroad company operating within this state who shall wilfully run or cause to be run any railroad train or engine faster than at the rate of six miles per hour, while passing over the traveled streets of any city or village or until all such streets have been passed by such train or engine, or who shall lock or cause to be locked the doors of any passenger car occupied by any passenger, while such car is in motion or so as to prevent the free exit therefrom of any passenger at any time, or who shall use or authorize the use of any kerosene oil or other dangerously explosive burning fluid in lighting any passenger car, or who shall knowingly carry or cause or permit to be carried or transported on any baggage, mail, express or passenger car any powder, dynamite or other dangerously explosive substance, and any person who shall, secretly or surreptitiously, or by concealment or misrepresentation, ship or cause to be shipped upon any railroad train or car any powder, dynamite or other dangerously explosive substance without the knowledge of the proper officer, agent, conductor or employe in charge of such train or car shall be punished by imprisonment in the county jail not more than six months or by fine not exceeding one hundred dollars.  [*1867 c. 163; 1871 c. 40 s. 1–3; 1872 c. 119 s. 52; R. S. 1878 s. 4393; Ann. Stats. 1889 s. 4393; Stats. 1898 s. 4393*]

**Manufacture of powder within corporate limits.**  SECTION 4393a—1.  It shall be unlawful for any person, firm, or corporation to manufacture gunpowder or black blasting powder in any quantity whatsoever within the corporate limits of any city or village or within one hundred rods of any occupied dwelling house or any church, school-house, town hall, depot, or other place in which people are accustomed to assemble.  [*1911 c. 223*]

**Storage of explosives within one mile of powder factory.**  SECTION 4393a—2.  It shall be unlawful for any person, firm or corporation engaged in the manufacture of gunpowder or black blasting powder to store, or permit to be stored on the land or premises where gunpowder or black blasting powder is manufactured, any dynamite or explosive other than that manufactured at such gunpowder or black blasting powder manufacturing plant or within one mile of any plant where gunpowder or black blasting powder is manufactured.  [*1911 c. 223*]

**Powder, how to be stored; barricades.**  SECTION 4393a—3.  It shall be unlawful for any person, firm, or corporation engaged in the manufacture of gunpowder or black blasting powder, to store or to keep in storage or permit to be stored or kept in storage,

at any plant where gunpowder or black blasting powder is manufactured, more than one hundred twenty-five thousand pounds of gunpowder or black blasting powder in any building or storage magazine at such plant; and all magazines or buildings where gunpowder or black blasting powder is kept in storage at such plant shall be located not less than one thousand feet from any building in which the manufacture, or any part of the manufacture of gunpowder or black blasting powder is carried on, and shall be effectually screened from all buildings where the manufacture, or any part of the manufacture, of gunpowder or black blasting powder is carried on, and from any occupied dwelling house or any church, schoolhouse, town hall, depot, or other place in which people are accustomed to assemble, except necessary openings for transportation facilities, by natural barricades or by an artificial barricade consisting of a mound or properly revetted wall of earth, of a minimum thickness of not less than three feet, of such height that any straight line drawn from the top of any side wall of the building in which the manufacture, or any part of the manufacture, of gunpowder or black blasting powder is carried on, to any part of the magazine or building to be protected will pass through such intervening natural or artificial barricade; and no magazine or building where gunpowder or black blasting powder is stored or kept in storage at any such manufacturing plant, shall be nearer to any other magazine or building where gunpowder or black blasting powder is stored or kept in storage, than five hundred feet; provided that whenever a magazine or building in which gunpowder or black blasting powder is stored or kept in storage, is effectually screened from any other magazine or building where gunpowder or black blasting powder is stored or kept in storage by a natural or artificial barricade as hereinbefore described and of such height that any straight line drawn from any part of the magazine or building to any part of the other magazine or building will pass through such intervening natural or artificial barricade, the distance that such magazine or building are by this section required to be located apart, may be reduced one-half, and not more than four magazines or buildings where gunpowder or black blasting powder is stored or kept in storage shall be located or maintained at any such gunpowder or black blasting powder manufacturing plant, or on the land or premises where the same is situated.  [*1911 c. 223*]

**Storage of powder within one-quarter mile of dwelling, etc., prohibited.** SECTION 4393a—4. No person, firm, or corporation shall store gunpowder or black blasting powder at any gunpowder or black blasting powder manufacturing plant, or on the land or premises where such plant is located within one-quarter of a mile of any occupied dwelling house, or any church, schoolhouse, town hall, depot, or other place where people are accustomed to assemble.  [*1911 c. 223*]

**Monthly reports of powder manufacturers.** SECTION 4393a—5. Every person, firm, or corporation engaged in the manufacture of gunpowder or black blasting powder, shall on the first day of each month make a written report in duplicate, showing the amount of gunpowder and black blasting powder on hand at the time of making such report, and also the greatest quantity of such explosives on hand at any time during the previous month, which report shall be verified by the oath of the owner or superintendent of such manufacturing plant, and shall file one copy thereof with the county clerk of the county where such plant is located and one copy with the clerk of the town in which such plant is located.  [*1911 c. 223*]

**Monthly inspection of powder storage magazines.** SECTION 4393a—6. 1. The chairman of the town board of supervisors shall be authorized to visit and inspect any gunpowder or black blasting powder manufacturing plant in his town once in each month for the purpose of inspecting all magazines or buildings where gunpowder or black blasting powder is stored or kept in storage to determine whether the provisions of this act relating to the quantity of explosives that may be lawfully stored, or kept in storage, the distance that such magazine or magazines shall be located from manufacturing buildings and from each other, as well as the provision relating to barricading, are being complied with.

