UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MACK ESCHER, GUN OWNERS' ACTION LEAGUE, COMMONWEALTH SECOND AMENDMENT, FIREARMS POLICY COALITION, INC., SECOND AMENDMENT FOUNDATION, NATIONAL RIFLE ASSOCIATION OF AMERICA, and GUN OWNERS OF AMERICA, INC, <br><br> Plaintiffs, <br><br> V. <br><br> COLONEL GEOFREY NOBLE, in his official capacity as Superintendent of the Massachusetts State Police and of the Commonwealth of Massachusetts, JAMIE GAGNON, in his official Capacity as Commissioner of the Department of Criminal Justice Information Services, and HEATH J. ELDREDGE, in his official capacity as Chief of Police of Brewster, Massachusetts, <br><br> Defendants. | ) <br> ) <br> ) <br> ) CIVIL ACTION NO. 1:25-cv-10389-GAO <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ...................................................................................................................1

BACKGROUND ......................................................................................................................1

    I.      Statutory Scheme .................................................................................................1

    II.     Procedural History and the Effect of The Ban on Plaintiffs. ........................................3

ARGUMENT ..........................................................................................................................5

    I.      The Plain Text of the Second Amendment Covers the Right of 18-to-20-Year-Olds to Carry. .........................................................................................................................6

    II.     No Historical Analogue Exists That Could Justify the Ban. ........................................8

          A.  Founding Era Limitations Were Nonexistent. ........................................................9

          B.  Late Nineteenth Century Restrictions Cannot Sustain the Ban. ...........................13

    III.    Plaintiffs Are Entitled to an Injunction Against the Ban. ...........................................16

CONCLUSION .....................................................................................................................17

i

## TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*Armstrong v. Exceptional Child Ctr., Inc.*,

    575 U.S. 320 (2015)..........................................................................................................7

*DeNovellis v. Shalala*,

    124 F.3d 298 (1st Cir. 1997).............................................................................................5

*Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers Loc. Lodge 207 v.*

    *Raimondo*, 18 F.4th 38 (1st Cir. 2021) ...........................................................................17

*District of Columbia v. Heller*,

    554 U.S. 570 (2008)...........................................................................................1, 2, 6, 7

*Firearms Policy Coal. v. McCraw*,

    623 F. Supp. 3d 740 (N.D. Tex. 2022) .......................................................................10, 15

*Gamble v. United States*,

    587 U.S. 678 (2019)..........................................................................................................8

*Gordon v. Holder*,

    721 F.3d 638 (D.C. Cir. 2013).........................................................................................17

*Hirschfeld v. BATFE*,

    5 F.4th 407 (4th Cir. 2021)......................................................................7, 8, 10, 11, 14

*Jones v. Bonta*,

    34 F.4th 704 (9th Cir. 2022).................................................................7, 9, 10, 14, 15

*Lara v. Comm'r Pa. State Police*,

    125 F.4th 428 (3d Cir. 2025) ..............................................................1, 6, 8, 9, 10, 14

*McCoy v. ATF*,

    140 F.4th 568 (4th Cir. 2025)....................................................................................10, 12

*McDonald v. City of Chicago*,

    561 U.S. 742 (2010)....................................................................................................5, 14

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,

    597 U.S. 1 (2022)...........................................................................1, 5, 6, 8, 11, 14, 16

*National Rifle Ass'n, Inc. v. Bondi*,

    133 F.4th 1108 (11th Cir. 2025) ..............................................................................10, 11, 12

*Nken v. Holder,*
   556 U.S. 418 (2009) ...................................................................................16, 17

*NRA v. ATF,*
   714 F.3d 334 (5th Cir. 2013) ..................................................................................8

*Ocean State Tactical, LLC v. Rhode Island,*
   95 F.4th 38 (1st Cir. 2024) ...............................................................................9, 13

*Rio Grande Cmty. Health Ctr., Inc. v. Rullan,*
   397 F.3d 56 (1st Cir. 2005) ..................................................................................16

*Rodriguez-Cardi v. MMM Holdings, Inc.,*
   936 F.3d 40 (1st Cir. 2019) ....................................................................................5

*Roman Cath. Diocese of Brooklyn v. Cuomo,*
   592 U.S. 14 (2020) ...............................................................................................16

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos,*
   605 U.S. 280 (2025) ................................................................................................3

*Staples v. United States,*
   511 U.S. 600 (1994) ............................................................................................2, 3

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
   393 U.S. 503 (1969) ................................................................................................8

*United States v. Miller,*
   307 U.S. 174 (1939) ................................................................................................9

*United States v. Rahimi,*
   602 U.S. 680 (2024) ..........................................................................6, 11, 12, 15

*Van Valkinburgh v. Watson & Watson,*
   13 Johns. 480 (N.Y. Sup. Ct. 1816) ....................................................................12

