UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MACK ESCHER; GUN OWNERS' ACTION LEAGUE; COMMONWEALTH SECOND AMENDMENT; FIREARMS POLICY COALITION, INC.; SECOND AMENDMENT FOUNDATION; NATIONAL RIFLE ASSOCIATION OF AMERICA; and GUN OWNERS OF AMERICA, INC.<br><br>    Plaintiffs,<br><br>v.<br><br>COLONEL GEOFFREY NOBLE, in his official capacity as Superintendent of the Massachusetts State Police and of the Commonwealth of Massachusetts; JAMIE GAGNON, in his official capacity as the Commissioner of the Department of Criminal Justice Information Services; and HEATH J. ELDREDGE, in his official capacity as the Chief of Police of Brewster, Massachusetts,<br><br>    Defendants. | CIVIL ACTION<br>No. 1:25-cv-10389-GAO |

**DEFENDANTS' JOINT MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

I.   PLAINTIFFS ARE INCORRECT THAT "FOUNDING ERA LIMITATIONS
     WERE NONEXISTENT."................................................................................... 2

     A.   Plaintiffs Are Incorrect to Argue That the Infancy Doctrine Is Not a Valid
          Historical Precursor. ....................................................................................... 3

     B.   The Scope of the Second Amendment Does Not Provide Broader Protections to
          Persons Over the Age of 18 Today Than at the Founding Merely Because Such
          Persons Have Since Acquired Other Types of Legal Privileges.......................... 8

     C.   Plaintiffs' Invocation of Militia Laws Is Inapposite. ........................................ 12

II.  THE RECONSTRUCTION-ERA ANALOGUES ARE PROBATIVE AND
     RELEVANTLY SIMILAR............................................................................... 13

III. CONCLUSION................................................................................................ 17

Under Massachusetts law, individuals aged 18 to 20 can purchase and possess non-semiautomatic rifles and shotguns. *See* Mass. Gen. Laws c. 140, § 129B. Until they turn 21, Massachusetts residents can also use other firearms—such as semiautomatic rifles or handguns—for purposes of hunting and target shooting, among others, so long as they are under the supervision of a licensed adult over 21. *See id.* §§ 129B(c), 129C(g). Persons under the age of 21, however, are ineligible to obtain the license required to purchase or possess handguns and semiautomatic rifles. *See id.* § 131. Defendants have moved for summary judgment on the ground that these common-sense age restrictions on firearms are permitted under the Second Amendment because they are consistent with our Nation's history of firearms regulations. Dkts. 39 & 53. Several circuit courts have agreed, finding similar age-based restrictions constitutional as applied to individuals aged 18 to 20 in consideration of the historical record. *See, e.g., McCoy v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 140 F.4th 568 (4th Cir. 2025); *Nat'l Rifle Ass'n v. Bondi*, 133 F.4th 1108 (11th Cir. 2025) (en banc).

Plaintiffs offer an incomplete and misleading historical narrative that cannot overcome the Defendants' showing of a robust historical tradition of restrictions on the functional and legal ability of minors under the age of 21 to access firearms. The experts offered by the State Defendants, Dkts. 41-3 to 41-8, describe a continuous line of restrictions on the basis of age that originated in Founding-era common law and later appeared in state statutes once the necessity for more targeted legislation emerged for the first time during Reconstruction. And the justification for such restrictions remained constant as well—the Founding Fathers recognized the dangers inherent in the immaturity, impulsivity, and risk-taking of young adults under the age of 21. Those concerns are borne out by modern science and remain the impetus for the modern age-based restrictions in Massachusetts and throughout the country.

Plaintiffs also misapply the *Bruen* and *Rahimi* framework in multiple ways. For instance, Plaintiffs attempt to discount Founding-era legal restrictions on 18-year-olds' access to firearms as "de facto" limitations that are irrelevant because they arose under "contract law," not firearm-specific legislation. Dkt. 44 at 10–11. But *Bruen* and *Rahimi* do not require a state to adduce some Founding-era "historical twin" in the form of a state statute that achieves precisely what the challenged law does. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 30 (2022); *United States v. Rahimi*, 602 U.S. 680, 692 (2024). The governing framework instead asks whether there is a broader "comparable tradition of regulation" that can demonstrate whether the original meaning of the Second Amendment brooks the type of burden imposed by the challenged law. *Bruen*, 597 U.S. at 27. Similarly, Plaintiffs argue that the scope of the Second Amendment's protections should evolve over time to match society's conception of a "legal adult[]," which has purportedly shifted to encompass all persons over the age of 18. Dkt. 44. That is fundamentally at odds with *Bruen*, which is, at its core, a framework for uncovering the Second Amendment's "original meaning." *Rahimi*, 602 U.S. at 738 (Barrett, J., concurring).

