UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MACK ESCHER, GUN OWNERS' ACTION LEAGUE, COMMONWEALTH SECOND AMENDMENT, FIREARMS POLICY COALITION, INC., SECOND AMENDMENT FOUNDATION, NATIONAL RIFLE ASSOCIATION OF AMERICA, and GUN OWNERS OF AMERICA, INC,<br>        Plaintiffs,<br><br>v.<br><br>COLONEL GEOFREY NOBLE, in his official capacity as Superintendent of the Massachusetts State Police and of the Commonwealth of Massachusetts, JAMIE GAGNON, in his official Capacity as Commissioner of the Department of Criminal Justice Information Services, and HEATH J. ELDREDGE, in his official capacity as Chief of Police of Brewster, Massachusetts,<br>        Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION NO. 1:25-cv-10389-GAO |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES......................................................................................... ii

INTRODUCTION ...................................................................................................1

ARGUMENT ..........................................................................................................2

   I.   Plaintiffs have standing..................................................................................2

   II.   No historical tradition of firearm regulation excuses the Ban. ...........................................5

       A.  Even accepting, arguendo, that the Defendants' historical analysis is accurate, there is *zero* historical support for disarming adults. ................................................5

       B.  The Commonwealth's historical analysis is flawed.................................................8

          1.  Eighteen-to-twenty-year-olds could, and did, purchase and carry firearms at the Founding. ....................................................9

          2.  Reconstruction-era restrictions cannot, and do not, support the Ban. .............17

CONCLUSION.....................................................................................................21

# TABLE OF AUTHORITIES

**Cases**                                                **Page(s)**

*Bach v. Pataki*,
408 F.3d 75 (2d Cir. 2005) ................................................................................4

*Baughcum v. Jackson*,
92 F.4th 1024 (11th Cir. 2024) ...................................................................3, 4, 5

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011) ........................................................................................16

*Cook v. State of R.I., Dep't of Mental Health, Retardation, & Hosps.*,
10 F.3d 17 (1st Cir. 1993) .................................................................................3

*Cotto v. Campbell*,
126 F.4th 761 (1st Cir. 2025) ............................................................................2

*District of Columbia v. Heller*,
554 U.S. 570 (2008) .......................................................................1, 17, 19, 20

*Doe v. Holcomb*,
883 F.3d 971 (7th Cir. 2018) .............................................................................3

*Espinoza v. Mont. Dep't of Rev.*,
591 U.S. 464 (2020) ........................................................................................18

*Ex parte Young*,
209 U.S. 123 (1908) .......................................................................................2, 3

*Grenier v. Cyanamid Plastics, Inc.*,
70 F.3d 667 (1st Cir. 1995) ...............................................................................5

*Hands v. Slaney*,
(1800) 101 Eng. Rep. 1556; 8 T.R. 577 .........................................................11

*Hightower v. City of Boston*,
693 F.3d 61 (1st Cir. 2012) ...............................................................................4

*Hirschfeld v. ATF*,
5 F.4th 407 (4th Cir. 2021) .........................................................................15, 18

*Int'l Bhd. Of Teamsters v. United States*,
  431 U.S. 324 (1977)..................................................................................4

*Jones v. Bonta*,
  34 F.4th 704 (9th Cir. 2022).................................................................10, 20

*Lara v. Comm'r Pa. State Police*,
  125 F.4th 428 (3d Cir. 2025)............................................................15, 17, 18

*McCoy v. ATF*,
  140 F.4th 568 (4th Cir. 2025)..................................................................9, 12

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010)..................................................................................4

*McKanna v. Merry*,
  61 Ill. 177 (1871) ...................................................................................13

*Morse v. Frederick*,
  551 U.S. 393 (2007)...................................................................................16

*Nat'l Rifle Ass'n, Inc. v. ATF*,
  714 F.3d 334 (5th Cir. 2013)......................................................................15

*Nat'l Rifle Ass'n, Inc. v. Bondi*,
  133 F.4th 1108 (11th Cir. 2025) ..............................................7, 9, 12, 16, 18

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
  597 U.S. 1 (2022)................................................................5, 12, 16, 17, 19, 20

*Ocean State Tactical, LLC v. Rhode Island*,
  95 F.4th 38 (1st Cir. 2024) .......................................................................17

*Peters v. Fleming*,
  (1840) 151 Eng. Rep. 314; 6 M. & W. 42.....................................................10

*Reese v. ATF*,
  127 F.4th 583 (5th Cir. 2025)...............................................................15, 17

*Saunders Glover & Co. v. Ott's Adm'r*,
  12 S.C.L. 572 (1 McCord) (S.C. Const. App. 1822).......................................12

*Sporhase v. Nebraska ex rel. Douglas*,
  458 U.S. 941 (1982)...................................................................................4

*State v. Allen*,
    94 Ind. 441 (1884) ........................................................................................20

*State v. Callicutt*,
    69 Tenn. 714 (1878) .....................................................................................20

*Terry v. Cook*,
    866 F.2d 373 (11th Cir. 1989) .......................................................................3

*United States v. Rahimi*,
    602 U.S. 680 (2024) ......................................................................................6

*Worth v. Harrington*,
    666 F. Supp. 3d 902 (D. Minn. 2023) ...........................................................3

*Worth v. Jacobson*,
    108 F.4th 677 (8th Cir. 2024) ...............................................................15, 16

**Constitutional Provisions**

U.S. CONST. amend. II. ..........................................................................................5

**Statutes**

MASS. GEN. LAWS
    ch. 4, § 7 .........................................................................................................6
    ch. 140, § 121 .................................................................................................2
    ch. 140, § 131 .................................................................................................2
    ch. 231, § 85P ................................................................................................6

Militia Act of May 8, 1972, ch. 33 § 1, 1 Stat. 271 ...............................................11