2. It shall be the duty of every person, firm, or corporation, engaged in the manufacture of gunpowder or black blasting powder, to permit the chairman of the town board of supervisors to visit and inspect all magazines and buildings where such explosives are stored or kept in storage, and whenever it shall appear from such inspection, or otherwise, that the provisions of this act are not being complied with, or upon refusal to allow the chairman of such town board of supervisors to make the inspection herein provided, it shall be the duty of said chairman to report such violation or refusal to the district attorney of the county wherein such manufacturing plant is located. [*1911 c. 223*]

**Penalty.** SECTION 4393a—7. Every person, whether as principal or agent, and any official, superintendent, or manager of any corporation violating any of the provisions of this act, shall be guilty of a misdemeanor and upon conviction thereof shall be punished by a fine of not less than two hundred nor more than one thousand dollars, or by imprisonment in the county jail for not less than two nor more than six months, or by both such fine and imprisonment. [1911 c. 223]

**Setting spring guns, etc.** SECTION 4394. Any person who shall set or fix in any manner whatever any gun, pistol or other firearm, or any spring gun for the purpose of killing game of any kind by coming in contact therewith or with any string, wire or other contrivance attached thereto, by which the same may be discharged, or for any other purpose, shall be punished by imprisonment in the state prison not less than six months nor more than three years; and if the death of any person is caused thereby he shall be deemed guilty of manslaughter in the second degree. [1869 c. 33 s. 1; 1875 c. 85; R. S. 1878 s. 4394; 1883 c. 20; Ann. Stats. 1889 s. 4394; Stats. 1898 s. 4394]

**Leaving unguarded ice holes.** SECTION 4395. Any person who shall remove ice or cause its removal from any stream, pond or lake and shall neglect to place around the margin of the opening made by such removal a fence, by setting posts of not less than two by four in size and with a fence board thoroughly nailed thereto not less than three and one-half feet above the surface of the ice on said stream, pond or lake shall be punished by imprisonment in the county jail not more than six months or by a fine not exceeding one hundred dollars. [1869 c. 85 s. 1; R. S. 1878 s. 4395; 1880 c. 267; Ann. Stats. 1889 s. 4395; Stats. 1898 s. 4395]

**Threshing-machine joints to be covered.** SECTION 4396. Any person owning or running any threshing machine in this state so constructed that any joint, knuckle or jack thereof is dangerously exposed, who shall neglect to cover or secure the same in some suitable manner so as to prevent injury to persons passing over or near the same, shall be punished by fine not exceeding fifty dollars nor less than two dollars. [1871 c. 103; R. S. 1878 s. 4396; Ann. Stats. 1889 s. 4396; Stats. 1898 s. 4396]

**Carrying and sale of weapons.** SECTION 4397. Any person who shall go armed with any concealed and dangerous weapon shall be punished by imprisonment in the county jail not more than six months or by fine not exceeding one hundred dollars; provided, that the foregoing shall not apply to any policeman or officer authorized to serve process. Any minor or person in a state of intoxication who shall go armed with any pistol or revolver, or any dealer or other person who shall sell, loan or give any pistol or revolver to any minor shall be punished by imprisonment in the county jail not more than six months or by fine not exceeding one hundred dollars. It shall be the duty of all sheriffs, constables and other public police officers to take from any minor any pistol or revolver found in his possession, and for neglect thereof any such officer shall be punished as hereinbefore provided. [1872 c. 7 s. 1; R. S. 1878 s. 4397; 1883 c. 329; Ann. Stats. 1889 s. 4397, 4397b; Stats. 1898 s. 4397]

**Sale and use of toy firearms.** SECTION 4397a. Any person who shall sell or use or have in his possession for the purpose of exposing for sale or use any toy pistol, toy revolver or other toy firearm shall be punished by imprisonment in the county jail not more than six months or by fine not exceeding one hundred dollars, or by both fine and imprisonment. [1882 c. 116; Ann. Stats. 1889 s. 4397a; Stats. 1898 s. 4397a]

**Getting on and off cars.** SECTION 4397b. Any person under the age of seventeen years who shall get upon, attempt to get upon, cling to, jump or step from any railroad car or train while the same is in motion shall be punished by fine of not more than twenty dollars nor less than two dollars, provided that this section shall not apply to the employes of any railway or express company. [1879 c. 183; Ann. Stats. 1889 s. 4575b; Stats. 1898 s. 4397b]

**Assault and abusive language.** SECTION 4398. Any person who shall assault another, when not excusable or justifiable, or who shall use in reference to and in the presence of another, or in reference to and in the presence of any member of his family, abusive or obscene language, intended or naturally tending to provoke an assault or any breach of the peace, shall be punished by imprisonment in the county jail not more than three months or by fine not exceeding one hundred dollars. The provisions of this section shall not be applicable to any city or village which has enacted an ordinance under its charter for the punishment of the same or similar offense. [R. S. 1878 s. 4398; 1882 c. 189; Ann. Stats. 1889 s. 4398; Stats. 1898 s. 4398]

**Sale, transportation, etc., of explosive for unlawful purpose.** SECTION 4398a. Any person who shall make, manufacture, compound, buy, sell, give away, offer for sale or to give away, transport or have in possession any nitroglycerine, giant, oriental or thunderbolt powder, dynamite, ballistile, fulgarite, detonite or any other explosive

1931

ADD254