*Winter v. Natural Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ..................................................................................................16

*Worth v. Jacobson,*
   108 F.4th 677 (8th Cir. 2024) ..........................................................6, 9, 10, 14, 15

iii

**Statutes**

1 THE LAWS OF THE STATE OF VERMONT, DIGESTED AND COMPILED, ch. 31 § 1, 321 (Wright 1808) (enacted 1797) ...................................................................................13

1856 Ala. Acts. 17 ...................................................................................................14

1856 Tenn. Pub. Acts 92 .........................................................................................14

1883 Kan. Sess. Laws 159 .......................................................................................14

1883 Wis. Sess. Laws 290 .......................................................................................14

Act of May 22, 1794, 1 Stat. 369, ch. 33 ...............................................................13

*An Act for Settling the Militia*, 3 WILLIAM W. HENING, THE STATUTE AT LARGE OF VIRGINIA 339 (1823) (enacted 1705) .............................................................................13

MASS GEN. LAWS
    ch. 4, § 7 ......................................................................................................... 1
    ch. 22C § 2 .......................................................................................................4
    ch. 22C § 6 .......................................................................................................4
    ch. 140, § 121 ..................................................................................................5
    ch. 140, § 129C(a) ...........................................................................................2
    ch. 140, § 129B ...............................................................................................2
    ch. 140, § 129B(c) ...........................................................................................2
    ch. 140, § 129B(a) ...........................................................................................2
    ch. 140, § 131 ..................................................................................................2
    ch. 140, § 131(a) .............................................................................................2
    ch. 140, § 131(d) .............................................................................................2
    ch. 231, § 85P ..............................................................................................1, 2
    ch. 269, § 10(a) ...............................................................................................2
    ch. 269, § 10(h) ...............................................................................................2

Militia Act of May 8, 1792, ch. 33, § 1, 1 Stat. 271 ...........................................7, 9

N.Y. Penal Code, ch. 375, § 1 (1885) ....................................................................14

**Constitutional Provisions**

U.S. Const.

    amend. II ........................................................................................................6

    art. I, § 2, cl. 2 ............................................................................................8

**Other Authorities**

*2021 Firearms Retailer: Survey Report*, NSSF (2021), https://perma.cc/N59Q-6UJJ................. 3

1 William Blackstone, Commentaries on the Laws of England (1765) .....................12, 15

Hendrik Booraem, Young Hickory: The Making of Andrew Jackson (2001)...................13

1 John Bouvier, Institutes of American Law (1858)........................................................11, 15

Brief of Amicus Curiae The Second Amendment Foundation in Support

    of Petitioner, *NRA v. Glass*, No. 24-1185 (U.S. June 20, 2025)........................................13

1 Sir Edward Coke, Institutes of the Laws of England, Co. Litt. 172a ..............................12

James B. Garry, Weapons of the Lewis and Clark Expedition (2012)..................................3

James Kent, 2 Commentaries on American Law (1848)........................................................12

David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types*

    *of Arms Before 1900*, 50 J. Legis. 223 (2024) .....................................................................3

David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights*

    *of Young Adults*, 43 S. Ill. Univ. L.J. 495 (2019) ............................................................10

James Lindgren & Justin L. Heather, *Counting Guns in Early America*,

    43 Wm. & Mary L. Rev. 1777 (2002).............................................................................13

Ken W. Purdy & Christopher G. Foster, *History of the automobile*,

    Encyclopædia Britannica, https://perma.cc/SL57-BHTR .............................................3

## INTRODUCTION

"[T]he Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home," as well as his right to possess arms in the home. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 10 (2022). This right presumptively "belongs to all Americans," *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008), a group that includes 18-to-20-year-olds, *see, e.g., Lara v. Comm'r Pa. State Police*, 125 F.4th 428, 438 (3d Cir. 2025); *see also Heller*, 554 U.S. at 580 ("the people" in the Constitution "unambiguously refers to all members of the political community, not an unspecified subset").

Thus, Americans, like Plaintiff Escher and 18-to-20-year-old members of the plaintiff organizations like him, are squarely among "the people" to whom the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592. As legal adults, there are no parents or guardians legally responsible for their care and protection. Yet, the laws challenged in this case prevent these 18-to-20-year-olds from exercising their Second Amendment protected rights on par with all other law-abiding adults in Massachusetts. That is unconstitutional, as at no relevant point in our history have Americans accepted restrictions on the Second Amendment protected rights of legal adults. Indeed, at the Founding, 18-to-20-year-olds were required to be armed. The earliest possible analogues to which Massachusetts will be able to point come from far too late to be relevant and, in any event, support at most limiting the rights of minors, not legal adults.