Because Massachusetts's firearm age restrictions are consistent with historical tradition and so do not violate the Second Amendment, Defendants respectfully request that this Court deny Plaintiffs' motion for summary judgment, and instead grant Defendants' motion for summary judgment, Dkts. 39 & 53.[1]

## I.    PLAINTIFFS ARE INCORRECT THAT "FOUNDING ERA LIMITATIONS WERE NONEXISTENT."

Plaintiffs incorrectly posit that founding-era limitations on access to firearms by persons under the age of 21 were "nonexistent." Dkt. 44 at 9. As explained in the State Defendants'

---

[1] Defendants do not dispute any of the statements of fact submitted by the Plaintiffs. Dkt. 45.

memorandum in support of their motion for summary judgment, persons under the age of 21 were prohibited at the Founding from purchasing firearms as the result of limitations on their ability to contract and faced restrictions through other mechanisms as well, such as university regulations prohibiting possession of firearms. *See* Dkt. 40 at 7–13.

Plaintiffs' contrary position depends on three faulty arguments that the Court should reject: (A) Plaintiffs incorrectly contend that Founding-era limitations on minors' access to firearms should be disregarded because they were "de facto limitation[s]" resulting from contract law that supposedly did not have the effect of preventing access to firearms; (B) by arguing that persons over age 18 should be free from age-based firearms restrictions because they enjoy more legal privileges today than at the Founding, Plaintiffs both assert an anti-originalist view of the Second Amendment that is inconsistent with *Bruen* and misinterpret the reasons that younger citizens were more strictly regulated at the Founding: because they lacked maturity and judgment, which has not changed since the Founding; and (C) Plaintiffs' reliance on Founding-era militia practice is misplaced, including because militia laws at the Founding presumed that a person under the age of 21 would not be capable of acquiring his own firearms.

### A.    Plaintiffs Are Incorrect to Argue That the Infancy Doctrine Is Not a Valid Historical Precursor.

Plaintiffs fleetingly acknowledge (Dkt. 44 at 10–11) that Founding-era persons under age 21 were subject to legal limitations that heavily restricted their ability to buy arms—i.e., the infancy doctrine, *see* Dkt. 40 at 7–10. Yet Plaintiffs dismiss that legal mechanism because it was, according to Plaintiffs, only a "de facto limitation" on minors' access to firearms resulting from contract law and supposedly did "not actually have the effect" of restricting minors' acquisition of firearms. Dkt. 44 at 10, 12. That argument is misguided in two ways.

*First*, the infancy doctrine was not merely a "de facto limitation" (Dkt. 44 at 10); it was a broad de jure rule recognized by courts, as explained in the State Defendants' prior memorandum, *see* Dkt. 40 at 7–10. And insofar as Plaintiffs suggest that the infancy doctrine is not a valid historical precursor because it was a "principle[] of contract law" (Dkt. 44 at 10–11), rather than a narrow piece of firearm-specific legislation, Plaintiffs fail to explain that position, which is wrong.

The *Bruen* framework explicitly rejected any requirement that precursor rules be "historical *twin*[s]" or "dead ringer[s]" for modern regulations. *Bruen*, 597 U.S. at 30 (emphasis in original). Rather, the *Bruen* inquiry instead asks whether there are "historical *analogue[s]*" that evince a broader "historical tradition." *Id.* at 30, 34 (emphasis in original). The purpose of seeking such historical analogues is to "help delineate the contours of the [Second Amendment] right" as originally understood at the relevant time. *Rahimi*, 602 U.S. at 691. The premise of the inquiry is that if historical regulations burdened the right to bear arms in a certain way, and that burden was tolerated, that is evidence that the Second Amendment was originally understood to permit that type of burden, and so modern regulations may impose a comparable burden. *See id.* at 738–39 (Barrett, J., concurring) (explaining the role of "[o]riginal history" in discerning the "original contours" of the Second Amendment right). And the historical inquiry is by no means limited to firearm-specific statutes, as shown by *Rahimi*'s primary reliance on multiple threads of "common law" regulations. *Id.* at 693, 695, 697.