**Other Authorities**

Brief of Amicus Curiae, The Second Amendment Foundation in Support of Petitioner, *NRA v. Glass*, No. 24-1185 (U.S. June 20, 2025) ......................................................12

PEREGRINE BINGHAM, THE LAW OF INFANCY AND COVERTURE (1816)............................................7

1 WILLLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND (1765)...............6, 7, 8, 10

1 JOHN BOUVIER, INSTITUTES OF AMERICAN LAW (1858).................................................6

1 SIR EDWARD COKE, INSTITUTES ON THE LAWS OF ENGLAND, Co. Litt. 172a.............................11

3 WILLIAM W. HENING, THE STATUTE AT LARGE OF VIRGINIA (1823) ...........................................11

2 JAMES KENT, COMMENTARIES ON AMERICAN LAW (1848)...........................................................10

James Lindgren & Justin L. Heather, Counting Guns in Early America, 43 WM. & MARY L. REV. 1777 (2002)........................................................................................................................11

1 WILLIAM STORY, A TREATISE ON THE LAW OF CONTRACTS (1856)............................................10

1 THE LAWS OF THE STATE OF VERMONT, DIGESTED AND COMPILED (Wright 1808).....................11

*The Minutes of the Senate Academicus, 1799-1842*, UNIV. OF GA. LIBRS. (1976), https://perma.cc/J3ZV-XMEC ...................................................................................16, 17

## INTRODUCTION

This case presents a simple question: may a peaceable, adult citizen of this Nation, legally dependent on no one but himself for his care and protection, nevertheless be deprived of his constitutionally protected right to keep and bear arms solely on account of his age? The Second Amendment requires that the answer to this question be "no." The Second Amendment "right to possess and carry weapons in case of confrontation" presumptively "belongs to all Americans," not "an unspecified subset." *District of Columbia v. Heller*, 554 U.S. 570, 580–81, 592 (2008). Nevertheless, the Commonwealth of Massachusetts has answered the question "yes." It argues that, historically, the scope of the right has been understood more narrowly than *Heller* established. But there is no evidence, from any relevant historical period, of limiting adults' rights the way that Massachusetts does today.

Even ignoring the dispositive fact that 18-to-20-year-olds are adults, the record compiled by the Defendants in this case discloses *zero* laws from the Founding that in any way restricted the rights of 18-to-20-year-olds to acquire and carry firearms. To the contrary, they were *required* to possess and use them. The Commonwealth supposes that background principles of contract law were *de facto* bans on firearm acquisition by those in this age group, but it must do more than that to shoulder its burden here. In any event, the historical record demonstrates that even those rules were no barrier to 18-to-20-year-olds exercising their Second Amendment protected rights.

That leaves the Commonwealth to rely on late-19th century statutes that come too late, under Supreme Court and First Circuit precedent, to meaningfully inform our view of the Second Amendment. In fact, all those laws tend to show is that no common law principles banned the sale of arms to 18-to-20-year-olds before some states determined to do so, for some concealable weapons, by statute almost a century after the Second Amendment was ratified. And in any event,

1

those laws provide no support for restricting the use of arms by adults of any age.

## ARGUMENT

I.    **Plaintiffs have standing.**

Defendant Eldredge makes two arguments that Plaintiffs lack standing. Neither has merit.

**A.** Eldredge argues that Plaintiffs have no standing against him, specifically, because he lacks discretion to grant a license to carry to an individual who is statutorily ineligible on account of his age, such as Escher. Eldredge Br. at 6. Eldredge claims that because he is required by law to deny such applications, he "has only general authority over the statute in controversy" and that such "general authority" is insufficient to make him an appropriate defendant. *Id.*

Even if Eldredge were correct, it would not result in the dismissal of Plaintiffs' suit, only Eldredge's dismissal as a defendant. But Eldredge is not correct. He has specific enforcement authority over the laws that ban 18-to-20-year-olds such as Escher from acquiring licenses to carry. Under *Ex parte Young*, all that is necessary is that the defendant has "some connection with the enforcement of the [allegedly unconstitutional] act." 209 U.S. 123, 157 (1908). The relevant question is: would an injunction against the defendant bring plaintiffs relief? If so, *Ex parte Young* is satisfied and the official is a proper defendant. *See Cotto v. Campbell*, 126 F.4th 761, 773 (1st Cir. 2025). That is the case here. As the "licensing authority" under MASS. GEN. LAWS ch. 140, §§ 121, 131 (2024), Eldredge is the official responsible for ultimately granting or denying applications for licenses to carry—even if he is bound to follow the law in doing so. An injunction barring him from denying a license to any individual who is 18-to-20-years-old but otherwise qualified for a license would remedy Plaintiffs' injury.

The cases Eldredge cites are all consistent with this position. He too, relies on *Cotto*, citing its statement that parties cannot proceed under *Ex parte Young* where "the state officials they sued

lack the authority to enforce or change [the challenged] procedures." 126 F.4th at 765. Eldredge suggests he is not a proper defendant because he "has no authority to change Massachusetts law … or to provide Mack Escher a valid LTC." Eldredge Br. 7. But *Cotto* said it was necessary that the official *either* be able to change *or* to enforce the challenged restrictions. Eldredge may not be able to change them, but he does enforce them through his processing of applications, and he can be enjoined to grant licenses to otherwise qualified 18-to 20-year-olds in spite of their age. The other cases he cites merely stand for the proposition that the "general duty to enforce the laws" that a governor or attorney general has cannot make them appropriate defendants in all *Ex parte Young* actions, unless they have a specific connection to the challenged statute. *See Doe v. Holcomb*, 883 F.3d 971, 976–78 (7th Cir. 2018) (cited by Eldredge Br. at 7). Because Eldredge is "responsible for issuing licenses, the challenged action is also redressable by a court order against [him.] The district court could … order [Eldredge] to issues licenses … despite the age limits in state law." *Baughcum v. Jackson*, 92 F.4th 1024, 1032 (11th Cir. 2024); *see also Worth v. Harrington*, 666 F. Supp. 3d 902, 931 (D. Minn. 2023) (finding *Ex parte Young* exception applied to sheriffs charged with processing applications for licenses).