## BACKGROUND

### I. Statutory Scheme

In Massachusetts, 18-to-20-year-olds are legal adults. *See* MASS. GEN. LAWS ch. 4, § 7 (defining "adult" as "any person who has attained the age of eighteen"); *see also id.* ch. 231, § 85P

("Except as otherwise specifically provided by law," 18-year-olds have "full legal capacity unless legally incapacitated for some reason other than insufficient age."). Yet through a complex regulatory scheme (collectively, "the Ban"), Massachusetts bans 18-to-20-year-old adults from acquiring, possessing, or carrying any semiautomatic firearm or any type of handgun. To acquire or possess any firearm, an individual must acquire one of two licenses: a firearm identification card, *see id.* ch. 140, § 129B, or a license to carry, *see id.* ch. 140, § 131. Absent an appropriate license, carrying a firearm or possessing it anywhere other than one's home or place of business is a felony, *id.* ch. 269, § 10(a), and possession even on one's own property is a misdemeanor, *id.* ch. 269, § 10(h); *id.* ch. 140, § 129C(a) (listing narrow exceptions not applicable here).

Massachusetts permits 18-to-20-year-olds to acquire only the more limited of these two licenses, the firearm identification card. *See id.* ch. 140, §§ 129B(a), 131(d). But a firearm identification card authorizes its holder only to purchase and possess "rifles and shotguns that are not large capacity or semi-automatic, and ammunition therefor." *Id.* ch. 140, § 129B(c). Ownership of any semiautomatic firearm, and all handguns (and hence, carrying handguns in public for self-defense) requires a carry license. *Id.* ch. 140, § 131(a).

That means, in effect, that Massachusetts bars 18-to-20-year-olds from owning the most popular categories of firearms in the country (semiautomatics and handguns), and the only category of firearm that is feasible to carry in public for self-defense (handguns). Handguns, for their part, are "the quintessential self-defense weapon" and "the most popular weapon chosen by Americans for self-defense in the home." *Heller*, 554 U.S. at 629. Semiautomatic firearms, lest there be any confusion, are not fully automatic "machineguns." In contrast with automatic weapons, a semiautomatic firearm is fires a single shot for each function of the trigger. *See Staples v. United States*, 511 U.S. 600, 602 n.1 (1994). The Supreme Court has explained that

2

semiautomatic firearms have "traditionally have been widely accepted as lawful possessions." *Id.* at 612. Indeed, such firearm technology is quite old, relatively speaking. Although semiautomatic firearms do not date to the Founding, multi-shot firearms were well known to that generation. In 1777, Joseph Belton demonstrated a repeating rifle that could hold 16 rounds of ammunition to members of the Continental Congress. David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. LEGIS. 223, 255 (2024). And Meriwether Lewis carried a Girardoni air rifle, with a 22-round tubular magazine, on his expedition with William Clark. James B. Garry, WEAPONS OF THE LEWIS AND CLARK EXPEDITION 100–01 (2012). "Modern" semiautomatic firearm technology has been around for 140 years, dating to 1885. *See* Kopel & Greenlee, *supra* at 282. That is the same year that Karl Benz invented the first gasoline-powered car. Ken W. Purdy & Christopher G. Foster, *History of the automobile*, ENCYCLOPÆDIA BRITANNICA (last updated July 19, 2025), https://perma.cc/SL57-BHTR. And they are enormously popular today. Semiautomatic pistol and rifle sales make up approximately 60% of all firearm sales in the country, according to industry data. *See 2021 Firearms Retailer: Survey Report*, NSSF (2021), https://perma.cc/N59Q-6UJJ. As *Staples* suggests, semiautomatic firearms have been broadly accepted as lawful possessions virtually everywhere in America across almost that entire time period, including in Massachusetts today. The Court has reiterated this observation as recently as June of this year. *See Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 297 (2025) (semiautomatic rifles "are both widely legal and bought by many ordinary consumers").

## II.    Procedural History and the Effect of The Ban on Plaintiffs.

Mack Escher is a 20-year-old American citizen and resident of the Commonwealth of Massachusetts. SOUMF ¶ 1. Escher possesses a firearm identification card which is, on account

of his age, the highest level of license that Massachusetts permits him to acquire. SOUMF ¶ 3.
With that card, he can, and does, possess a non-semiautomatic muzzleloading rifle and a shotgun.
SOUMF ¶ 4. He desires, however, to possess a semiautomatic rifle that he could use for hunting
and a handgun that he could own and occasionally carry for self-defense. SOUMF ¶ 5. He has
refrained from acquiring a handgun or semiautomatic rifle (and consequently, also from carrying
a handgun) because he fears prosecution for exercising his rights, given Massachusetts'
requirement that an individual be at least 21 years old to do those things. SOUMF ¶ 5. Were it not
for the age limitation on acquiring a license to carry, Escher would acquire such a license and
possess semiautomatic firearms and carry a handgun in public for self-defense with it. SOUMF
¶ 6.