Viewed through that lens, the infancy doctrine is a highly relevant precursor. It was a legal doctrine that broadly prevented persons under age 21 from purchasing firearms, and Founding-era society tolerated that restriction without objecting that it offended the Second Amendment. *See* Dkt. 40 at 7–10. It should not be discounted merely because it was significantly *broader* and more burdensome than the challenged laws here—i.e., because it restricted nearly all manner of

4

commercial engagement, rather than just the ability to purchase firearms. *Cf. Rahimi*, 602 U.S. at 699 (identifying "going armed laws" as relevantly similar historical analogues even though the penalty of "imprisonment" was *greater* than the "temporary disarmament" imposed by the challenged modern regulation). On the contrary, the infancy doctrine is particularly strong evidence of the original meaning of the Second Amendment because of the sweeping burden that it imposed: not only did Founding-era society clearly accept that the right to purchase firearms may be constitutionally restricted based on age, Founding-era society apparently harbored an even deeper skepticism about the maturity and judgment of persons under 21 than the challenged law reflects. Nor are Defendants aware of any challenge made to the infancy doctrine—to the contrary, it was widely cited favorably by the major commentators of the era. *See* Dkt. 40 at 7–10. Where there have been "no disputes regarding the lawfulness of [historical] prohibitions," the court can "assume it settled" that those prohibitions were "consistent with the Second Amendment." *Bruen*, 597 U.S. at 30; *see also id.* at 36 ("[W]here a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide our interpretation of an ambiguous constitutional provision.") (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 572 (2014) (Scalia, J., concurring in judgment)).

If Plaintiffs' conception of Founding-era views were correct—i.e., if the Second Amendment were originally understood to require that an 18-year-old be legally permitted to purchase a firearm—the infancy doctrine would have been viewed at the Founding as an intolerable infringement of that right because it prevented 18-year-olds from purchasing firearms. *See* Dkt. 40 at 9–10. For example, if the Second Amendment were understood at the Founding to be as broad as Plaintiffs assert, the infancy doctrine might have reflected an exception for firearms as "necessaries," like various other essential goods—but it did not. *See* Dkt. 40 at 9–10.

5

The infancy doctrine is highly salient for the additional reason that it renders nonsensical any search for a "historical twin" in this context, which is what Plaintiffs appear to demand. *Bruen*, 597 at 30. Because the infancy doctrine made it practically impossible for persons under age 21 to acquire firearms, there was no need for states or local governments to enact separate legislation specifically prohibiting those persons from purchasing firearms. *See* Dkt. 40 at 10. Indeed, Plaintiffs' emphasis on the absence of such legislation repeats the same common misunderstanding of *Bruen* that Justice Barrett criticized in her *Rahimi* concurrence: Plaintiffs "assume[] that founding-era legislatures maximally exercised their power to regulate, thereby adopting a 'use it or lose it' view of legislative authority," which is a "flawed" assumption that "originalism does not require." *Rahimi*, 602 U.S. at 739–40. Put another way, there was no need for Founding-era legislatures to "maximally exercise[] their power" to explicitly prohibit persons under age 21 from purchasing firearms because they were already prohibited from doing so; but that does not mean that Founding-era legislatures lacked such a power. *See id.*

Indeed, the *Bruen* test would lead to absurd results if it truly demanded a narrow piece of firearms legislation reflecting the same age-based restriction like the modern law under challenge, as Plaintiffs contend. For example, there are apparently no Founding-era laws prohibiting young toddlers from purchasing or possessing firearms—presumably because there was no widespread problem of toddlers purchasing or obtaining firearms that created a need for such legislation—but the scope of Plaintiffs' claims in this lawsuit, which only concern the ability of persons over age 18 to buy firearms, tacitly acknowledges that is constitutionally acceptable.

**Second**, Plaintiffs are simply incorrect that the infancy doctrine "did not actually have [the] effect" of restricting persons under the age of 21 from accessing firearms. Dkt. 44 at 12. As explained in the State Defendants' prior memorandum and the expert reports of multiple historians

attached to that motion, and as recognized by multiple courts already, minors were heavily impeded from purchasing firearms. *See* Dkt. 40 at 9; *see also Bondi*, 133 F.4th at 1118 ("[M]inors generally could not purchase firearms because they lacked the judgment and discretion to enter contracts and to receive the wages of their labor."); *McCoy*, 140 F.4th at 576 ("The infancy doctrine imposed a severe burden on a minor's ability to purchase goods, including firearms, during the founding era.").