**B.** Eldredge also argues that "there is a serious question as to whether the Plaintiffs have 'suffered an injury in fact,' " because Escher has never applied for a license to carry. Eldredge Br. at 7–8 (quoting *Capen v. Campbell*, 134 F.4th 660, 667 (1st Cir. 2025)). The First Circuit has rejected the proposition "that the law venerates the performance of obviously futile acts." *Cook v. State of R.I., Dep't of Mental Health, Retardation, & Hosps.*, 10 F.3d 17, 26 (1st Cir. 1993). "Courts have long recognized circumstances in which failure to apply may be overcome by facts which demonstrate the futility of such application." *Terry v. Cook*, 866 F.2d 373, 378 (11th Cir. 1989). As the Supreme Court has said, "[i]f an employer should announce his policy of discrimination by a

3

sign reading 'Whites Only' on the hiring-office door, his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs." *Int'l Bhd. Of Teamsters v. United States*, 431 U.S. 324, 365 (1977); *see also Sporhase v. Nebraska ex rel. Douglas*, 458 U.S. 941, 944 n.2 (1982). Eldredge himself asserts that he has no authority to ignore the age requirement and must deny applications that do not comport with it, *see* Eldredge Br. 6, so there can be no question that had Escher applied, he would have been denied. His standing, therefore, is secure.

Eldredge cites *Hightower v. City of Boston*, 693 F.3d 61 (1st Cir. 2012), for support, but that decision is not to the contrary. In *Hightower*, the holder of a Class A "unrestricted" carry license had her license revoked, and the First Circuit, at the outset of its opinion, made clear that the challenge was limited to "the characteristics of the license that was revoked," not alternative, more limited licenses for which she never applied, was denied, or had revoked. *Id.* at 70–71. In so holding, the court emphasized that she could, in fact, have applied for those licenses, and it rejected the claim that, in fact, the Class B carry license was categorically unavailable to her. *Id.* & 70 nn.5–6. *Hightower* is therefore fundamentally different from this case where it is undisputed that Escher *could not* get a license to carry if he applied.

In cases that are much more directly on point, courts have consistently found standing for Plaintiffs in Second Amendment challenges to licensing regimes under which they are plainly ineligible even in the absence of a futile application. In *Bach v. Pataki*, for instance, the Second Circuit found a plaintiff's "failure to file a license application [did] not pose an obstacle to consideration of his claims" under the Second Amendment because it was plain that "he was statutorily ineligible for a license" given that he neither lived nor worked in New York. 408 F.3d 75, 82 (2d Cir. 2005), *overruled on other grounds by McDonald v. City of Chicago*, 561 U.S. 742 (2010). And, on all fours with this case, in *Baughcum*, the Eleventh Circuit held that 18-to-20-

year-old plaintiffs just like Escher had standing to challenge Georgia's ban on granting carry

licenses to adults under 21 despite not having applied for a carry license since "any application for

a carry license would be a futile gesture because they do not meet the state's requirements for

license holders." 92 F.4th at 1035. This case is precisely the same.

## II.     No historical tradition of firearm regulation excuses the Ban.

Defendants implicitly concede that Escher's proposed conduct—acquiring, as an 18-to-20-

year-old, common arms (semiautomatics and handguns) and carrying a firearm for self-defense—

falls within the Second Amendment's textual command that "the right of the people to keep and

bear Arms shall not be infringed." U.S. CONST. amend. II. Though the Commonwealth states that

it is only "assum[ing] without conceding that the Second Amendment's plain text covers the

conduct regulated by the challenged law," Mass. Br. 5 n.3, the effect is the same, *see Grenier v.

Cyanamid Plastics, Inc.*, 70 F.3d 667, 678 (1st Cir. 1995) ("If a party fails to assert a legal reason

why summary judgment should not be granted, that ground is waived and cannot be considered or

raised on appeal."). As such, "the Constitution presumptively protects" Escher's proposed conduct,

and the only question for this Court is whether Defendants can "justify [the Ban] by demonstrating

that it is consistent with the Nation's historical tradition of firearm regulation." *N.Y. State Rifle &

Pistol Ass'n v. Bruen*, 597 U.S. 1, 24 (2022); *see also* Pls.' Br. 6–8. All of Defendants' arguments

on that score center on the claim that history allows restrictions on what would otherwise be

protected conduct where the individual is under 21 years of age. But for those, like Escher, who

are legal adults over the age of 18, history provides no such justification.

### A.     Even accepting, arguendo, that the Defendants' historical analysis is accurate, there is *zero* historical support for disarming adults.