The other Plaintiffs in this action are a collection of organizations that seek to promote and
defend the Second Amendment-protected rights of their members, including Firearms Policy
Coalition, Second Amendment Foundation, Gun Owners' Action League, Commonwealth Second
Amendment, National Rifle Association of America, and Gun Owners of America. SOUMF ¶ 8.
Each of these organizations has members in Massachusetts, including Plaintiff Escher, and each
sues on behalf of their members in Massachusetts who are adversely affected by the Ban. SOUMF
¶¶ 7–8.

The Defendants to this action include Colonel Geoffrey Noble, the Superintendent of the
Massachusetts State Police, and Jamie Gagnon, the Commissioner of the Department of Criminal
Justice Information Services. Superintendent Noble enforces the Commonwealth's laws
prohibiting the unlicensed carriage or possession of firearms, MASS. GEN. LAWS ch. 22C, §§ 2, 6,
and both Superintendent Noble and Commissioner Gagnon have duties respecting the processing
and granting of applications for licenses to carry, including by informing local licensing officials

4

where an individual is statutorily ineligible to acquire a carry license. The actual licensing applications themselves, however, are processed by local officials. In Plaintiff Escher's case, that official is Defendant Chief Heath J. Eldredge of the Brewster Police Department. Chief Eldredge is the official ultimately responsible for granting or denying applications for licenses to carry from individuals, like Escher, who reside in Brewster. *See id.* ch. 140, § 121.

## ARGUMENT

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Rodriguez-Cardi v. MMM Holdings, Inc.*, 936 F.3d 40, 46 (1st Cir. 2019). "The test is whether, as to each essential element," when "view[ing] the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor," "there is 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.' " *DeNovellis v. Shalala*, 124 F.3d 298, 306 (1st Cir. 1997) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)).

The United States Constitution guarantees "the right of the people to keep and bear Arms." U.S. CONST. amend. II. The Second Amendment is applicable to the States through the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010) (plurality op.); *id.* at 805 (Thomas, J., concurring in part and concurring in judgment).

The Supreme Court has instructed that "the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. The Supreme Court has already established that the Second Amendment covers both possessing privately and carrying publicly arms for self-defense and other lawful

purposes. *See Heller*, 554 U.S. at 629; *Bruen*, 597 U.S. at 32. Thus, the Second Amendment "presumptively protects" Plaintiff Escher's and similarly situated 18-to-20-year-olds' proposed course of conduct. *Id.* at 24. It is Massachusetts' burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19; *see also id.* at 60 ("[W]e are not obliged to sift the historical materials for evidence to sustain New York's statute. That is respondents' burden.").

A presumptively unconstitutional law such as the Ban can survive only if the government proves "the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *United States v. Rahimi*, 602 U.S. 680, 692 (2024) (quoting *Bruen*, 597 U.S. at 29). It is impossible for Massachusetts to do so here.

## I. The Plain Text of the Second Amendment Covers the Right of 18-to-20-Year-Olds to Carry.

The Second Amendment declares: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. "Importantly, the Second Amendment's plain text does not have an age limit." *Worth v. Jacobson*, 108 F.4th 677, 692 (8th Cir. 2024). The Supreme Court has explained that "like other references to 'the people' in the Constitution, 'the term unambiguously refers to all members of the political community, not an unspecified subset,'" *Lara*, 125 F.4th at 435 (quoting *Heller*, 554 U.S. at 580); *accord Worth*, 108 F.4th at 690, and therefore the right is "guaranteed to 'all Americans,'" *Bruen*, 597 U.S. at 70 (quoting *Heller*, 554 U.S. at 581). "Eighteen to 20-year-olds are included in the 'political community.'" *Worth*, 108 F.4th at 689 (quoting *United States v. Cruikshank*, 92 U.S. 542, 549 (1875)). Thus, "[o]rdinary, law-abiding 18 to 20-year-old [citizens of Massachusetts] are unambiguously members of the people." *Id.* at 692.

If there were any doubt on this point, the Second Amendment's reference to the "militia" makes clear that the right to carry arms publicly for self-defense and other lawful purposes fully vests by age 18. As *Heller* explained, "the militia" referenced in the Second Amendment is not a separate body from "the people" but rather a subset of it. 554 U.S. at 579–80. At the Founding, the "militia" was widely understood to refer to "all able-bodied men," *id.* at 596, including in the unanimous judgment of the federal government and every state in the union, all men at least 18 years of age, *Jones v. Bonta*, 34 F.4th 704, 718–19, 738–39 app. 2 (9th Cir. 2022), *vacated on rehearing en banc*, 47 F.4th 1124 (9th Cir. 2022) (collecting post-ratification state militia laws). Indeed, just months after ratification of the Second Amendment, Congress enacted the Militia Act of 1792, which *required* all able-bodied men to enroll in the militia and to arm themselves *upon turning 18*. Militia Act of May 8, 1792, ch. 33, § 1, 1 Stat. 271. Shortly after the federal age for militia participation was set at 18, every state set it at 18 as well. *Jones*, 34 F.4th at 719, 738 app. 2. *Heller* makes clear that the "militia" discussed in the Second Amendments "prefatory clause" refers to "a subset of 'the people' " 554 U.S. at 580. It follows then, from the unanimous inclusion of 18-to-20-year-olds in the militia at the Founding, that 18-to-20-year-olds *must have* been part of "the people" whose rights were protected by the Second Amendment. *Hirschfeld v. BATFE*, 5 F.4th 407, 429–30 (4th Cir. 2021), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021) ("Because the individual right is broader than the Second Amendment's civic purpose, those required to serve in the militia and bring arms would most assuredly have been among 'the people' who possessed the right.").