Plaintiffs cite no direct historical evidence to the contrary. Indeed, the only support Plaintiffs offer for this position is that the infancy doctrine admitted an exception for "necessaries," which, according to Plaintiffs, encompassed firearms. *See* Dkt. 44 at 12–13. However, Plaintiffs do not identify a single historical source stating that firearms were considered "necessaries" under that doctrine, and multiple historical sources indicate the opposite. Dkt. 40 at 9–10; *see, e.g.*, *Saunders Glover & Co. v. Ott's Adm'r*, 12 S.C.L. 572, 572 (S.C. Const. App. 1822) (holding that "pistols" and gunpowder were not necessaries); 1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND *454 (George Sharswood ed., 1893) (stating that necessaries included only "meat, drink, apparel, [and] physic [medicine]"); *see also* Saul Cornell, *Common-Law Limits on Firearms Purchases by Minors: The Original Understanding*, 173 Pa. L. Rev. 133, 137–38 (identifying historical sources indicating that firearms were not covered by the "necessaries" exception), *available at* https://pennlawreview.com/2025/06/24/common-law-limits-on-firearms-purchases-by-minors-the-original-understanding/.[2]

---

[2] Plaintiffs cite in passing an isolated anecdote about Andrew Jackson purchasing a firearm at age 20 (Dkt. 44 at 12), but Plaintiffs provide no evidence that he was able to purchase the firearm as the result of the "necessaries" exception, nor that this single example was in any way representative of the state of affairs in broader society. *See* HENDRIK BOORAEM, YOUNG HICKORY: THE MAKING OF ANDREW JACKSON 195, 199 (2001) (providing no further detail or historical sources as to the cited passages). Also, it is not even clear that Andrew Jackson was

Plaintiffs' position is also belied by the fact that militia laws widely included exceptions and other provisions designed to account for the fact that persons under age 21 could not acquire their own firearms (for example, by exempting them from supplying their own arms for militia service). *See* Dkt. 40 at 10–12. If it were true, as Plaintiffs assert, that persons under age 21 could purchase firearms of their own accord at the Founding, they would have been subject to the same firearm-supply requirements as everyone else.

**B.    The Scope of the Second Amendment Does Not Provide Broader Protections to Persons Over the Age of 18 Today Than at the Founding Merely Because Such Persons Have Since Acquired Other Types of Legal Privileges.**

Plaintiffs argue that the challenged laws are distinguishable from the Founding-era tradition of restricting the ability of persons under age 21 from purchasing firearms because, unlike at the Founding, modern society now treats persons over the age of 18 as adults. *See* Dkt. 44 at 11–12. According to this argument, the decisions of other courts upholding age restrictions like the ones challenged here are wrong because "every . . . constitutional right . . . indisputably applies to 18-year-olds who are legal adults," and so restrictions on 18-year-olds at the Founding, when they were treated as minors, are supposedly irrelevant. Dkt. 44 at 11. This argument is without merit for four reasons.

*First*, Plaintiffs' focus on which age groups *possess* constitutional rights is a legally dubious framing of the issue, and whether 18-year-old persons are covered by the Second Amendment was not the issue decided in other cases that have upheld age restrictions like the ones challenged here. Of course, "[c]onstitutional rights do not mature and come into being magically

---

under the age of 21 at the time of this account; it purportedly occurred when he moved to Tennessee in 1788, and he was born in 1767, which means he may have already been 21 years old at the time. *See Family Life, the Law, Business and Politics: 1767-1811*, Library of Congress, *available at* https://www.loc.gov/collections/andrew-jackson-papers/articles-and-essays/andrew-jackson-timeline-1767-1845/family-life-the-law-business-and-politics-1767-1811/.

only when one attains the state-defined age of majority," and it is settled that "[m]inors, as well as adults, are protected by the Constitution and possess constitutional rights." *Planned Parenthood of Cent. Missouri v. Danforth*, 428 U.S. 52, 74 (1976). However, the state may nevertheless, in many instances, lawfully burden a person's constitutional rights in a manner that depends on age and maturity. *See, e.g.*, *Ginsberg v. State of N. Y.*, 390 U.S. 629, 637–41 (1968) (concluding that state law restricting persons under age 17 from accessing obscene material did not "invade[] the area of freedom of expression constitutionally secured to minors").