Even if this Court accepts that *every* piece of historical evidence the Defendants have

cited—regardless of the time period or place where it was enacted and without reference to the

actual scope of the historical restriction it embodied (issues discussed below in detail)—is relevant evidence under *Bruen* of a tradition "of regulation and restriction of the access of minors, defined as those under 21, to certain categories of firearms," Mass. Br. 17, that cannot support the Ban today, because Massachusetts no longer defines "minors" as "those under 21," *see, e.g.*, MASS. GEN. LAWS ch. 4, § 7; *id.* ch. 231, § 85P. That matters because, as the Supreme Court has emphasized, the object of the *Bruen* analysis is to derive, from historical evidence, "the principles that underpin our regulatory tradition," and then to ask, "whether the challenged regulation is consistent with [those] principles." *United States v. Rahimi*, 602 U.S. 680, 692 (2024). It is those *principles* that bind us today, not those principles' specific eighteenth-century applications. And if the principle that is deduced from the historical evidence is that *minors* can have their rights restricted in some way (and as discussed below, nearly all of the restrictions on which Defendants rely were *explicitly* predicated on minority status), that principle cannot support restricting *adults* today. As Plaintiffs explained in their brief in support of summary judgment, *see* Pls.' Br. at 11– 12,  the distinction between an adult and a minor is a meaningful one and though minors are, today as at earlier periods in our history, restricted in some ways, "their very disabilities are privileges," as a minor, unlike an adult, has a "guardian" who is obligated "to defend him against all attacks as well by law as otherwise." 1 WILLLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 452 (1765). On the other hand, it is fundamental to the very concept of adulthood that an adult is someone who has "full enjoyment of his civil and political rights." 1 JOHN BOUVIER, INSTITUTES OF AMERICAN LAW 148 (1858). Restricting an adult's rights today because he would have been considered a minor at earlier periods is precisely the sort of context-agnostic "law trapped in amber" reasoning that *Rahimi* rejected. 602 U.S. at 691.

A concrete example demonstrates the perversity of treating Escher (and other adult 18-to-

20-year-olds) as though historical restrictions on minors could still apply to him today. The Commonwealth's primary argument that 18-to-20-year-olds' right to acquire, possess, and carry firearms was limited at the Founding is the existence of a suite of "legal disabilities" that were placed on minors at the time, including rules that subjected them to the "strict control of their parents" and "a general rule [that] contracts for the purchase of personal property involving minors were voidable." Mass. Br. 8–9 (final quotation quoting *Nat'l Rifle Ass'n, Inc. v. Bondi*, 133 F.4th 1108, 1118 (11th Cir. 2025) (en banc)). Any impediments to firearms acquisition by minors at the founding therefore were incidental to legal disabilities of minors, and they should have no bearing on people who are not minors. Notably, contracting restrictions on minors at the founding were if anything *less* severe than the restrictions that were placed on married women at the time. If that defunct legal regime cannot restrict the rights of married women today, neither should contracting disabilities that no longer apply to 18-to-20-year-olds.

At the Founding, just as parents had significant authority over their children, a husband's control over his wife was so complete that "the very being or legal existence of a woman is suspended during the marriage," and "under [her husband's] wing, protection, and cover, she performs every thing; and is therefore called in our law-french a *feme-covert*." BLACKSTONE, *supra* at 430. As with a minor and his father, these restrictions manifested most notably in limitations on the wife's ability to contract. "Married women [were], by the law of England, subject, in matters of contract, to a greater disability even than infants; (a) for the contracts of an infant [were], as hath been shewn, for the most part only voidable, while those of married women [were], with few exceptions, absolutely void." PEREGRINE BINGHAM, THE LAW OF INFANCY AND COVERTURE 161 (1816). The notable exception to this rule was, just as for minors, the ability to acquire "necessaries." *See* Mass. Br. at 9–10 (acknowledging the "necessary" exception to minor

contracting limitations). "The husband is bound to provide his wife with necessaries as by law, as much as himself; and if she contracts debts for them, he is obliged to pay them: but for anything besides necessaries, he is not chargeable." BLACKSTONE, *supra* at 430.

Thus, just as an 18-to-20-year-old minor was under the care and protection of his father at the Founding and limited in his ability to contract for and acquire goods, a married woman was in nearly the same—in fact, a worse—situation. If historical restrictions applicable to 18-year-olds on account of a now-obsolete minority status can be imported to today and applied against legal adults of the same age, then the question has to be asked: could Massachusetts place the same restrictions on married women, under precisely the same reasoning? The correct answer, of course, *must be* "no." It would be patently absurd to treat a married woman today as a "feme covert" merely because her marital status would have designated her as one at the Founding. Marriage today is different and married women today are subject to very different expectations and rules. But that is precisely the point. Eighteen-to-twenty-year-olds like Escher are not minors today, they are adults who are legally responsible for managing their own affairs and providing for their own care and protection. Treating them as though they are still subject to the historical burdens that came along with a now inapplicable status is as nonsensical as it would be to treat married women as though they were "femes covert" in 2025.

### B.  The Commonwealth's historical analysis is flawed.

The Court can end its analysis here. The State's evidence, as described above, at most yields a principle that permits the Commonwealth to place limitations on the rights of "minors" with respect to firearms. But Plaintiffs have challenged the Ban's application to *adults* like Escher. There is no historic warrant for that restriction. Even so, should the Court carry its analysis forward, close examination of the evidence the State has marshalled in favor of the Ban

demonstrates it is insufficient to support it.

> **1. Eighteen-to-twenty-year-olds could, and did, purchase and carry firearms at the Founding.**

The Commonwealth begins its attempt to shoulder its historical burden under *Bruen* by (correctly) focusing on the state of the law during the period surrounding the ratification of the Second Amendment. It offers three types of Founding-era historical evidence it suggests supports the Ban, but none are "relevantly similar" to Massachusetts' law barring 18-to-20-year-old adults today from purchasing or possessing many of the most common firearms in the country and from carrying firearms in public for self-defense.

**a.** Following the example of the Fourth and Eleventh Circuits, which both recently upheld age-based restrictions on 18-to-20-year-olds, *see Bondi*, 133 F.4th at 1123; *McCoy v. ATF*, 140 F.4th 568, 577 (4th Cir. 2025), the Commonwealth's primary Founding-era support for its ban is the voidability rule, discussed above, that held that minors at the Founding could not form binding contracts except for "necessaries." As discussed above, these common law restrictions, to the extent that they impacted 18-to-20-year-olds' ability to acquire firearms at all, did so entirely based on a legal status—not having reached the age of majority—that does not apply today, and even then, it at most impacted their firearm rights incidentally. *Directly* regulating firearm access by legal *adults* is incompatible with that history under *Bruen* and *Rahimi*.