Further, the Constitution's individual amendments and clauses must be interpreted "in the context of the Constitution as a whole." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 325 (2015). The Constitution elsewhere explicitly considers and prescribes limits based on age.

*See, e.g.*, U.S. CONST. art. I, § 2, cl. 2 (setting a minimum age of 25 to serve in the House of Representatives). "In other words, the Founders considered age and knew how to set age requirements but placed no such restrictions on rights, including those protected by the Second Amendment." *Hirschfeld*, 5 F.4th at 421; *see also NRA v. ATF*, 714 F.3d 334, 342 (5th Cir. 2013) (Jones, J., dissenting from denial of rehearing en banc) ("The members of the first Congress were ignorant of thermal heat imaging devices; with late teenage males, they were familiar.").

Reading the Second Amendment this way accords with how we treat other constitutional rights. The "people" is also used to describe those who have rights secured under the First and Fourth Amendments, and both of those amendments extend fully to all adults regardless of age and apply to some degree to *the whole people*, even those under 18. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969) ("Students . . . are 'persons' under our Constitution [who] . . . are possessed of fundamental rights which the State must respect."). Even where "the people" does not appear, *every other constitutionally protected right* applies *at least* to those legal adults 18 and older. *Hirschfeld*, 5 F.4th at 422–23 (noting that this is true for the right to jury trial, voting, marriage, and the age at which an individual can legally consent to sexual intercourse).

## II.    No Historical Analogue Exists That Could Justify the Ban.

"[W]hen it comes to interpreting the Constitution, not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.'" *Bruen*, 597 U.S. at 34 (quoting *Heller*, 554 U.S. at 634–35) (emphasis in *Bruen*). The Supreme Court has "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.* at 37; *see also Gamble v. United States*, 587 U.S. 678, 702 (2019) (The relevant inquiry is "the public understanding in 1791 of the right codified by the Second Amendment," not 1868 when the Fourteenth Amendment was ratified.); *Lara*, 91 F.4th at 134

("[T]o maintain consistency in our interpretation of constitutional provisions, we hold that the Second Amendment should be understood according to its public meaning in 1791."); *Worth*, 108 F.4th at 692 ("*Bruen* strongly suggests that we should prioritize Founding-era history.").

Consistent with this precedent, the First Circuit has held that " 'founding-era historical precedent' is of primary importance for identifying a tradition of comparable regulation" in Second Amendment cases and that later evidence, especially " 'late-19th-century evidence' . . . may have probative value if it does not 'contradict[] earlier evidence.' " *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 51 (1st Cir. 2024) (quoting *Bruen*, 597 U.S. at 27, 66 n.28).

### A.    Founding Era Limitations Were Nonexistent.

Although 1791 is the key year by which to judge the value of historical evidence regarding the Second Amendment's scope, the difference between 1791 and 1868 is not significant here. The unanimous practice from the Founding of ensuring that 18-to-20-year-olds could exercise their rights protected by the Second Amendment on equal footing with the rest of the population was still the overwhelming majority practice in the states in 1868. Even before the Founding Era, the practice of 18-to-20-year-olds "keeping and bearing arms [was] deep-rooted in English law and custom" and "was brought across the Atlantic by the American colonists." *Jones*, 34 F.4th at 717. Immediately after the Amendment was ratified, the age for militia participation was set by every state and the federal government at 18. *See* Militia Act of May 8, 1792, ch. 33, § 1, 1 Stat. 271. Militia participation affirmatively *required* 18-year-olds to possess arms. *United States v. Miller*, 307 U.S. 174, 179 (1939) ("[W]hen called for service these men were expected to appear bearing arms supplied by themselves."). Thus, 18-year-olds at the Founding were expected to bear arms while participating in militia service, and they were also expected to keep and maintain their arms at the ready as private citizens who could be called to service. *See Worth*, 108 F.4th at 695 ("A mandate to acquire a firearm is hardly 'evidence' that one was previously prohibited from owning

one."). And there were no restrictions limiting the use of those arms to militia uses—they could be used for self-defense, hunting, and other lawful purposes. *See Lara*, 125 F.4th at 443–44 ("Against the sparse record of state regulations on 18-to-20-year-olds at the time of the Second Amendment's ratification, we can juxtapose the Second Militia Act.")