Here, Defendants assume for purposes of summary judgment that persons under the age of 21 are covered by the text of the Second Amendment under *Bruen*'s first inquiry. *See* Dkt. 40 at 5 n.3. And, consistent with that assumption, the challenged laws permit such persons to use and purchase various firearms, leaving ample room for persons under 21 to exercise whatever Second Amendment rights they possess. *See* Dkt. 40 at 2 (describing challenged laws, which permit 18-year-olds, and even some younger persons with parental consent, to purchase and possess non-large capacity, non-semiautomatic rifles and shotguns). The question here is merely whether Massachusetts may impose stricter *limits* on the Second Amendment rights of persons under the age of 21 than those of older individuals. That type of age-based distinction does not offend the Second Amendment for the reasons explained in the State Defendants' prior memorandum. *See* Dkt. 40 at 4–20. And it bears noting that other constitutional rights, like those enshrined in the Equal Protection Clause, already serve the role of protecting against unlawful age discrimination—a type of claim Plaintiffs do not assert, presumably because they recognize that the Equal Protection Clause and other constitutional rights afford the government great latitude in discriminating based on age. *See, e.g.*, *Izquierdo Prieto v. Mercado Rosa*, 894 F.2d 467, 471 (1st

Cir. 1990) ("The Supreme Court has held that constitutional age discrimination claims [under the Fourteenth Amendment] are subject to the rational basis test . . . .").

*Second*, by dismissing the relevant Founding-era restrictions because 18-to-20-year-olds were treated as "minors" at the Founding, instead of "adults" as they are today, Plaintiffs assert an anti-originalist view of the Second Amendment that is antithetical to the *Bruen* framework. *See Rahimi*, 602 U.S. at 737–39 (Barrett, J., concurring) (describing *Bruen* framework as "an originalist approach to the Second Amendment," which is "built on [a] core principle[] . . . that the meaning of constitutional text is fixed at the time of its ratification"). Essentially, Plaintiffs argue that, because modern society has evolved to confer a greater number of legal privileges on 18-year-olds today than they enjoyed at the Founding, the Second Amendment's scope has likewise evolved—and continues to evolve, depending on how states and the federal government adjust age-based privileges and restrictions in other legal domains in the future, like military conscription, the purchase of tobacco, and criminal punishments (which are not even necessarily the same across or within jurisdictions at any given point in time).

As the *Bondi* court pointed out, "[t]aken to its logical end, [that] position would mean that the federal right to keep and bear arms turns on a sliding scale defined by contemporary state law that varies from jurisdiction to jurisdiction." *Bondi*, 133 F.4th at 1125. Indeed, the age of conscription was not even lowered to the age of 18 until World War II, and the voting age was not universally lowered to 18 until 1971, *see id.* at 1122; thus, under Plaintiffs' reasoning, Massachusetts's law would have been constitutional for most of the nation's history, but it became unlawful at some vaguely defined moment in the twentieth century when 18-year-olds accrued enough legal privileges to become "adults." *But see District of Columbia v. Heller*, 554 U.S. 570,

634–35 (2008) ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them[.]").

*Third*, Plaintiffs' argument ignores that the *Bruen* framework emphasizes that whether historical precursors are relevant analogues to a modern law depends in part on "*why* the [historical precursor] burden[ed] a law-abiding citizen's right to armed self-defense" and whether the modern law follows from a similar reason. *Bruen*, 597 U.S. at 29 (emphasis added). Although 18-year-olds may enjoy more legal privileges in general now than at the Founding, the "why" that underlaid the infancy doctrine at the Founding is the same as the "why" that drives the modern challenged restriction on 18-year-olds' access to firearms: people under the age of 21 lack the maturity and judgment of older citizens. *See* Dkt. 40 at 19–20.

*Fourth*, Plaintiffs' argument—that all "legal adults" must receive equal protection under the Second Amendment, without age-based restrictions—is inconsistent with the broader text of the Constitution. Where constitutional provisions enshrine age-based minima or maxima, the Constitution says so expressly. For example, the Twenty-Sixth Amendment provides explicitly that "[t]he right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age." U.S. Const., Amend. XXVI, § 1; *see also, e.g.*, U.S. Const., Art. I, § 2, cl. 2 ("No Person shall be a Representative who shall not have attained to the Age of twenty five Years . . . ."); U.S. Const., Art I, § 3, cl. 3 ("No Person shall be a Senator who shall not have attained to the Age of thirty Years . . . ."). Thus, if the Second Amendment secured an absolute immunity from age-based burdens for all "legal adults," one would expect it to say so explicitly. *See, e.g.*, *Haaland v. Brackeen*, 599 U.S. 255, 350 (2023) (Thomas, J., dissenting) ("Because the Constitution contains one Indian-specific power, there is simply no reason to think that there is some sort of free-floating,

unlimited power over all things related to Indians. That is common sense: *expressio unius est exclusio alterius*."). Instead, as the Supreme Court has repeatedly recognized, the Second Amendment incorporates accepted historical limitations, which includes significant restrictions on the legal ability of those under 21 to purchase and possess firearms.