But leaving that objection aside, this argument should still be rejected because there is no evidence that the "voidability rule" prevented 18-to-20-year-olds from acquiring firearms. The Commonwealth suggests that it was a *de facto* ban, arguing that the economy at the Founding was a credit economy and that the "necessaries" exception "did not yield to any supposed right of 18-to-20-year-olds to possess or purchase firearms—because none existed." Mass. Br. 9. Rather the Commonwealth casts the necessaries exception as encompassing only "a narrow range" of goods:

" 'meat, drink, apparel, [and] physic [medicine],' " Mass. Br. 9–10 (quoting Expert Report of Saul Cornell ¶ 30, internal quotations to 1 BLACKSTONE, COMMENTARIES *454), and categorically excluding firearms, Mass. Br. 10.

But this conception of the "necessaries" exception is incorrect. While certain items—like food and drink, clothing, lodging, medicine, and educational expenses appear to have been effectively *per se* necessaries for which any minor could contract, *see, e.g.*, BLACKSTONE, *supra* at 454, they did not form a closed list, as Blackstone emphasized that a minor could also contract for "such other necessaries" as he required, *id.* Despite the name, the category of expenses that were "necessaries" was "not strictly limited to such things as are requisite for support and subsistence," though, as Blackstone's statement shows, it certainly encompassed those things, "but [ought] to be construed liberally and varying with the estate and degree, the rank, fortune, and age of the infant." 1 WILLIAM STORY, A TREATISE ON THE LAW OF CONTRACTS 126, § 77 (1856). That meant that whether a firearm was a necessary depended upon whether it was an item "such as a person in [the minor's] rank and station in life would require," *Peters v. Fleming* (1840) 151 Eng. Rep. 314; 6 M. & W. 42 (Alderson, B.), a determination that is "governed by the real circumstances of the infant." 2 JAMES KENT, COMMENTARIES ON AMERICAN LAW 239 (1848). And firearms were *undoubtedly* necessary for many 18-to-20-year-olds at the Founding. For one thing, they were legally obliged to possess them as part of their militia duty, *see, e.g., Jones v. Bonta*, 34 F.4th 704, 719 (9th Cir. 2022); *vacated in light of Bruen*, 47 F.4th 1124 (9th Cir. 2022) (noting that The Militia Act of 1792 generally "commanded that every able-bodied male citizen between the ages of 18 and 45 be enrolled in the militia and equip himself with appropriate weaponry") (quoting *Perpich v. Dep't of Def.*, 496 U.S. 334, 341 (1990) (cleaned up)). That legal obligation was enough to render an item a "necessary." As Lord Coke explained, "generally whatsoever an infant is bound to do by

10

law, the same shall bind him, albeit he does it without a suit at law." 1 SIR EDWARD COKE, INSTITUTES ON THE LAWS OF ENGLAND 172a (emphasis omitted). For instance, in *Hands v. Slaney* (1800) 101 Eng. Rep. 1556, 1557; 8 T.R. 577, 579, a military livery ordered for the servant of a 20-year-old army captain was a "necessary" because the court found it required of "a gentleman in the defendant's situation to have a servant." If a *servant*'s military equipment was necessary, so too must be a minor's own military firearm.

Even apart from the militia obligations, all available evidence suggests that firearms were necessary for ordinary life for most people at the time. As one indicator of their necessary position in American households, the federal Militia Act of 1792 "exempted from all suits, distresses, executions or sales, for debt or for the payment of taxes" firearms that were possessed for militia duty, Militia Act of May 8, 1792, ch. 33, § 1, 1 Stat. 271, and several states in the period leading up to and just after the Founding similarly exempted firearms from any form of otherwise legal seizure, *see, e.g.*, 3 WILLIAM W. HENING, THE STATUTES AT LARGE OF VIRGINIA ch. 24, 339 (1823) (enacted 1705) (exempting militia members' arms "from being seized or taken by any manner of distress, attachment or writ of execution"); 1 THE LAWS OF THE STATE OF VERMONT, DIGESTED AND COMPILED, ch. 31 § 1, 321 (Wright 1808) (enacted 1797) (generally permitting seizure of property to pay for debts, but "[a]lways excepting, one cow, and such suitable apparel, bedding, tools, *arms*, and articles of household furniture, *as may be necessary for upholding life*") (emphasis added). And a review of probate records from the time found that firearms were more commonly owned (by almost double) than Bibles, and while less commonly possessed than beds or cooking utensils, were more common in estates than *chairs*. *See* James Lindgren & Justin L. Heather, *Counting Guns in Early America*, 43 WM. & MARY L. REV. 1777, 1786, 1801 (2002); *see also* Brief of Amicus Curiae at 6–16, The Second Amendment Foundation in Support of Petitioner,

*NRA v. Glass*, No. 24-1185 (U.S. June 20, 2025) (discussing this and other Founding-era evidence that firearms would have been considered "necessaries").

In light of the foregoing, the Commonwealth's claims that there is "no evidence in legal records of the time to suggest a firearm might have been considered a necessary" should be rejected. Brewer Report ¶ 29, *see also* Mass. Br. at 10 (citing Cornell Report ¶ 34 (similar) and *McCoy*, 140 F.4th at 576 (similar)). The evidence discussed directly above refutes those statements and it is simply not enough for the Commonwealth, which bears the burden here, to hypothesize that, in an evidentiary vacuum, a lack of evidence showing that firearms were necessaries means this Court can infer that the voidability rule in fact restricted access to firearms. Quite the opposite. A "barren record" provides an additional reason to reject reliance on this rule. *See Bruen*, 597 U.S. 58 n.25. "To the extent there are multiple plausible interpretations" of this history, the tie goes to Plaintiffs as permitting 18-to-20-year-olds to acquire and carry firearms is "more consistent with the Second Amendment's command." *Id.* 44 n.11.