Further, 18-to-20-year-olds were expected to bear arms as part of the *posse comitatus*, which "allowed sheriffs and others to compel citizens to serve in the name of the state to execute arrests, level public nuisances, and keep the peace, upon pain of fine and imprisonment." *Jones*, 34 F.4th at 718, 722 (cleaned up). At common law, by age 18, all able-bodied men "were obliged to join in the 'hue and cry' (*hutesium et clamor*) to pursue fleeing criminals." David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. ILL. UNIV. L.J. 495, 534 (2019). Fully consistent with this history, at the time the Second Amendment was ratified, there were *no laws in any state* that purported to limit the rights of 18-to-20-year-olds to possess firearms in the home or to carry them in public. *See Firearms Policy Coal. v. McCraw*, 623 F. Supp. 3d 740, 756 (N.D. Tex. 2022) ("[T]he record stops short and does not show any 'historical analogs' from the Founding Era.").

"While some gun regulations existed at the Founding, there were no regulations restricting minors' ability to possess or purchase weapons until two states adopted such laws in 1856." *Hirschfeld*, 5 F.4th at 437. Indeed, "there is not just a vacuum at the founding era: instead, the founding-era evidence of militia membership undermines" the importance of any Reconstruction Era outliers. *Jones*, 34 F.4th at 722. Two circuit courts have recently held otherwise, but they did so on faulty grounds. In *McCoy v. ATF*, 140 F.4th 568 (4th Cir. 2025), and in *National Rifle Association, Inc. v. Bondi*, 133 F.4th 1108 (11th Cir. 2025) (en banc), the Fourth and Eleventh Circuits concluded that Founding-era 18-to-20-year-olds faced a *de facto* limitation on their ability

to acquire arms based not upon a historical tradition of *firearm* regulation, but rather principles of *contract* law that allowed a minor to void their contracts upon reaching the age of majority. *See, e.g. NRA*, 133 F.4th at 1118.

This Court should not follow those decisions, which rest on a poor historical foundation— the voidability rule was, in fact, not a barrier to firearm acquisition or possession for 18-to-20-year-olds. More importantly, there is a global problem with these court's analyses, setting aside the fact that the Founders *required* 18-to-20-year-olds to keep and bear arms: the voidability rule applied only to *minors* at the Founding (which 18-year-olds were at the time), not to legal adults (as 18-year-olds are today). That distinction matters for two reasons. First, it is axiomatic that an adult has the "full enjoyment of his civil and political rights." 1 JOHN BOUVIER, INSTITUTES OF AMERICAN LAW 148 (1858). Indeed, every other constitutional right, including those not enumerated explicitly in the Constitution, indisputably applies to 18-year-olds who are legal adults. *Hirschfeld*, 5 F.4th at 422–23. The Second Amendment "is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.' " *Bruen*, 597 U.S. at 70 (quoting *McDonald*, 561 U.S. at 780). Since that is true, the right to keep and bear arms cannot be the *only* constitutionally protected right that is denied to a subset of adult Americans.

Second, the distinction between adult and minor was a meaningful one, and that defeats any possible analogy under *Bruen* between restrictions on adults today to limits on children at the Founding. The Supreme Court requires that historical and modern regulations be animated by the same "principles," *Rahimi*, 602 U.S. at 692, or, put another way, the historical and modern regulations must be "relevantly similar" in both "how and why" they limit the right to bear arms, *Bruen*, 597 U.S. at 29. An incidental restriction on a *minor* is simply not the same as a direct restriction on an *adult*, because an adult is responsible for himself and his own care and protection

11

in a way that a minor is not. Blackstone, for instance, who the Fourth and Eleventh Circuits both cited on this point, *see McCoy*, 140 F.4th at 575; *NRA*, 133 F.4th at 1117, made clear, in the same chapter in which he discussed the legal disabilities of minors or "infants," that "their very disabilities are privileges; in order to secure them from hurting themselves by their own improvident acts. An infant cannot be sued but under the protection, and joining the name, of his guardian; *for he is to defend him against all attacks as well by law as otherwise*." 1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 452 (1765) (emphasis added). In other words, any restrictions on minors were for *their* benefit. And they were integrally related to the fact that minors enjoyed the protection of their guardians. The Commonwealth today wishes to place the same supposed disabilities on legal adults, who lack guardians to protect them. That sort of mechanical application of putative historical rules without care for the fact that the principles underpinning those historical rules do not apply today is precisely the sort of "law trapped in amber" legal reasoning that *Rahimi* definitively rejected. 602 U.S. at 691.