### C.    Plaintiffs' Invocation of Militia Laws Is Inapposite.

Plaintiffs' invocation of militia laws (Dkt. 44 at 9–10) does little to support their arguments. As pointed out in the State Defendants' prior memorandum, it is true that persons between the ages of 18 to 20 were often required as a matter of federal and state statute to serve in militias at the Founding, and that service likely entailed the use of firearms. *See* Dkt. 40 at 10–12. But, contrary to Plaintiffs' suggestion, the age of 18 was not even a uniform or constant line that was drawn. *See* Cornell (Dkt. 41-3) ¶ 52 ("Indeed, the ages of individuals required to serve in the militia fluctuated, depending on the need for soldiers, and whether the country was in a time of war or peace."). Moreover, the fact that persons under the age of 21 were allowed, or even required, to use firearms in the context of militia service does not mean that government actors were constitutionally barred from restricting their firearm access in other contexts. Indeed, as explained in the State Defendants' prior memorandum, militia laws included various mechanisms to account for the fact that persons under the age of 21 lacked the ability to purchase firearms on their own account. Dkt. 40 at 10–12. Thus, far from demonstrating that the Second Amendment prohibited states from limiting 18-year-olds' ability to purchase firearms, Founding-era militia laws demonstrate the opposite: Founding society's background assumption was that persons under the age of 21 would not legally be able to procure their own arms.

Moreover, although modern regulations need not precisely mirror Founding-era policy to be constitutional, there are striking similarities between Massachusetts's treatment of firearm possession by 18-to-20-year-olds serving in the military and Founding-era treatment of their

12

firearm possession in militias, and those similarities underscore the weakness of Plaintiffs' position. That is, in Massachusetts, any "person in the military or other service of any state or of the United States" is allowed to "purchase, sell or otherwise transfer and possess non-large capacity firearms and ammunition therefor without holding a [license to carry]," regardless of age, as long as they are acting " in the performance of their official duty." Mass. Gen. Laws c. 140, § 129C(f). Accordingly, access to firearms by persons in Massachusetts broadly resembles the general state of affairs at the Founding, vis-à-vis military service: (1) outside the context of military service, as in Founding-era context outside of a militia, persons under the age of 21 face legal barriers to acquiring firearms that older citizens do not face, but (2) persons under 21 do not face those same barriers within the context of military service, and might even be required to use firearms, just as in the context of Founding-era militia service. *See* Brewer (Dkt. 41-4) ¶ 48 ("With respect to minors in particular, it is clear through close examination of the militia laws that minors had a role primarily as military trainees, to serve as necessary if called to the public defense. The laws did not contemplate minors having unrestricted access to firearms outside of the militia context, under which the use of firearms was supervised.")

## II.    THE RECONSTRUCTION-ERA ANALOGUES ARE PROBATIVE AND RELEVANTLY SIMILAR.

Plaintiffs' dismissal of the nineteenth-century age restrictions is likewise inconsistent with governing law. Dkt. 44 at 13. The First Circuit in *Ocean State Tactical* confirmed that nineteenth (and even twentieth) century analogues can "provide insight as apt historical precursors." *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 52 (1st Cir. 2024), *cert. denied* 145 S.Ct. 2771; *see also Capen v. Campbell,* 134 F.4th 660, 670–71 (1st Cir. 2025) (reaffirming reliance on nineteenth-century historical analogues). As the First Circuit noted, the Supreme Court has relied on "how the Second Amendment was interpreted from immediately after its ratification *through*

*the end of the 19th century.*" *Ocean State Tactical,* 95 F.4th at 52 (quoting *Heller*, 554 U.S. at 605) (emphasis added).[3] While nineteenth-century analogues may be less probative if they "contradict earlier evidence," *id.* (quoting *Bruen,* 597 U.S. at 66 n.28), that is not the case here. Instead, the Founding-era understanding of infancy confirmed that minors were *not* presumed to have unfettered firearms access or any right to such access—quite the contrary.