Other than its misreading of the treatises already discussed, the only affirmative evidence the Commonwealth points to are two 19th century cases, but neither comes close to establishing the principle that firearms were not necessaries for 18-to-20-year-old minors at the Founding or after. First, consider *Saunders Glover & Co. v. Ott's Adm'r*, 12 S.C.L. 572 (1 McCord) (S.C. Const. App. 1822). Notably, this single decision formed the basis for both the Fourth and Eleventh Circuit's erroneous conclusions on this issue. *See Bondi*, 133 F.4th at 1118; *McCoy*, 140 F.4th at 576. But *Saunders*, which said that "liquor, pistols, powder, saddles, bridles, whips, fiddles, fiddle-strings, &c." were not necessaries, is more limited than those opinions suggest. 12 S.C.L. at 572. First, *Saunders*, which provides no explanation for its conclusions, dealt only with pistols, which were not the primary weapons used for militia duty or for most other purposes at the time. Second,

it did not even treat pistols as *per se* not "necessary," but rather held that were not necessary in that particular minor's case (and the fact that the minor was also buying fiddles and liquor at the same time gives some historical hint as to why they might not have been seen as appropriate purchases for his betterment). In other cases, pistols were purchased by minors, as in the case of future President Andrew Jackson, who acquired a pair at the age of 20 when he was a practicing attorney even though he was a "minor." *See* Pls.' Br. at 13. *Saunders* therefore does not even establish that pistols were categorically not necessaries, let alone firearms writ large.

*McKanna v. Merry*, 61 Ill. 177 (1871), is no better for the Commonwealth. Though the court did not cite anything for its assertion "courts have generally excluded from the term 'necessaries,' horses, saddles, bridles, pistols, liquors, fiddles, chronometers, etc.," *id.* at 179, the significant overlap with the previous list suggests that the court was likely referring to *Saunders*. And just like in *Saunders*, *McKanna* did not purport to opine on whether firearms in general were necessaries but was, again, specifically limited to pistols. Moreover, *McKanna* is even clearer than *Saunders* that even that holding was case-specific. It cautioned items "generally" not treated as necessaries like "horses, saddles, [and] bridles," were not always so excluded and "that if riding on horseback was necessary to the health of the infant, the rule was different." *Id.* That was because, in marked contrast to the Commonwealth's view, the *McKanna* court acknowledged that "[t]here is no positive rule by means of which it may be determined what are, and what are not, necessaries" because whether an item was, in fact, necessary for a minor was a question of fact to be judged on a case-by-case basis. *Id.* at 178. Especially given that 18-to-20-year-olds were members of the militia with the obligation to be armed, it is impossible to credit the Commonwealth's supposition that because they did not fall within the very narrow categories of food, drink, lodging, and medicine, firearms were not necessaries.

**b.** The Commonwealth next turns to obligations militia laws places on the parents of minors in the militia. Though the Commonwealth casts these as a separate type of evidence, they are better considered in connection with the voidability rule, the necessaries exception, and the Commonwealth's arguments that, at the Founding, parental control over minors was itself a *de facto* restriction on their rights. That is because there is no argument that the militia laws actually precluded 18-to-20-year-olds from acquiring weapons, and at most the Commonwealth suggests that these laws evidence an underlying reality about 18-to-20-year-olds' access to weapons because they "presumed minors under age 21 would not be able to legally procure firearms without assistance." Mass. Br. 10–11.

Taking these laws in turn, the Commonwealth first highlights a pair of laws from Delaware and Pennsylvania exempting minors from the requirement to possess a firearm for militia service. Mass. Br. at 11. But neither law evidences any inherent difficulty in a minor acquiring firearms. Rather, both reflected a desire to limit the disturbances caused by militia duty during peacetime, by entirely exempting both minors and servants from acquiring the necessary equipment *and* from participating in militia training, but neither exception applied "in cases of rebellion, or an actual or threatened invasion of this or any of the neighboring states." ADD15; ADD17. If the reason to exempt them was because they could not acquire arms to begin with, it is hard to understand why those states chose to ignore that impossibility when the need for greater militia participation arose.

Next, the Commonwealth points to laws from New Hampshire, Massachusetts, Vermont, North Carolina, Louisiana, Maine, and Missouri which required parents of minors to acquire firearms for their militia service and to laws from Virginia, Connecticut, New York, Rhode Island, Maryland, New Jersey, Ohio, Mississippi, Kentucky, Georgia, Indiana, and Illinois that made parents liable for fines incurred by their sons for lacking the proper arms and equipment. *See* Mass.

14

Br. at 11–12. But these laws are even less supportive of the Ban. Under Massachusetts law today, it is unlawful for an 18-to-20-year-old to *possess* handguns or semiautomatic rifles or to carry firearms in public. But the upshot of each of these laws, in contrast to the Delaware and Pennsylvania laws, was still to *require* 18-to-20-year-olds to possess firearms. Even if they required parents to purchase the firearm or put them on the hook for a minor's failure to fulfill his obligation, "the point remains that those minors … were required to own their own weapons." *Nat'l Rifle Ass'n, Inc. v. ATF*, 714 F.3d 334, 342 (5th Cir. 2013) (Jones, J., dissental); *see also Reese v. ATF*, 127 F.4th 583, 597 (5th Cir. 2025); *Worth v. Jacobson*, 108 F.4th 677, 695 (8th Cir. 2024) ("A mandate to acquire a firearm is hardly 'evidence' that one was previously prohibited from owning one."). By proving that 18-year-olds *did actually have* firearms, they make arguments about whether or how they could acquire them effectively a moot point in a case like this one, where Massachusetts law bans possession. And they make the lack of any historical restrictions on the rights of 18-year-olds—who we *know* had them—to *carry* firearms all the more apparent. *See, e.g.*, *Lara v. Comm'r Pa. State Police*, 125 F.4th 428, 444 & n.26 (3d Cir. 2025). And of course, these laws were, as discussed above, specifically predicated on a legal status that no longer applies to 18-to-20-year-olds: "Most of those laws require 18-year-olds to enlist but do not set an age for parental liability, just requiring guardians to be liable for the equipment and food of those 'who shall be under their care.' " *Hirschfeld v. ATF*, 5 F.4th 407, 434 (4th Cir. 2021), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021).