Moreover, the voidability rule simply cannot support a modern restriction on 18-to-20-year-olds acquiring or carrying arms because it did not actually have that effect at the Founding. The voidability rule had an important exception that allowed an "infant" to acquire "necessaries" through contracts that could not be voided. As Lord Coke explained, "generally whatsoever an infant is bound to do by law, the same shall bind him, albeit he does it without suit at law." Co. Litt. 172a (emphasis omitted). Put another way, "[t]he question of necessaries is governed by the real circumstances of the infant." JAMES KENT, 2 COMMENTARIES ON AMERICAN LAW 239 (1848); *see also Van Valkinburgh v. Watson & Watson*, 13 Johns. 480 (N.Y. Sup. Ct. 1816). And given that 18-to-20-year-olds were required to be armed by law, it follows that they could bind themselves to a contract to acquire those required arms.

Wholly apart from that legal requirement, other evidence that firearms were critical in effectively *all* stations of life at the Founding abounds. Shortly after the Constitution's ratification, Congress "prohibit[ed] for a limited time the Exportation of Arms and Ammunition, and encourage[ed] the Importation of the same" to ensure the American populace was well-armed. Act of May 22, 1794, 1 Stat. 369, ch. 33.  Several states specifically exempted firearms from any form of otherwise legal seizure. *See, e.g.*, *An Act for Settling the Militia*, 3 WILLIAM W. HENING, THE STATUTE AT LARGE OF VIRGINIA 339 (1823) (enacted 1705); 1 THE LAWS OF THE STATE OF VERMONT, DIGESTED AND COMPILED, ch. 31 § 1, 321 (Wright 1808) (enacted 1797).  And a review of probate records likewise found that firearms were more commonly owned (by almost two times, in fact) than Bibles, and while less commonly possessed than beds or cooking utensils, were more common than *chairs*. *See* James Lindgren & Justin L. Heather, *Counting Guns in Early America*, 43 WM. & MARY L. REV. 1777, 1786, 1801 (2002); *see also* Brief of Amicus Curiae at 6–16, The Second Amendment Foundation in Support of Petitioner, *NRA v. Glass*, No. 24-1185 (U.S. June 20, 2025) (discussing this and other Founding-era evidence that firearms would have been considered "necessaries"). Indeed, depending upon their circumstances, minors could sometimes even buy "pistols" as necessaries. For instance, future President Andrew Jackson, who was a practicing attorney at age 20 despite being a "minor," purchased a pair of pistols and a rifle for his self-defense when he moved to (what would become) Tennessee. *See* HENDRIK BOORAEM, YOUNG HICKORY: THE MAKING OF ANDREW JACKSON 195, 199 (2001).

### B.    Late Nineteenth Century Restrictions Cannot Sustain The Ban.

As noted above, the First Circuit has held that late-19th century restrictions are useful only to the extent they confirm what the history of earlier periods already establishes. *Ocean State Tactical*, 95 F.4th at 52. No statutes regulating the ability of 18-to-20-year-olds to acquire firearms appear until this late period, which, on its own, is reason enough to reject reliance on them. *See*

13

*Lara*, 125 F.4th at 442 ("Founding-era laws reflect the principle that 18-to-20-year-olds are 'able-bodied men' entitled to exercise the right to bear arms, while the Commissioner relies on laws enacted at least 50 years after the ratification of the Second Amendment to argue the exact opposite.") (citation omitted); *Bruen*, 597 U.S. at 36 ("[P]ost-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text.") (citation omitted). Of the small handful of laws that regulated access to firearms by those under 21 at all, just two of them predate the Civil War. *See* 1856 Ala. Acts. 17; 1856 Tenn. Pub. Acts 92. "It would also be strange to rely on two southern laws restricting gun rights that were enacted before the Civil War given Congress's grave concerns about southern states disarming freed Blacks during this period." *Hirschfeld*, 5 F.4th at 440; *see also McDonald*, 561 U.S. at 770–78; *Jones*, 34 F.4th at 722 (noting the "deeply offensive nature of many of" "the Reconstruction-era laws" restricting the Second Amendment rights of 18-to-20-year-olds). And even closer to the end of the 19th century, when there were more laws targeting this age group, they still were generally less restrictive than the Ban, which forbids not just public carry, but also simple possession.

Among the few laws restricting the right to carry in the period were a pair enacted in Kansas and Wisconsin in 1883, that limited the possession or carry of pistols or revolvers by 18-to-20-year-olds. *See* 1883 Wis. Sess. Laws 290; 1883 Kan. Sess. Laws 159. New York enacted a similar law in 1885, but that applied only to those *under* 18, thus expressly leaving 18-to-20-year-olds unregulated in their rights to carry and possess firearms. N.Y. Penal Code, ch. 375, § 1 (1885); *see also Worth*, 108 F.4th at 697 (explaining how many of Minnesota's purported analogues from this period "have 'serious flaws even beyond their temporal distance from the founding' ") (quoting *Bruen*, 597 U.S. at 37).