Nineteenth-century history is particularly probative where it marks the first time a societal problem emerged—here, the problem of youth gun violence. As described in the State Defendants' prior memorandum, Dkt. 40 at 13–15, changes to the technological, economic, social, and legal fabric of the United States combined to give young adults unprecedented access to firearms by the mid- to late-nineteenth century. *See also* Rivas (Dkt. 41-8) ¶¶ 19–34, 41–42; Cornell ¶¶ 72, 74–76. And legislators took note—starting in 1856 and extending throughout the remainder of the nineteenth century—numerous states passed restrictions on firearms sales, transfers, possession and/or carry that set age limitations related to specific categories of weapons. Rivas ¶¶ 35–40.[4] Those laws were widespread and largely unchallenged—the solitary challenge of which Defendants are aware concluded the Tennessee law at issue was constitutional. *State v. Callicutt*, 69 Tenn. 714, 716–17 (1878) (state law banning "sale, gift, or loan" of pistols or other "dangerous

---

[3] As noted in the State Defendants' prior memorandum, Dkt. 40 at 18, the Supreme Court has left open the question of whether 1791 or 1868 is most directly relevant to the historical inquiry. *See Rahimi*, 602 U.S. at 692 n.1 (acknowledging "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope" but declining to resolve that dispute (quoting *Bruen*, 597 U.S. at 37)).

[4] Plaintiffs suggest the 1856 laws in Alabama and Tennessee should be discarded because they were pre-Civil War laws from southern states, citing vacated out-of-circuit precedent. Dkt. 44 at 14. But those two laws contain *only* a restriction on the sale or gift of certain weapons to "any male minor," for the Alabama law, or "any minor," for the Tennessee law. *See* Dkt. 40-2 (Addendum Vol. II) at Add.187–188. The restrictions on minors were not enacted alongside, for example, any suspect classifications based on race. And they are consistent with laws passed after the Civil War all across the United States. *See* Rivas ¶ 35 n.43.

weapon[s]" to minors was "not only constitutional" as consistent with the right to keep and bear arms, but also "wise and salutary in all its provisions"); *see also* Rivas ¶ 40. Plaintiffs do not provide any evidence to the contrary.

The State Defendants' prior memorandum, supported by unrebutted expert reports, laid out numerous historical analogues that restricted minors from acquiring specified weapons in the mid- to late-nineteenth century. Dkt. 40 at 15–17. Plaintiffs argue those analogues are insufficient because not enough of them addressed possession specifically. Dkt. 44 at 14. While recognizing that two of the relevant analogues *did* explicitly ban possession of particular weapons to minors, Plaintiffs nonetheless demand further historical twins to the current Massachusetts restrictions. But even one "'historical *twin*' is not required." *Rahimi*, 602 U.S. at 701 (quoting *Bruen*, 597 U.S. at 30); *see also id.* at 739 (Barrett, J., concurring) ("To be *consistent* with historical limits, a challenged regulation need not be an updated model of a historical counterpart.") Here, at least two jurisdictions historically took precisely the same path that Massachusetts does now to restrict possession of particular weapons by minors. Massachusetts's modern regulations are even more consistent with their "historical counterpart[s]" than is minimally required. *See id.*

Plaintiffs also assert that "laws restricting the firearms rights of minors from the Reconstruction Era through the end of the 19th century regulated only *sales to* such individuals," Dkt. 44 at 15, but the historical record is to the contrary. Of the twenty-four age-based weapon restrictions discussed in the report of the State Defendants' expert, "[m]ost" of them "prohibited all forms of sale *or provision* of deadly weapons to minors or those underage, including by their parents." Rivas ¶ 35 (emphasis added). While some states did choose to allow purchase by minors with parental consent, or gifting by a relative, those policy choices do not act as a ceiling on legislative authority today. *See Rahimi*, 602 U.S. at 739–40 (Barrett J., concurring) (explaining

that *Bruen* does not require "21st-century regulations to follow late-18th-century [or 19th-century] policy choices"). Just as today, states and territories in the nineteenth century were permitted to take different approaches to firearms regulation based on local concerns and policy preferences. The Second Amendment "by no means eliminates" the ability of states "to devise solutions to social problems that suit local needs and values." *McDonald v. City of Chicago,* 561 U.S 742, 785 (2010); *see also id.* ("[S]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment."). For historic jurisdictions that lacked the administrative capacity to enforce a possession ban, for example, a sales ban might have been more efficient while accomplishing the same goal—to restrict a minor's ability to misuse a firearm.