Taking, for the sake of argument, the maximal view of the Commonwealth's evidence, these militia laws and the background principles of the common law show, at most, that parents exercised significant authority over their children prior to adulthood. But even if that control extended so far as to deprive them the ability to acquire firearms (and as discussed above, it did

not), 18-year-olds are not subject to such parental authority today *and* a father or mother's decision not to allow their 18-year-old son or daughter to acquire a firearm is not "relevantly similar," *Bruen*, 597 U.S. at 29, to the Commonwealth banning possession and carriage of common firearms. No parent today can excuse their 18-year-old from the Commonwealth's restrictions. And as the Supreme Court has made clear in the First Amendment context (which it has frequently drawn on to explain its method of analysis in the Second Amendment context, *see Bruen*, 597 U.S. at 24) the government cannot arrogate to itself the authority of a parent in controlling the exercise of even a minor's rights. *See Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 795 n.3 (2011). So too here—even if parents still had authority to control whether their 18-to-20-year-old sons and daughters could acquire firearms today (and they do not), it would be inappropriate for the State to supplant that authority with its own.

**c.** Finally, the Commonwealth points to university regulations from the Founding as further evidence "that minors' access to firearms could be lawfully restricted." Mass. Br. 12. But those restrictions applied only to students. *See, e.g., The Minutes of the Senate Academicus, 1799-1842* at 86, UNIV. OF GA. LIBRS. (1976), https://perma.cc/J3ZV-XMEC. And even in arguing the point, the Commonwealth refutes any analogy to the Ban, as it acknowledges that "universities occupied a special legal status in relation to their students, acting *in loco parentis*, meaning the universities stood 'in the place of parents to the students entrusted to their care.'" Mass. Br. 12 (quoting *Bondi*, 133 F.4th at 1120); *see also Morse v. Frederick*, 551 U.S. 393, 413 n.3 (2007) (Thomas, J., concurring). A university exercising *in loco parentis* authority over its students could restrict their freedoms in ways that, if applied to the general population, would have certainly been unconstitutional. *Worth*, 108 F.4th at 695; *see also Minutes of the Senate Academicus*, *supra* at 38 ("Every Student, whether a Graduate or Undergraduate, shall be subject to the laws and

government of the College and show in speech and behavior, all proper respect and obedience to the President, Professors and Tutors of the College.") (1803 restriction); *id.* at 85–86 ("If any scholar shall be guilty of profane swearing … [or] [i]f he shall disturb others by noise[,] loud talking[,] or singing during the time of study[ ] … he shall for either of those offences be punished.") (1810 restriction). As such, "[a]ctions taken *in loco* parentis say little about the general scope of Constitutional rights and protections." *Reese*, 127 F.4th at 596. The Commonwealth does not stand in similar relation to its 18-to-20-year-old residents today, and taking on itself the power of a parent is inappropriate as just discussed.

### 2.  Reconstruction-era restrictions cannot, and do not, support the Ban.

The First Circuit has explained that, in assessing the historical limits on the right to keep and bear arms, " 'founding-era historical precedent' is of primary importance for identifying a tradition of comparable regulation" while " 'late-19th-century evidence' … may have probative value if it does not 'contradict[] earlier evidence.' " *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 51 (1st Cir. 2024) (quoting *Bruen*, 597 U.S. at 27, 66 n.28); *see also* Pls.' Br. at 8–9. That is because later evidence simply cannot "provide as much insight" into the contours of the right as history from the Founding. *Bruen*, 597 U.S. at 36 (quoting *Heller*, 554 U.S. at 614). And that is a fatal problem here for the Commonwealth because "Founding-era laws reflect the principle that 18-to-20-year-olds are 'able-bodied men' entitled to exercise the right to bear arms, while the [Commonwealth] relies on laws enacted at least 50 years after the ratification of the Second amendment to argue the exact opposite." *Lara*, 125 F.4th at 441 (quoting *Heller*, 554 U.S. at 596); *see also Reese*, 127 F.4th at 599 ("The limitation of these late 19th century analogues is … that the laws were passed too late in time to outweigh the tradition of pervasively acceptable firearm ownership by eighteen-to-twenty-year-olds at the crucial period of our nation's history." (citation

17

and quotation marks omitted)). Indeed, the Supreme Court has recently held that the practices of "more than 30 States" from "the second half of the 19th century," more than the Commonwealth can muster here, "cannot by itself establish an early American tradition" that shapes the scope of a constitutional right. *Espinoza v. Mont. Dep't of Rev.*, 591 U.S. 464, 482 (2020).

It is entirely appropriate, therefore, for this Court to simply end its analysis at the Founding. *See Lara*, 125 F.4th at 441. Nothing that comes later can trump the evidence that 18-to-20-year-olds were unrestricted in their ability to possess and carry firearms at that period. Furthermore, even these later laws applied only to minors, which as discussed above, is an adequate basis on which to reject them. *See Hirschfeld*, 5 F.4th 437–38. Nevertheless, the Commonwealth argues that this Court should credit a group of laws dating from, at the earliest, 1856 and almost entirely post-dating even the ratification of the Fourteenth Amendment in 1868 that "restricted the purchase or use of certain firearms by minors." Mass. Br. 16 (quoting *Bondi*, 133 F.4th at 1222). The Court should decline that invitation. In fact, perhaps the one appropriate use of the later evidence that the Commonwealth cites is to further undermine the Commonwealth's claim that background principles of contract law at the Founding limited the ability of 18-to-20-year-olds to possess arms. Those same common law principles still existed in the latter half of the 19th century. If the Commonwealth were right, there would be little reason for these new laws to be passed at all.