Otherwise, laws restricting the firearms rights of minors from the Reconstruction Era through the end of the 19th century regulated only *sales to* such individuals. *Worth*, 108 F.4th at 697–98 (cataloguing examples); *Jones*, 34 F.4th at 720 (same). Individuals subject to such laws during the Reconstruction Era through the end of the 19th century would have still, in many cases, been able to lawfully acquire a pistol from a parent or legal guardian and been subject to the same laws governing the carry of firearms as older citizens—meaning that, once acquired, they could possess, carry, and use such arms just the same. The distinctly more limited nature of such restrictions is significant in determining whether the Ban is " 'relevantly similar' to laws that our tradition is understood to permit," *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 29), which requires considering "[w]hy and how the regulation burdens the right," *id.*

Most importantly, just as with the voidability rule discussed above, the majority of laws imposing any firearm restrictions at all against 18-to-20-year-olds did so explicitly because, at the time, they were deemed "minors" and thus under the legal protection of their parents or guardians. *See* 1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND *441 (1765); *McCraw*, 623 F. Supp. 3d at 755 ("States did not enact legislation lowering the age of majority to 18 until the 1970s."). But Plaintiff Escher and all those similarly situated are legal adults. *See Worth*, 108 F.4th at 692 ("For political rights, the Twenty-Sixth Amendment sets the age of majority at age 18."). Plaintiffs are not aware of any law from any potentially relevant period that singled out the firearm rights of legal *adults* for restrictions based on their being younger than other legal adults. *See, e.g.*, 1 JOHN BOUVIER, INSTITUTES OF AMERICAN LAW 148 (1858) (Upon reaching the age of majority, "every man is in the full enjoyment of his civil and political rights[.]"); *Worth*, 108 F.4th at 698 ("Minnesota did not proffer an analogue that meets the 'how' and 'why' of the Carry Ban for 18 to 20-year-old Minnesotans.").

In sum, 18-to-20-year-olds are part of "the people" with Second Amendment rights, and there is no well-established and representative Founding-era historical tradition that the State could possibly point to that would justify prohibiting them possessing and carrying firearms on an equal footing with other adult citizens. Accordingly, Massachusetts ban on those activities violates the Second Amendment.

### III.    Plaintiffs Are Entitled to an Injunction Against the Ban.

If this Court concludes that Plaintiffs have shown the Ban is unconstitutional, they are entitled to an injunction against its enforcement that would permit the Organizational Plaintiffs' 18-to-20-year-old members, such as Escher, to acquire licenses to carry that would permit them to both possess semiautomatic firearms and handguns in the home and carry handguns for self-defense in public. An injunction is warranted because, in addition to having demonstrated actual success on the merits, Plaintiffs are likely to suffer irreparable harm in the absence of an injunction, and the balance of equities and public interest both favor entry of an injunction. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20, 32 (2008). Each of those criteria is met here. Irreparable harm is "an injury that cannot be adequately compensated for . . . by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). Plaintiffs' constitutional injury is just such a harm—sovereign immunity bars a damages claim in this case, but even if it did not, the deprivation of a fundamental right is not compensable with money. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.))); *Bruen*, 597 U.S. at 70 ("The [Second Amendment] is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.' " (citation omitted)). As for the balance of hardships and the public interest, these factors merge when the government is the opposing party.

*Nken v. Holder*, 556 U.S. 418, 435 (2009). While there ordinarily is a public interest in the enforcement of statutes, *see, e.g.*, *Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers Loc. Lodge 207 v. Raimondo*, 18 F.4th 38, 47 (1st Cir. 2021), "enforcement of an unconstitutional law is always contrary to the public interest," *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013).

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment to Plaintiffs, declare the Ban unlawful, and enjoin its enforcement against Plaintiffs and their members.

Dated: November 20, 2025

Respectfully submitted,

Jason A. Guida (BBO# 667252)
Principe & Strasnick, P.C.
17 Lark Avenue
Saugus, MA 01960
(617) 383-4652
jason@lawguida.com

  /s/ David H. Thompson
David H. Thompson*
Peter A. Patterson*
William V. Bergstrom*
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
Telephone: (202) 220-9600
Facsimile: (202) 220-9601
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
wbergstrom@cooperkirk.com

*Admitted *pro hac vice*

*Counsel for Plaintiffs*

17

**CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of November, 2025, I filed the foregoing Brief in Support of Summary Judgment via the Court's CM/ECF appellate system, which will electronically notify all counsel requiring notice.

Respectfully submitted,

*/s/ David H. Thompson*
David H. Thompson

*Counsel for Plaintiffs*