The historical analogizing required by *Bruen* and *Rahimi* takes into account the entirety of our regulatory tradition, including both statutes and the common law, and draws principles from that tradition to ascertain the limits of constitutional authority today. *See, e.g., Rahimi*, 602 U.S. at 693–700. It does not "trap[] in amber" the choices made only by the historic governments with the *least* restrictive regulations. *See id.* at 691. As described above, not all governments "maximally exercised their power to regulate," and neither originalism nor prior Supreme Court precedent requires such a "'use it or lose it' view of legislative authority." *Id.* at 739–40 (Barrett, J., concurring). Instead, both historical and modern governments may choose to be more or less restrictive within a range of constitutionally permissible limits. *See McDonald,* 561 U.S at 785. Here, the historical record reflects that the range of permissible choices includes the one made by Massachusetts today—to account for the increased danger posed specifically by young adults by prescribing that their use of certain firearms be under the supervision of an older adult. That supervision becomes unnecessary once individuals reach the age at which, according to both historical understanding and modern science, individuals gain greater maturity and can engage in

more responsible decision-making. Dkt. 40 at 19–20; *see generally* Cauffman (Dkt. 41-9).

Plaintiffs' suggestion that the nineteenth-century laws are not analogous because individuals under the age of 21 were "under the legal protection of their parents or guardians," Dkt. 44 at 15, is similarly contrary to the unrebutted expert testimony in this case. It is true that States generally lowered the legal age of majority for various purposes below 21 much later into the twentieth century, as acknowledged above. *See supra* at 10. However, nineteenth-century legislation responded precisely to the concern that armed minors were *not* under parental control. Rivas ¶ 32 ("Even though their parents may not have approved, young people with money to spend could easily get their hands on bowie knives, pistols, metal knuckles, and other deadly weapons on offer at pawn shops, gun stores, and hardware stores across the country."); ¶ 33 ("Because they lacked parental supervision and education, [] children [who moved to cities seeking work] often fell into serious trouble."). And, as before, the concern was with the impulsivity and risk-seeking behavior of individuals below the age of 21, not with their legal status per se as minors or adults. *E.g.*, Rivas ¶ 33 (quoting reformer Jane Addams, who described the "foolish and adventurous persistence of carrying loaded firearms" by youth). That same concern animates the modern regulations. Brain science does not depend on the current legal age of majority and instead confirms an understanding that has persisted since before the Founding—that young adults under 21 "have yet to reach the age of reason." *Bondi*, 133 F.4th at 1122.

## III.    CONCLUSION

Defendants respectfully request that this Court deny Plaintiffs' motion for summary judgment (Dkt. 43), grant the State Defendants' motion for summary judgment (Dkt. 39) and Chief Eldredge's motion for summary judgment (Dkt. 53), and enter judgment in favor of Defendants.

Respectfully submitted,

COLONEL NOBLE and                                CHIEF ELDREDGE,
COMMISSIONER GAGNON,

By their attorneys                                By his attorneys,

ANDREA JOY CAMPBELL

/s/ Grace Gohlke                                 /s/ Joseph Mongiardo
Grace Gohlke, BBO #704218                        Douglas I. Louison (BBO# 545191)
Aaron Macris, BBO #696323                        Joseph A. Mongiardo (BBO# 710670)
Assistant Attorney General                       Louison, Costello, Condon & Pfaff, LLP
Office of the Attorney General                    Ten Post Office Square, Suite 1330
Government Bureau                                 Boston, MA 02109
Constitutional and Administrative Law Div.        dlouison@lccplaw.com
One Ashburton Place                              jmongiardo@lccplaw.com
Boston, MA 02108
(617) 963-2527
grace.gohlke@mass.gov
(617) 963-2987
aaron.macris@mass.gov


December 18, 2025

## CERTIFICATE OF SERVICE

I, Grace Gohlke, hereby certify that, on December 18, 2025, a true and accurate copy of this Memorandum in Opposition was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) to:

Jason A. Guida
Law Office of Jason A. Guida
17 Lark Avenue
Saugus, MA 01906
jason@lawguida.com

David H. Thompson
Peter A. Patterson
William V. Bergstrom
Cooper & Kirk, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
wbergstrom@cooperkirk.com

***Counsel for the Plaintiffs***

/s/ Grace Gohlke
Grace Gohlke, BBO #704218
Assistant Attorney General