The Commonwealth offers an alternative view and argues that these later laws were necessitated by two different developments—(1) an increase in the technological advancement and effectiveness of firearms and (2) increasing urbanization and a change toward a cash economy in which minors had greater ability to acquire firearms. Mass. Br. 13–15. But these explanations are not persuasive. As to the first claim, an increase in the effectiveness of firearms has been rejected by the Supreme Court as an excuse for regulating them more strictly. *See Heller*, 554 U.S. at 582

18

("Some have made the argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment."); *Bruen*, 597 U.S. at 21 ("[T]he Second Amendment protects the possession and use of weapons that are 'in common use at the time.' " (quoting *Heller*, 554 U.S. at 627)). Indeed, it is perverse to suggest that, because firearms technology improved, 18-to-20-year-olds who previously had the right to acquire arms with which to defend themselves should be disarmed at precisely the time when arms become more effective tools to be wielded against them.

As for the second claim, it is an insufficient explanation for two reasons. First, if these laws were intended to enshrine a pre-existing 21-year-old cutoff for the right to acquire firearms, we would expect them to uniformly select that age, but they do not. In addition to the laws of 19 states and the District of Columbia that were cited in *Bondi*, the Commonwealth identifies "additional age-based restrictions from the late nineteenth century in the Arizona Territory, Florida, Ohio, Oklahoma, Pennsylvania, and Virginia." Mass. Br. 16 n.4. But of those laws, *all but one* chose a different age cutoff *below* the age of 18. *See* ADD197 (Ohio, 14); ADD201 (Florida, 16); ADD207 (Pennsylvania, 16); ADD215 (Arizona, 17); ADD224 (Virginia, 16). (*Bruen* rejected the other (from Oklahoma) as an unconstitutional outlier which, "completely prohibited public carry of pistols *everywhere*." 597 U.S. at 66.) If the purpose of these laws was to make up for restrictions that existed across the board to everyone under the age of 21 but were becoming less effective, it is hard to understand why so many states targeted a lower age range with their restrictions.

Second, if these laws were reinstating or reaffirming earlier prohibitions on the purchase of firearms based on age, they would go farther. As it is, the vast majority of these laws did not prevent individuals from acquiring common rifles or shotguns but rather targeted a small subset of "deadly weapons," usually those that were capable of being carried concealed on the person. *See,*

*e.g.*, ADD202 (forbidding the sale by anyone other than "the father, guardian or employer of the minor" of "any pistol, revolver, derringer, bowie knife, dirk or other deadly weapon of like character, capable of being secreted upon the person"). Given that states often made concealed carry illegal at this period in favor of open carry, *see, Heller*, 554 U.S. at 626, these laws can be best understood as targeting what were effectively thought of as "dangerous and unusual" weapons at the time, *see Bruen*, 597 U.S. at 54 & n.21 (discussing ban on carrying small concealable pistols that preserved the right to carry larger pistols). Indeed, while most of the cases that the Commonwealth cites as having confirmed the constitutionality of these laws in the late 19th and early 20th century are fairly thin on details, *see* Mass. Br. 17, it is notable that the details in them support the *type of weapon* or the *manner of carriage* being the key feature of these statutes. *See, State v. Allen*, 94 Ind. 441, 442 (1884) (noting that the affidavit supporting prosecution stated that the defendant had traded to a minor "a certain deadly and dangerous weapon, to wit: a pistol, commonly called a revolver, which could be worn or carried concealed about the person"); *State v. Callicutt*, 69 Tenn. 714, 716–717 (1878) (holding constitutional a law forbidding the sale "of a pistol or other like dangerous weapon to a minor"); *see also Jones*, 34 F.4th at 720 ("In [*Callicutt*], on top of not saying how old the minor was, that court also addressed concealed carry of dangerous weapons, not the right to keep and bear arms more generally."). Even if the states may have been mistaken about whether all of those weapons *were* "dangerous and unusual," the fact remains that they did not ban, as Massachusetts does, the acquisition or possession by 18-to-20-year-olds of the most common firearms of the day. That both refutes the Commonwealth's historical explanation for why these laws arose so late *and* defeats any valid analogy to these laws under *Bruen*.

## CONCLUSION

The Court should deny Defendants' motions for summary judgment.

Dated: December 18, 2025                    Respectfully submitted,


                                            */s/ David H. Thompson*
Jason A. Guida (BBO# 667252)                David H. Thompson*
2nd Amendment Legal                         Peter A. Patterson*
76 Winn Street, Ste. 1A                     William V. Bergstrom*
Woburn, MA 01801                            COOPER & KIRK, PLLC
(617) 383-4652                              1523 New Hampshire Ave., N.W.
jason@lawguida.com                          Washington, D.C. 20036
                                            Telephone: (202) 220-9600
                                            Facsimile: (202) 220-9601
                                            dthompson@cooperkirk.com
                                            ppatterson@cooperkirk.com
                                            wbergstrom@cooperkirk.com

                                            *Admitted *pro hac vice*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 18th day of December, 2025, I filed the foregoing Opposition to Defendants' Motions for Summary Judgment via the Court's CM/ECF appellate system, which will electronically notify all counsel requiring notice.

Respectfully submitted,

*/s/ David H. Thompson*
David H. Thompson

*Counsel for Plaintiffs*